1  Robert A. Mittelstaedt (State Bar No. 60359)
ramittelstaedt@JonesDay.com
2  Patrick T. Michael (State Bar No. 169745)
pmichael@jonesday.com
3  Krista S. Schwartz (State Bar No. 303604)
ksschwartz@JonesDay.com
4  David C. Kiernan (State Bar No. 215335)
dkiernan@JonesDay.com
5  Joe C. Liu (State Bar No. 237356)
jcliu@JonesDay.com
6  JONES DAY
555 California Street, 26th Floor
7  San Francisco, CA  94104
Telephone:    +1.415.626.3939
8  Facsimile:    +1.415.875.5700

9  Attorneys for Plaintiff
SYNOPSYS, INC.

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13               SAN FRANCISCO DIVISION

14

15  **SYNOPSYS, INC.,**                    |  **Case No. 3:13-cv-02965-MMC (DMR)**

16              **Plaintiff,**             |  **PLAINTIFF SYNOPSYS' MOTION
                                              TO DISMISS DEFENDANT**
17        **v.**                           |  **ATOPTECH'S SECOND AMENDED
                                              COUNTERCLAIMS AND STRIKING**
18  **ATOPTECH, INC.,**                    |  **AFFIRMATIVE DEFENSES NOS. 7,
                                              11 AND 15.**
19              **Defendant.**

                                           |  **Date:        July 24, 2015**
20                                         |  **Time:        09:00 AM**
                                              **Judge:       Hon. Maxine M. Chesney**
21                                         |  **Courtroom:   7, 19th Floor**

22        ///

23        ///

24        ///

25        ///

26        ///

27        ///

28        ///

1

## NOTICE OF MOTION AND MOTION

2      PLEASE TAKE NOTICE that on July 24, 2015 at 9:00 a.m. before the Honorable Maxine

3  Chesney, United States District Court, San Francisco, California, Plaintiff Synopsys, Inc.

4  ("Synopsys") will, and hereby does, move the Court pursuant to Federal Rules of Civil Procedure

5  12(b)(6) for an Order dismissing Defendant ATopTech, Inc.'s ("ATopTech") Second Amended

6  Answer and Counterclaims ("SAC") and Striking Affirmative Defenses Nos. 7, 11 and 15.

7      Synopsys respectfully requests that Counts I-VIII be dismissed with prejudice for failure

8  to state a claim upon which relief can be granted.

9      Synopsys' motion is based on this Notice of Motion and Motion, the accompanying

10  Memorandum of Points and Authorities, the complete files and records in this action, oral

11  argument of counsel, and such other and further matters as this Court may consider.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................ 1

II.     FACTUAL BACKGROUND ...................................................................... 1

III.    ATOPTECH'S COUNTERCLAIMS SHOULD BE DISMISSED.................... 3

        A.   ATOPTECH'S COPYRIGHT MISUSE FAILS (COUNT I &
             AFFIRMATIVE DEFENSE 7)................................................................. 4

             1.   EULA Restrictions Are Proper ..................................................... 5

             2.   Milkyway Restrictions ................................................................... 7

        B.   ATOPTECH'S CLAYTON ACT CLAIM FAILS (COUNT II) ........................ 8

             1.   ATopTech Fails To Allege Antitrust Injury................................... 9

        C.   ATOPTECH'S AGREEMENT IN RESTRAINT OF TRADE CLAIM
             FAILS (COUNT III) ......................................................................... 11

             1.   EULA Restrictions Do Not Violate Section 1 .......................... 11

             2.   ATopTech Has Not Alleged Injury To Competition ................ 13

        D.   ATOPTECH'S TYING CLAIM FAILS (COUNT IV) ...................................... 14

             1.   Synopsys' Offers Both Products Separately ............................ 15

             2.   ATopTech Does Not Allege Harm to Competition .................. 16

        E.   ATOPTECH'S MONOPOLIZATION AND ATTEMPTED
             MONOPOLIZATION CLAIMS FAIL (COUNTS V-VI)................................... 17

             1.   Monopolization of Place-and-route Market Fails (Count VI).................. 18

                  (a)   ATopTech Fails to Allege Exclusionary Conduct ...................... 20

                  (b)   ATopTech Fails to Allege Harm to Competition in the
                        Relevant Market ........................................................................ 19

             2.   Monopolization of the Static Timing Verification Market Fails
                  (Count V) .................................................................................... 20

                  (a)   ATopTech Fails to Allege Exclusionary Conduct ...................... 20

                  (b)   ATopTech Fails to Allege Harm to Competition in the
                        Relevant Market ........................................................................ 21

        F.   ATOPTECH'S CARTWRIGHT CLAIMS ARE DERIVATIVE OF ITS
             SHERMAN ACT CLAIMS AND FAIL FOR THE SAME REASONS
             (CLAIM VII)..................................................................................... 21

G.    ATOPTECH'S UNFAIR COMPETITION LAW CLAIMS FAIL (CLAIM VIII) ................................................................................... 21

IV.    THE COURT SHOULD STRIKE ATOPTECH'S INSUFFICIENTLY PLED AFFIRMATIVE DEFENSE NOS. 7, 11 AND 15.................................................. 22

V.    CONCLUSION ............................................................................................................ 23

# <u>TABLE OF AUTHORITIES</u>

Page

**CASES**

*Abcor Corp. v. AM Int'l*,
916 F.2d 924 (4th Cir. 1990)................................................17

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
948 F.2d 536 (9th Cir. 1991)................................................17

*Alberta Gas Chem., Ltd. v. E.I. Du Pont de Nemours & Co.*,
826 F.2d 1235 (3d Cir. 1987)........................................8, 9, 10, 11

*Alcatel USA, Inc. v. DGI Tech., Inc.*,
166 F.3d 772 (5th Cir. 1999)................................................6, 7

*Allen v. AVT Event Techs., Inc.*,
2013 U.S. Dist. LEXIS 87070 (N.D. Cal. June 20, 2013) ................22, 23

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof. Publs., Inc.*,
108 F.3d 1147 (9th Cir. 1997)................................................19

*Ansari v. Elec. Document Processing, Inc.*,
2012 U.S. Dist. LEXIS 128622 (N.D. Cal. Sept. 10, 2012)................22, 23

*Apple Inc. v. Psystar Corp.*,
658 F.3d 1150 (9th Cir. 2011)........................................ passim

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................3, 4

*Atlantic-Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)................................................8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................3, 4, 18, 19

*Betaseed, Inc. v. U & I Inc.*,
681 F.2d 1203 (9th Cir. 1982)................................................15

*Bhan v. NME Hospitals, Inc.*,
772 F.2d 1467 (9th Cir. 1985)................................................20

*Brantley v. NBC Universal*,
675 F.3d 1192 (9th Cir. 2012)........................................8, 13, 16

*Brooke Grp., Ltd. v. Brown,*
    509 U.S. 209 (1993) ..................................................................................16

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ..........................................................................8, 9, 10

*C.R. Bard, Inc. v. M3 Sys., Inc.,*
    157 F.3d 1340 (Fed. Cir. 1998) .................................................................19

*Cal. Computer Prods. v. IBM,*
    613 F.2d 727 (9th Cir. 1979) .....................................................................12

*Cascade Health Solutions v. Peacehealth,*
    515 F.3d 883 (9th Cir. 2008) .....................................................................16

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,*
    20 Cal. 4th 163 (1999) ..............................................................................22

*Colonial Med Grp., Inc. v. Catholic Healthcare W.,*
    2010 U.S. Dist. LEXIS 51350 (N.D. Cal. May 25, 2010) ...........................3

*County of Tuolumne v. Sonora Cmty. Hosp.,*
    236 F.3d 1148 (9th Cir. 2001) ...................................................................16

*Digital Sun v. Toro Co.,*
    2011 U.S. Dist. LEXIS 30222 (N.D. Cal. Mar. 22, 2011) .........................21

*eBay, Inc. v. MercExchange, LLC,*
    547 U.S. 388 (2006) ..................................................................................11

*Energex Enters., Inc. v. Anthony Doors, Inc.,*
    250 F. Supp. 2d. 1278 (D. Colo. 2003) .....................................................11

*Foremost Pro Color, Inc. v. Eastman Kodak Co.,*
    703 F.2d 534 (9th Cir. 1983)..........................................................12, 15, 18

*Gyore v. Krausz Precision Mfg. Corp.,*
    1992 U.S. App. LEXIS 2241 (9th Cir. Feb. 11, 1992)................................19

*Handgards, Inc. v. Ethicon, Inc.,*
    601 F.2d (9th Cir. 1979) ............................................................................18

*Ill. Tool Works Inc. v. Indep. Ink*
    547 U.S. 28, 46 (2006) .........................................................................14, 15

*Image Tech. Servs. v. Eastman Kodak Co.,*
    125 F.3d 1195 (9th Cir. 1997) ...................................................................17

*In re Adderall XR Antitrust Litigation,*
    754 F.3d 128 (2d Cir. 2014)......................................................................13

*In re Tobacco II Cases,*
    46 Cal. 4th 298 (2009) ............................................................................22

*Infineon Techs. AG v. Volterrra Semiconductor Corp.,*
    2013 WL 1832558 (N.D. Cal. May 1, 2013) ..........................................22

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.,*
    2007 WL 4976364 (C.D. Cal. Oct. 29, 2007) ......................................2, 3

*John Lenore & Co. v. Olympia Brewing Co.,*
    550 F.2d 495 (9th Cir. 1977)......................................................................9

*K&M Glass Co., Inc. v. Int'l Bhd. of Painters & Allies Trades Union & Indus.*
    *Nat'l Pension Fund,*
    1986 WL 5925 (N.D. Cal. Feb. 13, 1986)................................................23

*Kearns v. Ford Motor Co.,*
    567 F.3d 1120 (9th Cir. 2009)............................................................19, 22

*Kendall v. Visa U.S.A., Inc.,*
    518 F.3d 1042 (9th Cir. 2008)....................................................................3

*Lambtek Yogurt Machs. v. Dreyer's Ice Cream, Inc.,*
    1997 WL 108718 (N.D. Cal. Mar. 3, 1997) ..............................................9

*Lasercomb Am., Inc. v. Reynolds*
    911 F.2d 970, 978 (4th Cir. 1990)....................................................4, 14, 16

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Assoc.,*
    884 F.2d 504 (9th Cir. 1989)..............................................................13, 14

*Marder v. Lopez,*
    450 F.3d 445 (9th Cir. 2006)......................................................................5

*Marin Co. Bd. of Realtors, Inc. v. Palsson,*
    16 Cal. 3d 920 (1976) ..............................................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)....................................................................................9

*McGlinchy v. Shell Chem. Co.,*
    845 F.2d 802 (9th Cir. 1988)..............................................................20, 21

*N. Pac. Ry. Co. v. United States,*
    356 U.S. 1 (1958)......................................................................................14

*Nat'l Soc. of Prof'l Eng'rs. v. United States,*
    435 U.S. 679 (1978) (*National Society*)..................................................11

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013)......................................................................12

*Nw. Whole Stationers, Inc. v. Stationery & Printing Co.*,
472 U.S. 284 (1985).......................................................................................11

*Oracle Am., Inc. v. Terix Computer Co.*,
2014 U.S. Dist. LEXIS 158060 (N.D. Cal. Nov. 7, 2014)..........................4

*Paladin Assocs., Inc. v. Mont. Power Co.*,
328 F.3d 1145 (9th Cir. 2003)...........................................................14, 15, 16

*Practice Mgt. Info Corp. v. Am. Med. Ass'n*,
121 F.3d 516 (9th Cir. 1997), *opinion amended by* 133 F.3d 1140 (9th Cir.
1998) ..............................................................................................................4

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993).......................................................................................18

*Schor v. Abbott Labs.*,
457 F.3d 608 (7th Cir. 2006)....................................................................12, 15

*Sec. People, Inc. v. Classic Woodworking, LLC*,
2005 U.S. Dist. LEXIS 44641 (N.D. Cal. Mar. 4, 2005).........................22

*See nSight v. PeopleSoft*,
296 Fed. App'x 555, 557-58 (9th Cir. 2008................................................21

*Simon v. Value Behavioral Health, Inc.*,
208 F.3d 1073 (9th Cir. 2000)......................................................................2

*Spectrum Sports v. McQuillan*,
506 U.S. 447 (1993).......................................................................................17

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011)......................................................................3

*State of Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*,
935 F.2d 1469 (7th Cir. 1991).....................................................................12

*Stearns Airport Equip. Co., Inc. v. FMC Corp.*,
170 F.3d 518 (5th Cir. 1999).......................................................................16

*Syncsort Inc. v. Sequential Software, Inc.*
50 F. Supp. 2d 318, 337 (D.N.J. 1999) .......................................................7

*Triad Sys. Corp. v. Se. Express Co.* .............................................................7
1994 WL 446049, *14 (N.D. Cal. Mar. 18, 1994)

*United States v. Westinghouse Elec. Corp.*,
        648 F.2d 642 (9th Cir. 1981)...................................................................................13

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
        540 U.S. 398 (2004).................................................................................12, 13, 17, 18

*W. Parcel Express v. UPS of Am.*,
        190 F.3d 974 (9th Cir. 1999)..................................................................................16

**STATUTES**

15 U.S.C. § 15(a) ................................................................................................................8

15 U.S.C. § 18 .....................................................................................................................8

Cal. Bus. & Prof. Code § 16720, *et seq* ........................................................................21

Cal. Bus. & Prof. Code § 17200 .......................................................................................21

California's Cartwright Act................................................................................... passim

California's Unfair Competition Law ...............................................................................21

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) ....................................................................................................19, 22

Fed. R. Civ. P. 12(b)(6)..................................................................................................3, 21

Fed. R. Civ. P. 12(f) ..........................................................................................................22

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Although ATopTech has had three opportunities, a prior round of briefing and the benefit of the Court's statements at the hearing which gave a roadmap for each claim, ATopTech still has not (because it cannot) plead a claim that survives dismissal.

ATopTech's copyright misuse claim attacks a licensing provision that prohibits customers from using or allowing others to use PrimeTime or its outputs to develop or enhance competing products. That is not misuse. As the Ninth Circuit has explained, "[a] software licensing agreement may reasonably restrict use of the software as long as it does not prevent the development of competing products." *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1159 (9th Cir. 2011). Synopsys' restriction does not prevent the use of competing products or prohibit others from independently developing competing products.

The antitrust claims fare no better. The Section 7 claim again fails to allege antitrust injury. Rather than alleging injury stemming from alleged effects on competition resulting from Synopsys' gained market share, ATopTech alleges that it was injured by Synopsys' decision to discontinue products and decision not to provide information to ATopTech.

ATopTech has added a Section 1 Sherman Act claim, alleging that the licensing restriction unreasonably restrains trade in the place-and-route market. The heart of the claim is that Synopsys should aid competitors in developing competing products. The antitrust laws impose no such duty. Moreover, no facts are alleged showing any foreclosure in the place-and-route market caused by the restriction. ATopTech raises the same Section 1 tying claim it previously alleged, arguing that Synopsys forces customers to purchase its products together by engaging in "punitive pricing." Because Synopsys offers its products separately, no tie exists and the claim fails at the start. Moreover, no showing has been made that a substantial volume of commerce has been foreclosed in the tied market. The monopolization and state law claims are predicated on the insufficient unlawful merger and Section 1 claims identified above, and fail for the same reasons. Finally, several of ATopTech's affirmative defenses lack sufficient factual support and should be stricken as insufficiently pled.

- 1 -

Motion to Dismiss Second Am. Compl.
Case No. 3:13-cv-02965-MMC (DMR)

Given that ATopTech has failed to state a claim after three tries, any further amendment would be futile.  The counterclaims and affirmative defenses, therefore, should be dismissed with prejudice.  *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1084 (9th Cir. 2000) ("The district court's discretion [in granting or denying leave to amend] 'is particularly broad' when the plaintiff previously has been granted leave to amend."); *Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, 2007 WL 4976364 at *15-16 (C.D. Cal. Oct. 29, 2007) (dismissing second amended complaint because it alleged "essentially the same claim pled in the original complaint").

## II.    **FACTUAL BACKGROUND**

Software for designing computer chips includes "place-and-route software" for designing the physical layout of the circuits on the chip and "static timing verification software" for confirming timing performance of the circuits.   Second Amended Answer and Counterclaims ("SAC") ¶ 66, ¶¶ 73-74, ECF No. 306. [1]  Synopsys offers a static timing verification software known as PrimeTime and holds approximately 88% of what ATopTech calls the "static verification timing market."  *Id.* ¶ 74, ¶ 73. [2]  Synopsys' End User License Agreement for PrimeTime ("EULA"), prohibits customers from using PrimeTime "or its output to develop or enhance any product that competes with a Synopsys product."  *Id.* ¶ 100.  Synopsys separately offers place-and-route software known as IC Compiler and has approximately 65% of what ATopTech calls the "place-and-route software market."  IC Compiler "competes directly" with ATopTech's place-and-route software called Aprisa, which has a 1% market share, and place-and-route software offered by at least two other companies, Cadence (30% market share) and Mentor Graphics (4% market share).  *Id.* ¶ 71, ¶ 66.  Some customers purchase both IC Compiler and Aprisa to design their chips.  *Id.* ¶ 72, n.10.

According to ATopTech, place-and-route software "must be interoperable with static timing verification software," and the level of interoperability "is a critical competitive dynamic."  *Id.* ¶ 80.  ATopTech does not allege that there is no interoperability or compatibility between

---

[1] The following allegations are taken from the SAC and assumed true for purposes of this motion only.

[2] Synopsys disputes the product and geographic market definitions and market shares alleged in the SAC including at ¶¶ 66-82.  However, Synopsys will accept the allegations as true <u>only</u> for purposes of deciding the motion to dismiss.

1    PrimeTime and Aprisa or place-and-route software offered by other producers.  In fact,

2    ATopTech claims that "Aprisa software achieves 'excellent' and/or 'tight' correlation with sign-

3    off timing software, including PrimeTime sign-off timing software, which it has achieved in a

4    lawful and proper manner through its own efforts."  *Id.* ¶ 18.  And "[m]any ATopTech customers

5    are purchasers of PrimeTime," including Broadcom.  *Id.* ¶¶ 147, 72, n.10.

6         In 2011, Synopsys acquired Extreme DA, which sold static timing verification software

7    known as GoldTime.  *Id.* ¶ 83-84.  Before the acquisition, ATopTech had licensed GoldTime (*Id.*

8    ¶ 112), "worked closely with Extreme DA to assure the interoperability of Aprisa and GoldTime"

9    (*id.*), optimized Aprisa to "work well" with GoldTime (*Id.* ¶ 85), and had a collaboration

10   agreement with Extreme DA to improve interoperability (*Id.* ¶¶ 85, 112).  Sometime after the

11   acquisition, Synopsys decided to discontinue GoldTime from its product line.  *Id.* ¶ 84.  In 2012,

12   Synopsys acquired Magma Design Automation, which sold a static timing verification tool

13   known as Tekton.  *Id.*, ¶¶ 83-84.  The SAC does not allege that Aprisa interoperated with Tekton

14   or that ATopTech had optimized Aprisa or otherwise collaborated with Magma.  At some point,

15   Synopsys decided to discontinue Tekton from its product line.

16   **III.    ATOPTECH'S COUNTERCLAIMS SHOULD BE DISMISSED**

17        To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead sufficient

18   evidentiary facts (as opposed to ultimate facts) that "'state a claim to relief that is plausible on its

19   face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

20   544, 570 (2007)).[3]  "'[A] plaintiff's obligation to provide the grounds of his entitlement to relief

21   requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

22   action will not do.'"  *Colonial Med Grp., Inc. v. Catholic Healthcare W.*, 2010 U.S. Dist. LEXIS

23   51350, at *7 (N.D. Cal. May 25, 2010) (quoting *Twombly*, 550 U.S. at 555).  The complaint must

24   "answer the basic questions: who, did what, to whom (or with whom), where, and when?"

25   *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).  The factual allegations must

26

27        [3] The Court in *Twombly* noted that costs of modern federal antitrust litigation counsel
     against sending the parties into discovery when there is no reasonable likelihood that the antitrust
     plaintiffs can construct a claim.  *See Twombly*, 550 U.S. at 558; *see also Starr v. Baca*, 652 F.3d
28   1202, 1216 (9th Cir. 2011) (same).

Motion to Dismiss Second Am. Compl.
Case No. 3:13-cv-02965-MMC (DMR)

make a claim for relief plausible, not merely conceivable.  *Twombly*, 550 U.S. at 570; *Iqbal,* 556 U.S. at 679.

### A.   ATOPTECH'S COPYRIGHT MISUSE FAILS (COUNT I & AFFIRMATIVE DEFENSE 7).

Copyright misuse is a narrow doctrine, used "sparingly" and *only* where a copyright license (i) prohibits the licensee from using any competing products or (ii) prevents the independent development of competing products.  *See Psystar Corp.*, 658 F.3d at 1157-58.[4]  The purpose of the doctrine is to prevent copyright holders "from leveraging their limited monopoly 'granted by the copyright to allow them control of areas outside the monopoly."  *Id.* at 1157.  In *Psystar*, for example, Apple required that its operating system be used exclusively on Apple's hardware—*i.e.*, a consumer was prohibited from using the operating system on any competing hardware for any purpose.  Defendant argued that Apple had misused its copyright by attempting to extend the copyright protection to non-copyrighted works.  The Court disagreed.  Recognizing that "[c]ourts have long held that copyright holders may [license their copyrights] on the acceptance of specific conditions," the Court held that the restriction was not misuse because it did not prevent the licensee from using competing products and did "not prohibit[] others from independently developing and using their own operating systems."  *Id.* at 1160; *cf. Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th Cir. 1990) (finding misuse where the license agreement prevented the licensee from independently developing any competing products).

Here, ATopTech's misuse counterclaim and affirmative defense fail because the licensing restrictions it challenges do not prevent the independent development of competing products or prohibit the use of competing products.  *See Oracle Am., Inc. v. Terix Computer Co.*, 2014 U.S. Dist. LEXIS 158060, at *26 (N.D. Cal. Nov. 7, 2014) ("Because Defendants do not allege any … restriction on use of a competitive product as a condition of licensing Oracle's copyrighted software, Defendants do not plead a plausible copyright misuse defense").

---

[4]  The misuse doctrine does not invalidate the copyright, but rather precludes the enforcement until the misuse has ended.  *Practice Mgt. Info Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997), *opinion amended by* 133 F.3d 1140 (9th Cir. 1998).

1          **1.      EULA Restrictions Are Proper.**

2          ATopTech contends that Synopsys has misused its copyright by imposing restrictions on

3   the use of PrimeTime and its outputs in Paragraph 2.9(f) of the EULA.  That paragraph provides

4   that licensees "may not (and may not allow anyone else to) . . . use [PrimeTime] or its output to

5   develop or enhance any product that competes with a Synopsys product."  SAC ¶ 100; *see also*

6   *id.*, ¶ 90.  ATopTech claims without any factual support that access to PrimeTime's outputs are

7   "necessary for the development of competitive place-and-route software" and that, by prohibiting

8   customers from using (or allowing others to use) the outputs, Synopsys has leveraged its

9   copyright to "prevent competition with Synopsys' own place-and-route software."  *Id.* ¶¶ 90-91;

10  *see also id.* ¶ 100.  These allegations are unavailing.

11         ATopTech does not dispute that Synopsys can prohibit customers from using PrimeTime

12  to develop competing products.  Nor could it.  As the Ninth Circuit explained, "[a] software

13  licensing agreement may reasonably restrict use of the software as long as it does not prevent the

14  development of competing products."  *Psystar*, 658 F.3d at 1159.  Instead, it contends that

15  Synopsys cannot restrict the use of PrimeTime's "outputs."  The argument defies logic.  The only

16  way to generate the outputs is to use PrimeTime.  Thus, if it is permissible to prohibit the use of

17  PrimeTime to develop a competing product (ATopTech does not allege otherwise), it is also

18  permissible to prohibit the use of the outputs that can be generated ***only*** by use of PrimeTime.

19  Use of the outputs necessarily involves use of PrimeTime.

20         The restriction on the use of outputs is not misuse for the simple reason that Paragraph

21  2.9(f) does not prohibit customers or others "from independently developing" their own place-

22  and-route software or using non-Synopsys' products.  *Psystar*, 658 F.3d at 1159.  And contrary to

23  ATopTech's allegation, Synopsys' customers are ***not*** "prevented from working with vendors to

24  create competing place-and-route software."  SAC ¶ 102.  Paragraph 2.9(f) prohibits customers

25  from "***us[ing] [PrimeTime] or its output*** to develop or enhance any product that competes with a

26  Synopsys product."  (emphasis added).  They remain free to work with any "vendor," including

27  ATopTech, to develop or enhance software so long as they do so without using PrimeTime or its

28

Motion to Dismiss Second Am. Compl.
Case No. 3:13-cv-02965-MMC (DMR)

1   outputs.[5]

2        ATopTech alleges that outputs are somehow "necessary" to develop "competitive place-

3   and-route software," and without such outputs, competitors cannot develop competing software.

4   (SAC ¶ 91).  Those allegations are flatly contradicted by the facts.  The SAC admits that a

5   number of firms, including ATopTech and Cadence (which has 30% of the market), have

6   developed competing place-and-route software.  SAC ¶ 66.  ATopTech does not allege that there

7   is no interoperability or compatibility between PrimeTime and Aprisa or place-and-route software

8   offered by other producers.[6]  Nor can it.  ATopTech claims that "Aprisa software achieves

9   'excellent' and/or 'tight' correlation with sign-off timing software, including PrimeTime sign-off

10  timing software, which it has achieved in a lawful and proper manner through its own efforts."

11  *Id.* ¶ 18.  And "[m]any ATopTech customers are purchasers of PrimeTime," including Broadcom

12  which is a "major buyer of ATopTech's Aprisa" and a buyer of both IC Compiler and

13  PrimeTime, reflecting that Broadcom uses Aprisa and PrimeTime together.  *Id.* ¶¶ 147, 72, n.10.

14  In addition, Cadence is alleged to have 30% of the place-and-route market, but only 8% of the

15  verification market.  This strongly suggests that some number of customers use Cadence place-

16  and-route software with PrimeTime.  In short, there is nothing in the EULA that prevents others

17  from independently developing competing products without the use of Synopsys' information,

18  and the facts alleged in the SAC demonstrate that is exactly what has occurred.

19        The Fifth Circuit's decision in *Alcatel USA, Inc. v. DGI Tech., Inc.*, 166 F.3d 772 (5th Cir.

20  1999) does not help ATopTech.  In *Alcatel*, plaintiff DSC licensed software on the condition that

21  it be used only on DSC switches and DSC components (*e.g.*, expansion cards).  *Id.* at 777-79.

22  The only way to develop expansion cards that were compatible with DSC switches was to run the

23  copyrighted software on the expansion cards, which is what defendant did.  *Id.* at 793-94.  The

24  Fifth Circuit found that restricting the use of the software to DSC hardware amounted to misuse

---

25        [5] On a motion to dismiss, the court need not accept as true allegations contradicted by the
26  actual documents referred to in the complaint.  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir.
    2006).

27        [6] Instead, ATopTech claims that it could develop a product that works better with
28  PrimeTime, if Synopsys would share certain information about PrimeTime.  *Id.* ¶¶ 80-81, 85, 90-
    91, 100-102.

because, "without the freedom to test its cards in conjunction with DSC's software, [defendant] was effectively prevented from developing its product, thereby securing for DSC a limited monopoly over is uncopyrighted cards." *Id.* at 794.  As the Ninth Circuit explained, *Alcatel* involved a case where "the agreement effectively prohibited the licensee form using any competing expansion cards."  *Psystar*, 658 F.3d at 1160.  Unlike the agreement in *Alcatel*, the Synopsys' EULA does not prohibit customers from using any competing place-and-route products or prevent customers from developing competing software.

In *Triad Sys. Corp. v. Se. Express Co.*, the Court found no misuse involving a similar license agreement, which conditioned the license on the customers' agreement not to allow third parties to use the software, including the defendant service provider that competed with Triad to service Triad hardware.  1994 WL 446049, *14 (N.D. Cal. Mar. 18, 1994).  Defendant claimed the restriction amounted to misuse because "Triad ha[d] used its intellectual property monopoly over Triad software to leverage its position in the Triad computer maintenance market."  *Id.*  The district court rejected the argument and the Ninth Circuit affirmed, holding that "Triad did not attempt to prohibit [its customer] or any other ISO from developing its own service software to compete with Triad."  *Id.* at 1337.

And in *Syncsort Inc. v. Sequential Software, Inc.*, the court dismissed a misuse claim in a case involving a similar licensing agreement.  50 F. Supp. 2d 318, 337 (D.N.J. 1999).  The agreement provided that the "LICENSEE agrees not to use, or allow any third party to use, the PRODUCTS(s) [sic] or any ***PRODUCT related information to aid in the development and/or marketing of a product competitive with the PRODUCT(s)***."  *Id.* (emphasis added).  The court rejected the misuse claim because the licensing agreement did not prevent the independent development of a competing product.  *Id.*  That holding equally applies here.

### 2.   Milkyway Restrictions

ATopTech also refers to a restriction in the Milkyway Development Kit End-User License Agreement ("MAP-in Agreement"), which provides ATopTech access to Synopsys' Milkyway software and prohibits disclosure of certain benchmarking data generated by Milkyway software.  *See* SAC ¶ 90.  ATopTech, does not, however, rely on the restrictions to support its copyright

1    misuse affirmative defense or counterclaim or explain how it relates to an alleged misuse of the

2    PrimeTime copyright.  *See Id.* ¶¶ 46, 100.  Any claim based on the restriction, therefore, should

3    be dismissed.

4        **B.    ATOPTECH'S CLAYTON ACT CLAIM FAILS (COUNT II).**

5        Although the SAC adds some bulk to the Section 7 claim, the additional allegations do not

6    cure the fatal defects of the claim.  Section 7 of the Clayton Act makes unlawful any acquisition

7    that may "substantially . . . lessen competition, or tend to create a monopoly."  15 U.S.C. § 18.

8    To establish standing to recover damages under Section 4 (15 U.S.C. § 15(a)), ATopTech must

9    allege with sufficient factual support that it suffered "antitrust injury"; *i.e.*, "injury of the type the

10   antitrust laws were intended to prevent and that flows from that which makes the defendants' acts

11   unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

12       ATopTech must allege not only injury to itself, but also that such injury flows from injury

13   to competition.  *Id.* at 488; *Brantley v. NBC Universal*, 675 F.3d 1192, 1198 (9th Cir. 2012)

14   (holding that plaintiff "must plead an injury to competition beyond the impact on the plaintiffs

15   themselves.").  The antitrust laws are intended to protect competition at large, not individual

16   competitors.  *Atlantic-Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990).  Thus, the

17   antitrust injury requirement ensures that a plaintiff can recover only "if the loss stems from a

18   competition-reducing aspect or effect of the defendant's behavior."  *Id.* at 344.[7]  It is often the

19   case that a consumer will have standing where a competitor does not.  *See, e.g., Alberta Gas*

20   *Chem., Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1239 (3d Cir. 1987) (noting that a

21   competitor's "interests are not necessarily congruent with the consumer's stake in competition").

22   In short, ATopTech must allege that its injuries flow from the anticompetitive effects caused by

23   Synopsys' increased market power gained as a result of the acquisitions.  It has failed to do so.

24

25

26       [7] Requiring a showing that the injury flows from that which makes the merger unlawful is
     necessary because "[e]very merger of two existing entities into one . . . has the potential for
27   producing economic readjustments that adversely affect some persons.  But Congress has not
     condemned mergers on that account; it has condemned them only when they may produce
28   anticompetitive effects."  *Brunswick Corp.*, 429 U.S. at 487.

1

### 1. ATopTech Fails To Allege Antitrust Injury.

As before, ATopTech alleges that some time after the acquisition of Extreme DA, [8] Synopsys discontinued GoldTime and decided not to offer the same level of cooperation and technical support offered by Extreme DA.  As a result, ATopTech claims, it lost sales because Aprisa was less attractive to customers when GoldTime was removed from the market (SAC ¶¶ 86, 112), was deprived the same level of technological cooperation that Extreme DA offered (*id.* ¶ 110), now "face[s] much greater challenges guaranteeing interoperability of Aprisa with PrimeTime" (*id.* ¶ 113), and has lost "its ability to secure new customers" (*id.*).

These alleged injuries do not flow from that which would make the acquisitions unlawful—*i.e.* from the anticompetitive effects due to Synopsys' alleged increased market power.  Instead, they flow from Synopsys's post-acquisition decision to discontinue GoldTime and not to give away its intellectual property to ATopTech or otherwise assist ATopTech to develop its own software.  ATopTech "would have suffered the identical 'loss' but no compensable injury" had Extreme DA or Magma been purchased by a company with a lower market share (like Cadence) that later decided to discontinue products or not to do business with ATopTech at all.  *Brunswick*, 429 U.S. at 487.[9]  Put another way, ATopTech is no worse off because Synopsys acquired Extreme DA as opposed to a smaller competitor.[10]

---

[8] Although ATopTech seeks damages resulting from the acquisitions of Extreme DA and Magma, it only identifies harms flowing from the Extreme DA acquisition.  *See* SAC ¶¶ 84-88; 111-113.  It alleges no facts regarding Magma.  For this reason alone, its Section 7 claim fails to the extent it is based on the Magma acquisition.

[9] *See also Lambtek Yogurt Machs. v. Dreyer's Ice Cream, Inc.*, 1997 WL 108718, at *4 (N.D. Cal. Mar. 3, 1997) (contractor whose asserted claim related to acquisition that resulted in loss of business lacked standing); *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 500 (9th Cir. 1977) ("Even though Lenore's injury may have occurred by reason of the unlawful acquisitions, it did not occur by reason of that which made the acquisitions unlawful. . . . All Lenore really alleges is that because Olympia purchased the Hamm's brand, Lenore was replaced in favor of other distributors. This is insufficient to make a case under § 7 which is concerned with competition, not competitors.") (internal citations omitted).

[10] ATopTech also alleges that customers were harmed by the post-acquisition conduct because they have fewer choices and face "an appreciable danger of higher prices."  (*id.* ¶ 111, ¶ 115).  ATopTech is not a customer of Synopsys' verification products and thus has no standing to recover for such injuries.  Nor would ATopTech suffer injuries from such harms.  As a competitor, ATopTech stood to gain from any increase in prices.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986).  Finally, these alleged harms flow from Synopsys' decision to discontinue GoldTime and not from its increase in market share.

1   In *Lucas*, for example, plaintiff Lucas Automotive alleged it had been injured by a

2   competitor's gain in market share because it had been excluded from participating in the

3   distribution of vintage tires following the competitor's allegedly unlawful acquisition.  *Id.* at 1233.

4   The Ninth Circuit denied standing, reasoning that Lucas Automotive would have suffered the

5   same injury had a small business acquired the right to manufacture and distribute the vintage tires.

6   *Id.*  Because Lucas Automotive's injury bore "no relationship to the size of either the acquiring

7   company or its competitors," it had not suffered an injury of "the type the statute was intended to

8   forestall."  *See id.*  Similarly, here, had any competitor, large or small, acquired Extreme DA and

9   discontinued the GoldTime product, ATopTech would have suffered the same injury.

10  ATopTech, without any supporting facts, speculates that it would not have suffered the

11  same injury had a smaller player purchased Magma or Extreme DA because "no potential

12  acquiring company—other than Synopsys—had the economic incentive to discontinue Magma

13  and Extreme DA's products."  SAC ¶ 118.  Neither *Brunswick, Lucas* nor any other case

14  Synopsys is aware of examined whether a smaller firm would likely engage in the same post-

15  acquisition conduct.  Instead, courts focus on whether a smaller firm *could* engage in the same

16  post-acquisition conduct.

17  Indeed, in *Alberta Gas*, the Third Circuit discounted any speculation about financial

18  incentives of a smaller acquirer.  *See* 826 F.2d at 1241-42.  Alberta, a methanol producer,

19  challenged the merger between DuPont, the largest producer of methanol in the United States,

20  and Conoco, a coal producer.  826 F.2d at 1236-37.  Prior to the merger, Conoco had planned to

21  build a new plant to convert coal into methanol.  In the interim, Conoco would buy methanol

22  from Alberta for resale.  After the acquisition, however, DuPont cancelled the plans to build a

23  plant for methanol conversion.  Alberta claimed it was injured by lost sales to Conoco and

24  indirectly injured by the loss of another supplier in the market which would have increased

25  demand.  *Id.* at 1237.  The court found no antitrust injury because "Alberta's alleged losses were

26  neither connected with, nor resulted from, DuPont's market power in the methanol-producing

27  industry" and "the same harm would have occurred had any acquirer decided to curtail Conoco's

28  production and marketing plans."  The Court also rejected the argument that the financial

1   incentives of a smaller hypothetical buyer are relevant:  "a non-methanol producing company,

2   whose merger would not pose antitrust problems, might have been dissuaded from entering the

3   market because of the costs of coal gasification or the depressed prices of oil and natural gas . . .;

4   [however,] that DuPont might have had an additional reason—a desire not to increase its total

5   production of methane—does not change the nature of the effect of DuPont's decision on Alberta."

6   *Id.* at 1241-42.

7        Here, as in *Lucas* and *Alberta Gas*, ATopTech's alleged losses were not suffered as a

8   result of Synopsys' gain in market power from its acquisitions.  Rather, they were caused by

9   Synopsys' decision to discontinue product lines and allegedly refusing to assist ATopTech in

10  developing its products.  Such actions do not constitute antitrust injury.

11        **C.    ATOPTECH'S AGREEMENT IN RESTRAINT OF TRADE CLAIM FAILS
             (COUNT III).**

12        In addition to challenging Paragraph 2.9(f) under the misuse doctrine, ATopTech also

13  challenges it under Section 1 of the Sherman Act.[11]  The Supreme Court has instructed that only

14  those agreements that are "adjudged an *unreasonable* restraint" on trade in the relevant market

15  violate Section 1 of the Sherman Act.  *Nw. Whole Stationers, Inc. v. Stationery & Printing Co.*,

16  472 U.S. 284, 289 (1985).  "Covenants in restraint of trade which are ancillary to a legitimate

17  transaction," such as the licensing of intellectual property, are analyzed by the rule of reason.

18  *Nat'l Soc. of Prof'l Eng'rs. v. United States*, 435 U.S. 679, 689 (1978) (*National Society*); *see

19  also Energex Enters., Inc. v. Anthony Doors, Inc.*, 250 F. Supp. 2d. 1278, 1283-84 (D. Colo.

20  2003) (non-compete clause in trade secret disclosure not a *per se* violation of Section 1).  Under

21  the rule of reason, the Court weighs the anticompetitive effects of the challenged provision

22  against its procompetitive effects. *National Society*, 435 U.S. at 691.  ATopTech's claim fails.

23        **1.    EULA Restrictions Do Not Violate Section 1.**

24        As demonstrated above, Synopsys has the right to exclude others from using its

25  copyrighted software and to impose conditions on how and when it can be used.  *See supra*

---

[11] ATopTech also references in passing the MAP-in Agreement in support of its restraint
of trade claim.  *See* SAC ¶ 122.  The Section 1 claim, however, is not predicated on the MAP-in
Agreement.  There are no allegations in the counterclaims explaining how or even whether the
restrictions in the MAP-in Agreement restrains trade in the place-and-route market.

Motion to Dismiss Second Am. Compl.
Case No. 3:13-cv-02965-MMC (DMR)

§ III(A); *see eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 392 (2006) (copyright holder has right to exclude others); *Psystar*, 658 F.3d at 1160 (copyright holder may conditionally license its works). Instead, it contends that Synopsys cannot restrict the use of PrimeTime's outputs and that Synopsys should be required to allow customers to use those outputs to develop competing products. The argument is misplaced. As discussed, it is improper to separate the outputs of PrimeTime from PrimeTime itself. A customer cannot use the outputs without first generating them by use of PrimeTime. In other words, using outputs to develop a competing product necessarily involves using PrimeTime, which is outside of what is permissible under the license. In addition, the restriction on the use of outputs does not prevent others from independently developing place-and-route software. Customers and others remain free to independently develop their own place-and-route software. Thus, there is no restraint on the development of place-and-route software.

The crux of ATopTech's claim is that Synopsys should provide (directly or indirectly) competitors with outputs generated by PrimeTime to develop competing products and to ensure the interoperability between PrimeTime and non-Synopsys products. The antitrust laws impose no such duty. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). As the Supreme Court explained, even a monopolist has "no duty to aid competitors" or to "share the source of [its] advantage" with competitors because doing so "may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities" and "may facilitate the supreme evil of antitrust: collusion." *Id.* at 407-08; *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983) ("The antitrust laws did not impose a duty on Kodak to assist … manufacturers of competing cameras, film, paper or chemicals to survive or expand"); *State of Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1484 (7th Cir. 1991) ("[M]onopolists needn't acquiesce to every demand placed upon them by competitors or customers; a monopolist's duties are negative—to refrain from anticompetitive conduct—rather than affirmative—to promote competition.").[12] And courts have

---

[12] *See also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) ("Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival."); *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) ("Cooperation is a *problem* in antitrust, not one of its obligations."); *Cal. Computer Prods. v. IBM*, 613 F.2d 727,

1  held that the antitrust laws do not require even an alleged dominant company to compete against

2  itself by licensing its intellectual property to others. *See United States v. Westinghouse Elec.*

3  *Corp.*, 648 F.2d 642, 647 (9th Cir. 1981).[13]  As the Supreme Court explained in *Trinko*,

4  contrary rule would facilitate collusion among competitors, stifle investment in new products and

5  innovation, and would be unadministrable, requiring courts to act as "central planners" for the

6  economy, setting the price and terms of compelled sharing." *Trinko*, 540 U.S. at 407-08.

7      In short, Synopsys is not required to provide (whether directly or indirectly through its

8  customers) information to rivals to help them develop interoperable products.  In fact, imposing

9  such a duty would harm competition and consumers by reducing a competitor's incentive to

10  independently develop its own software, thereby stunting the growth of the industry as a whole.

11              **2.    ATopTech Has Not Alleged Injury To Competition**

12      ATopTech's Section 1 claim also fails because ATopTech has not alleged the requisite

13  harm to competition in the relevant market—*i.e.*, sufficient foreclosure of customers in the place-

14  and-route market.  *See Brantley*, 675 F.3d at 1200 (Section 1 plaintiff must allege "an actual

15  adverse effect on competition" in the restrained market); *Les Shockley Racing, Inc. v. Nat'l Hot*

16  *Rod Assoc.*, 884 F.2d 504, 508 (9th Cir. 1989) ("Ordinarily, the factual support needed to show

17  injury to competition must include proof of the relevant . . . markets and demonstration of the

18  restraint's anticompetitive effects in that market.").

19      ATopTech's theory is that the EULA restriction has foreclosed competition in the place-

20  and-route market.  According to ATopTech, but for the restriction, it would have been able to use

21  the outputs to enhance the interoperability between Aprisa and PrimeTime.  SAC ¶¶ 80-81, 85,

22

23  (continued…)

24  744 (9th Cir. 1979) ("IBM, assuming it was a monopolist . . . was under no duty to help CalComp
    or other peripheral equipment manufacturers survive or expand").

25      [13] Courts have recognized a "limited exception" to an alleged monopolist's freedom to

26  refuse to deal with competitors where a party unilaterally terminates a voluntary (and profitable)
    course of dealing and forsakes short-term profits.  *See In re Adderall XR Antitrust Litigation*, 754

27  F.3d 128, 135-136 (2d Cir. 2014) (affirming dismissal for failing to meet *Aspen Skiing* narrow
    exception to the long recognized "right" of a firm's freedom to determine with who it will deal).

28  Here, the counterclaim contains no allegations of a voluntary and profitable course of dealing
    existed between Synopsys and ATopTech or that Synopsys sacrificed short-term profits.

1    90-91, 100-102.  But because Synopsys will not give access to those outputs, Aprisa does not

2    work as well with PrimeTime as IC Compiler does.  As a result, customers purchase IC Compiler

3    instead of Aprisa.  This is alleged injury to ATopTech, not injury to competition.

4         No facts are alleged establishing any foreclosure in the place-and-route market resulting

5    from the EULA restriction.  ATopTech makes no attempt to identify what percentage of

6    Synopsys' customers would chose Aprisa over IC Compiler.  It has failed to allege that even one

7    customer was foreclosed because of lack of interoperability.  And any speculation of foreclosure

8    is refuted by ATopTech's own allegations.  Competing place-and-route software does in fact

9    interoperate with PrimeTime.  Indeed, ATopTech admits that "many ATopTech customers,"

10   including Broadcom use both Aprisa and PrimeTime, indicating that ATopTech is not foreclosed

11   from the place-and-route market as a result of Synopsys' license restrictions.  *See Id.* ¶ 72 n.10 &

12   ¶ 147.  The SAC also admits that Synopsys has 65% and Cadence and Mentor have 34% of the

13   place-and-route market.  *See id.* ¶ 66.  That Synopsys has 88% and Cadence has 8% of the

14   verification market suggests Cadence is capturing place-and-route customers that use PrimeTime.

15   These admissions directly undercut ATopTech's theory that competitors are foreclosed.

16        Without facts supporting a theory of how competition in the relevant market has been

17   foreclosed, ATopTech cannot support a claim.  *See Les Shockley*, 884 F.2d 509.

18        **D.    ATOPTECH'S TYING CLAIM FAILS (COUNT IV).**

19        A tying arrangement is defined as "an agreement by a party to sell one product [the tying

20   product] but only on the condition that the buyer also purchases a different (or tied) product, or at

21   least agrees that he will not purchase that product from any other supplier."  *See N. Pac. Ry. Co. v.*

22   *United States*, 356 U.S. 1 n.4 (1958) ("*Northern Pacific*").  To prevail on a its tying claim,

23   ATopTech must establish: "(1) that there exist two distinct products or services in different

24   markets whose sales are tied together; (2) that the seller possesses appreciable economic power in

25   the tying product market sufficient to coerce acceptance of the tied product" and negative impact

26   in the tied market.  *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir.

27   2003); *Ill. Tool Works Inc. v. Indep. Ink*, Inc., 547 U.S. 28, 46 (2006).

28

- 14 -

1

### 1.    **Synopsys' Offers Both Products Separately.**

2        Where products are available separately, there is no unlawful tying. *Northern Pacific*, 356

3 U.S. at 1 n.4; *Lasercomb,* 911 F.2d at 972 n.6.  In the previous round of briefing, Synopsys

4 demonstrated that there is no tie because PrimeTime and IC Compiler are sold separately.  The

5 SAC does not allege otherwise.  It is undisputed that Synopsys does not condition the sale of

6 PrimeTime on the purchase of IC Compiler and that the products are offered separately.  In fact,

7 the SAC alleges that many Aprisa users also purchase PrimeTime.  SAC ¶ 147.  This alone

8 defeats the tying claim. *Foremost Pro Color, Inc.*, 703 F.2d at 540 ("[T]he seller must condition

9 the sale of the tying product on the buyer's purchase of the tied product."); *Schor v. Abbott Lab.*,

10 457 F.3d at 610 ("Abbott sells ritonavir as part of Kaletra, but this is not a tie-in because ritonavir

11 is available separately . . . .").  ATopTech nevertheless argues in conclusory terms that Synopsys

12 forces (some) customers to purchase PrimeTime and IC Compiler together.

13        Coercion to buy the tied product that the customer "did not want at all, or might have

14 preferred to purchase elsewhere on different terms" is an "essential characteristic" of a tying

15 claim. *Jefferson Parish*, 466 U.S. at 12 ; *Ill. Tool*, 547 U.S. 34-35; *Paladin Assocs.*, 328 F.3d at

16 1159; *Foremost Pro* 703 F.2d at 540.  The coercion test distinguishes transactions where

17 customers voluntarily choose to purchase two products together from those where the seller

18 forces the customer to do so.

19        As it did in its First Amended Counterclaim, ATopTech alleges that Synopsys coerces

20 customers by charging (or threatening to charge) "punitive prices" when the customer purchases

21 the products separately, which makes it "economically unviable" for consumers to do so.   SAC

22 ¶¶ 95-97, 128-129; *but see* ¶ 147 (admitting that ATopTech customers use PrimeTime).

23 ATopTech clarifies in Paragraph 95, that it challenges Synopsys' alleged decision to offer a

24 discount to customers who purchase the products together and to "eliminat[e] substantial

25 discounts" when purchased separately.  This is the very claim and allegations that the Court

26 previously rejected.

27        First, other than pointing to a single customer, ATopTech fails to allege that "an

28 appreciable number of buyers" were forced into buying the products together. *Betaseed, Inc. v. U*

- 15 -

1    *& I Inc.*, 681 F.2d 1203, 1215 (9th Cir. 1982) (defining coercion as "a showing of an onerous

2    effect on an appreciable number of buyers coupled with a demonstration of sufficient economic

3    power in the tying market"); *Jefferson Parish*, 466 U.S. at 5 (coercing a single purchaser

4    insufficient).  This alone dooms its claim.

5         Second, discounting products when offered as a package is lawful under the antitrust laws.

6    Indeed, courts have recognized that offering packaged discounts is a ubiquitous practice that

7    provides significant benefits to consumers in the form of lower prices.  *See e.g., Cascade Health*

8    *Solutions v. Peacehealth*, 515 F.3d 883, 894-95 (9th Cir. 2008); *W. Parcel Express v. UPS of Am.*,

9    190 F.3d 974, 976 (9th Cir. 1999); *see also Lasercomb,* 911 F.2d at 972 n.6 (discounting the price

10   of a product in a package deal "simply is not a tie-in").  Only in very specific circumstances,

11   which ATopTech has not and cannot allege, can discounts give rise to an antitrust claim.

12   *Cascade*, 515 F.3d at 903, 906-07.[14]  In short, ATopTech is challenging Synopsys' decision to

13   offer customers lower prices for its products.  Protecting profit margins of competitors is not the

14   purpose of the antitrust laws.

15                    **2.       ATopTech Does Not Allege Harm to Competition.**

16        Both per se and rule of reason tying claims must allege that the tie negatively impacted the

17   tied market.  *Paladin*, 328 F.3d at 1159; *Brantley*, 675 F.3d at 1200 (9th; *Sidibe*, 4 F. Supp. 3d at

18   1177; *see also County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1157 (9th Cir. 2001).

19   The key issues is foreclosure—the effect of the alleged tying agreement on the ability of

20   competitors to obtain access to consumers.  *Jefferson Parish*, 466 U.S. at 16 ("[W]e have refused

21   to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby.").

22        ATopTech claims the alleged tying scheme had an unlawful effect on "a substantial

23   volume of interstate commerce regarding place-and-route software."  *See* SAC ¶ 131.  There are

24   no facts alleging what percentage of the place-and-route market has been foreclosed by Synopsys'

_____

25        [14] For example, a plaintiff challenging discounting must at a minimum allege that "the
     prices at issue were below an appropriate measure of its rival's costs."  *Stearns Airport Equip.*
26   *Co., Inc. v. FMC Corp.*, 170 F.3d 518, 532 (5th Cir. 1999).  But nowhere does ATopTech allege
     facts that Synopsys charges prices below its costs.  *See also Brooke Grp., Ltd. v. Brown*, 509 U.S.
27   209, 224 (1993) (holding that predatory pricing requires pricing below marginal or average
     variable cost and a dangerous probability of recouping investment after driving rivals from the
28   market).

alleged tying.  At most, ATopTech alleges that a single customer was "forced" to purchase

Synopsys' products as a package due to "punitive prices."  *Id.* ¶ 97.  But as the Supreme Court

has made clear, "[i]f only a single purchaser were 'forced' with respect to the purchase of a tied

item, ***the resultant impact on competition would not be sufficient to warrant the concern of***

***antitrust law***."  *Jefferson Parish*, 466 U.S. at (emphasis added).

### E.   ATOPTECH'S MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION CLAIMS FAIL (COUNTS V-VI).[15]

Other than changing a word or two, ATopTech made no effort to amend its

monopolization claims.  The claims should again be dismissed, but this time with prejudice.

To state a valid claim, ATopTech must allege "'(1) the possession of monopoly power in

the relevant market and (2) the willful acquisition or maintenance of that power as distinguished

from growth or development as a consequence of a superior product, business acumen, or historic

accident.'"  *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541 (9th Cir. 1991).  A

claim for attempted monopolization requires "(1) that the defendant has engaged in predatory or

anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability

of achieving monopoly power."  *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993).

"To safeguard the incentive to innovate, the possession of monopoly power will not be

found unlawful unless it is accompanied by an element of anticompetitive *conduct*."  *Trinko*, 540

U.S. at 407.  In fact, the "mere possession of monopoly power, and the concomitant charging of

monopoly prices, is not only not unlawful; it is an important element of the free market system."

*Id.*  The Supreme Court has cautioned that, although the nature of the acts that can support a

Section 2 claim are "difficult" to describe, "[t]he cost of false positives counsel against an undue

expansion of § 2 liability."  *Id.* at 414.  "A desire to increase market share or even drive a

competitor out of business through vigorous competition on the merits is not sufficient."  *Abcor*

*Corp. v. AM Int'l*, 916 F.2d 924, 927 (4th Cir. 1990).  "When a legitimate business justification

supports a monopolist's exclusionary conduct, that conduct does not violate § 2 of the Sherman

Act."  *See Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997).

---

[15] Count VI is mislabeled as Count XI in the SAC.

- 17 -

Motion to Dismiss Second Am. Compl.
Case No. 3:13-cv-02965-MMC (DMR)

1.    **Monopolization of Place-and-route Market Fails (Count VI).**

(a)    **ATopTech Fails to Allege Exclusionary Conduct.**

ATopTech alleges that Synopsys monopolized the place-and-route market by allegedly "(a) imposing a tying arrangement" and "(e) engaging in copyright misuse." SAC ¶ 152.[16]  For the reasons stated above, Synopsys neither engaged in tying or copyright misuse.  Accordingly, the Section 2 claims predicated on such conduct fail.

ATopTech also contends that Synopsys monopolized the market by refusing to allow competitors "access to essential sign-off information . . . necessary to assure interoperability of competitors' place-and-route software" and "periodically alter[ed] the verification tests within PrimeTime . . . without disclosing this information to competitors."  First, there is no factual support for any of these claims.  ATopTech provides no details about what it means by "essential sign-off information"; what "verification tests within PrimeTime" were altered, when they were altered, and how they allegedly impacted competitors in the place-and-route market.  Without that crucial information, Synopsys cannot analyze or understand the claim, including whether such claims are barred by the statute of limitations.  *See* 550 U.S. at 570.

Putting those fatal deficiencies aside, the claim fails to state a viable monopolization claim.  The essence of the claim is that Synopsys has refused to provide information ("essential sign-off information" and information regarding software updates) to its competitors to assist them in creating interoperable products.  As discussed above, firms have no duty to assist competitors to ensure that their products work better or interoperate.  *See Trinko*, 540 U.S. at 411; *Foremost Pro*, 703 F.2d at 545.

ATopTech next argues that Synopsys has monopolized the market by filing objectively baseless litigation.  The inclusion in the SAC appears to be a mistake.  ATopTech removed all the underlying factual allegations that it previously alleged in support of its baseless litigation claim.  Without a showing that Synopsys engaged in sham litigation, any claim based on Synopsys' efforts to enforce its copyrights is barred by the *Noerr-Pennington* doctrine.  *See Prof'l Real*

---

[16] With respect to Count VI, ATopTech alleges that Synopsys holds an 87.5% market share with respect to the place-and-route market, but this figure contains no support in the SAC, which alleges Synopsys' market share is 65%.  *Compare* SAC ¶ 151 *with* ¶ 66.

1  *Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 56 (1993) ("[T]hose who

2  petition government for redress are generally immune from antitrust liability."); *Handgards, Inc.*

3  *v. Ethicon, Inc.*, 601 F.2d, 996 (9th Cir. 1979) (to pierce *Noerr-Pennington* immunity, a claimant

4  must show "clear and convincing evidence of bad faith"); *C.R. Bard, Inc. v. M3 Sys., Inc.,* 157

5  F.3d 1340, 1368-69 (Fed. Cir. 1998) ("Neither the bringing of an unsuccessful suit … nor the

6  effort to enforce a patent that falls to invalidity, subjects the suitor to antitrust liability.").

7       Finally, ATopTech asserts that Synopsys made "false and misleading statements" about

8  ATopTech to monopolize the market.  The SAC, however, fails to identify when these statements

9  were allegedly made, to whom, whether they induced any reliance, or how the statements differed

10  from the general puffery involved during sales.  *See* SAC ¶ 93-94.  Without such necessary facts,

11  the allegations do not pass muster under *Twombly*.  550 U.S. at 570.  Further, to the extent the

12  "false and misleading statements" accuse Synopsys of engaging in fraudulent conduct, they must

13  be pled with particularity pursuant to Rule 9(b).  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120,

14  1126 (9th Cir. 2009).  ATopTech's allegations are based on "information and belief" and contain

15  none of the particulars regarding the allegedly fraudulent statements, and thus do not meet Rule

16  9(b).  *Id.* (dismissing complaint for failure to allege "the particular circumstances surrounding"

17  alleged misrepresentations, including the contents of specific statements, reliance on such

18  statements and the identity of the person making the statement); *see also Gyore v. Krausz*

19  *Precision Mfg. Corp.*, 1992 U.S. App. LEXIS 2241, at *2 (9th Cir. Feb. 11, 1992) (dismissing

20  antitrust claim premised on fraud for failure to meet Rule 9(b)'s heightened pleading standard).

21       Also, the false statements are not exclusionary.  Courts have recognized that consumers

22  rarely place much credence in a seller's disparaging comments about a rival, and thus such

23  statements are insufficient to support a monopolization claim.  *Am. Prof'l Testing Serv., Inc. v.*

24  *Harcourt Brace Jovanovich Legal & Prof. Publs., Inc.,* 108 F.3d 1147, 1152 (9th Cir. 1997)

25  (affirming district court's overturning of jury's finding that false statements were exclusionary

26  conduct in violation of Sherman Act).  This is because customers remain free to ignore the

27  statements and purchase any products they desire.

28

- 19 -

Motion to Dismiss Second Am. Compl.
Case No. 3:13-cv-02965-MMC (DMR)

**(b)      ATopTech Fails to Allege Harm to Competition in the Relevant Market.**

Section 2 claims, like Section 1 claims, must also allege harm to competition in the relevant market. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812 (9th Cir. 1988) (claim for attempted monopolization failed to state a claim because no injury in the relevant market alleged). As identified with respect to both of ATopTech's Section 1 allegations, there are no facts plausibly alleging a harm to competition (*i.e.* foreclosure) in the place-and-route market. *See supra* § III(C) & (D). Thus, the claim fails.

**2.      Monopolization of the Static Timing Verification Market Fails (Count V).**

**(a)      ATopTech Fails to Allege Exclusionary Conduct.**

As with the place-and-route monopolization claim, ATopTech claims that Synopsys engaged in a number of exclusionary acts to monopolize the verification market. Its chief complaint is that Synopsys monopolized the market by acquiring "competitors in violation of Section 7 of the Clayton Act." SAC ¶ 140. As discussed above, ATopTech cannot state a Clayton Act claim, and thus its monopolization claim fails for the same reasons. *See supra* § III(B). In addition, ATopTech relies on the same alleged exclusionary conduct asserted in support of its monopolization of the place-and-route market. Each of these claims fail for the same reasons as demonstrated above with respect to Count VI.

ATopTech's monopolization of the static timing verification market fails for the independent reason that ATopTech does not participate in the static timing verification market. Thus, although ATopTech alleges that "customers and competitors" in the market have been harmed as a result of Synopsys' alleged conduct, ATopTech ignores the fact that it is neither a customer nor a competitor in the market. Instead, ATopTech only alleges that many of *its* "customers are purchasers" of static timing verification software. SAC ¶ 147. Because ATopTech is not itself a participant in the market for static timing verification software, it has suffered no actionable antitrust injury. *See Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985) (plaintiff must be "a participant in the same market as the alleged malefactors.").

(b)     **ATopTech Fails to Allege Harm to Competition in the Relevant Market.**

Just as ATopTech could not muster a theory to allege harm to competition in the place-and-route market, it has failed to allege harm to competition in the static timing verification market. ATopTech produces no coherent theory regarding how the alleged exclusionary acts had any impact in the verification market. Indeed, with the exception of Synopsys' acquisitions (which fail for the reasons identified above, *see* § III(B)), none of the activities are alleged to have impacted the verification market. *See* SAC ¶ 140(b)-(g). Indeed, ATopTech claims that each of the remaining exclusionary acts allegedly foreclosed competition in the place-and-route market, ***not*** the verification market. Because these acts are not alleged to have impacted competition in the appropriate market, they are insufficient to support ATopTech's claims. *See McGlinchy*, 845 F.2d at 812 (claim for attempted monopolization failed to state a claim because no injury in the relevant market alleged).

**F.     ATOPTECH'S CARTWRIGHT CLAIMS ARE DERIVATIVE OF ITS SHERMAN ACT CLAIMS AND FAIL FOR THE SAME REASONS (CLAIM VII).[17]**

ATopTech also asserts its tying claim (Count III) under California's Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.* The Cartwright Act is patterned after the Sherman Act. *See Marin Co. Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925 (1976). Thus, for the same reasons outlined above with respect to the tying claim, the Cartwright Claim should also be dismissed. *See nSight v. PeopleSoft*, 296 Fed. App'x 555, 557-58 (9th Cir. 2008) (affirming dismissal of Cartwright claim because plaintiff's Sherman Act claim was deficient under Rule 12(b)(6)).

**G.     ATOPTECH'S UNFAIR COMPETITION LAW CLAIMS FAIL (CLAIM VIII).**

California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. ATopTech's "unlawful" claim is derivative of the Sherman Act claims. For the reasons stated above, those claims fail and thus the "unlawful" § 17200 claim must be dismissed. *See Digital Sun v. Toro Co.*, 2011 U.S.

---

[17] Mislabeled as Count XII in the SAC.

Dist. LEXIS 30222, at *14 (N.D. Cal. Mar. 22, 2011).  For UCL "unfairness" claims brought by competitors instead of consumers, California courts require the competitor to allege "an incipient violation of an antitrust law," or a violation of the "policy or spirit of one of those laws."  *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).  As established above, ATopTech has not alleged harm to *competition*, thus it has not alleged a violation of any antitrust laws or their policy or spirit.  Finally, ATopTech's "fraudulent" claim fails because it has failed to meet Rule 9(b)'s heightened pleading standards.  *See Kearns*, 567 F.3d at 1125.  Such pleading requires particularized allegations of fraud, including "actual reliance on the allegedly deceptive or misleading statements. . . ."  *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009).

## IV.   THE COURT SHOULD STRIKE ATOPTECH'S INSUFFICIENTLY PLED AFFIRMATIVE DEFENSE NOS. 7, 11 AND 15.

A court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  A defense may be insufficient "as a matter of pleading or as a matter of substance." *Sec. People, Inc. v. Classic Woodworking, LLC*, 2005 U.S. Dist. LEXIS 44641, at *5 (N.D. Cal. Mar. 4, 2005).  The sufficiency of an Answer's pleading of affirmative defenses are subject to the *Iqbal* and *Twombly* standard; thus affirmative defenses must allege well-pled facts that state plausible affirmative defenses.  *See, e.g., Allen v. AVT Event Techs., Inc.*, 2013 U.S. Dist. LEXIS 87070, at *4-5 (N.D. Cal. June 20, 2013) (striking all of defendant's affirmative defenses because each failed to plead facts and violated the *Twombly/Iqbal* pleading standard); *Ansari v. Elec. Document Processing, Inc.*, 2012 U.S. Dist. LEXIS 128622, at *13 (N.D. Cal. Sept. 10, 2012) ("[A]ll twenty-four affirmative defenses raised by Defendants are insufficiently pled, and Plaintiff's motion to strike is GRANTED as to all twenty-four affirmative defenses.").

The Seventh Affirmative Defense merely restates ATopTech's copyright misuse counterclaim.  This defense fails for each of the reasons identified above.  *See supra* § III(A).

The Eleventh Affirmative Defense contains factual allegations regarding a series of representations Synopsys allegedly made to its *customers*, and contends that as a result of these representations to *customers*, Synopsys' is estopped from pursuing its claims against *ATopTech*.

SAC ¶ 50.  ATopTech does not allege how it relied on any of Synopsys' representations to support an estoppel defense.  *Infineon Techs. AG v. Volterrra Semiconductor Corp.*, 2013 WL 1832558, *4 (N.D. Cal. May 1, 2013) (elements of affirmative defense of equitable estoppels include (1) misleading communication; (2) reliance on the communication; (3) material harm caused by reliance if party allowed to assert a claim); *see also K&M Glass Co., Inc. v. Int'l Bhd. of Painters & Allies Trades Union & Indus. Nat'l Pension Fund*, 1986 WL 5925, *3 (N.D. Cal. Feb. 13, 1986) (no equitable estoppels because no detrimental reliance.).

The Fifteenth Affirmative Defense contains *no facts*, just a series of legal labels and conclusions.  Accordingly, it fails to meet the *Iqbal/Twombly* standard.  *See Allen*, 2013 U.S. Dist. LEXIS 87070, at *4-5 (striking affirmative defenses for failure to plead facts); *Ansari*, 2012 U.S. Dist. LEXIS 128622, at *13 (same).

Accordingly, Seventh, Eleventh and Fifteenth Affirmative Defenses should be stricken.

## V.   CONCLUSION

For these reasons, ATopTech's counterclaims should be dismissed and Affirmative Defenses 7, 11 and 15 Stricken.


Dated: June 18, 2015                          Respectfully submitted,

                                              JONES DAY


                                              By:/s/ *David C. Kiernan*
                                                   David C. Kiernan

                                              Counsel for Plaintiff
                                              SYNOPSYS, INC.