Paul Alexander (No. 49997)
ARNOLD & PORTER LLP
1801 Page Mill Road, Suite 110
Palo Alto, CA 94304-1216
Telephone:  (650) 798-2920
Fax:  (650) 798-2999
E-Mail:  Paul.Alexander@aporter.com

Martin R. Glick (No 40187)
Daniel Asimow (No. 165661)
Willow Noonan (No. 277584)
Daniel Pastor (No. 297948)
ARNOLD & PORTER LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4024
Telephone:  (415) 471-3100
Fax:  (415) 471-3400
E-Mail:  Marty.Glick@aporter.com
E-Mail:  Daniel.Asimow@aporter.com
E-Mail:  Willow.Noonan@aporter.com
E-Mail:  Daniel.Pastor@aporter.com

Denise McKenzie (No. 193313)
Ryan M. Nishimoto (No. 235208)
ARNOLD & PORTER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone:  (213) 243-4000
Fax:  (213) 243-4199
E-Mail:  Denise.McKenzie@aporter.com
E-Mail:  Ryan.Nishimoto@aporter.com

Attorneys for Defendant
ATOPTECH, INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SYNOPSYS, INC.,<br><br>                    Plaintiff,<br><br>        v.<br><br>ATOPTECH, INC.,<br><br>                    Defendant. | Case No. 3:13-cv-02965 MMC (DMR)<br><br>**DEFENDANT ATOPTECH, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SYNOPSYS'S MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS AND TO STRIKE AFFIRMATIVE DEFENSES NOS. 7, 11, AND 15.**<br><br>Date:        August 7, 2015<br>Time:        9:00 a.m.<br>Judge:      Hon. Maxine M. Chesney<br>Place:       Courtroom 7, 19th Floor |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................... 1

I.     ATOPTECH HAS PROPERLY STATED ITS ANTITRUST
       COUNTERCLAIMS. ..................................................................... 3

       A.     ATopTech Has Properly Alleged Copyright Misuse. ............ 3

       B.     ATopTech Has Sufficiently Alleged That Synopsys Violated
              Section 7 Of The Clayton Act By Acquiring Competitors In The
              Static Timing Verification Market. ....................................... 7

              1.     ATopTech Does Not Complain Only Of Injury To Itself. ...... 7

              2.     ATopTech's Injury Flows From The Competition-
                     Reducing Aspects Of Synopsys' Conduct. .................. 8

              3.     ATopTech Would Not Have Suffered The Same Injury If A
                     Small Firm Had Acquired Magma And Extreme DA. ...... 10

       C.     Synopsys Violated Section 1 Of The Sherman Act By Forcing Its
              Customers To Sign An Anticompetitive Licensing Agreement For
              PrimeTime. .......................................................................... 12

              1.     The PrimeTime License Restrictions Violate Section 1
                     Under The Rule Of Reason. ...................................... 12

              2.     Synopsys' Intellectual Property Rights Do Not Immunize
                     Its Anticompetitive Conduct. ................................... 14

              3.     ATopTech Has Alleged Injury To Competition. ............ 15

       D.     ATopTech Has Properly Alleged That Synopsys Monopolized And
              Attempted To Monopolize Both The Static Timing Verification
              Market (Count V) And The Place-And-Route Market (Count VI). ... 16

              1.     Synopsys' Monopolization Of The Static Timing
                     Verification Market. ................................................ 16

              2.     Synopsys' Monopolization Of The Place-And-Route
                     Market. ................................................................... 18

              3.     ATopTech Has Properly Alleged Attempted
                     Monopolization. ...................................................... 19

       E.     ATopTech Has Properly Alleged A Tying Claim (Count IV). ...... 20

1.      ATopTech Has Alleged The Use Of Economic Coercion
        To Force Customers To Accept The Tied Product.          20

2.      ATopTech Has Alleged A Sufficient Effect In The Tied
        Product Market.                                          22

F.      ATopTech Has Properly Alleged A Cartwright Act Claim.    22

G.      ATopTech Has Properly Alleged Unfair Competition Law Claims.   23

II.     THE COURT SHOULD DENY SYNOPSYS' MOTION TO STRIKE
        AFFIRMATIVE DEFENSES 7, 11, and 15.                      23

CONCLUSION                                                       25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
    948 F.2d 536 (9th Cir. 1991) ............................................................................. 16

*Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*,
    826 F.2d 1235 (3d Cir. 1987) ............................................................................. 11

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
    166 F.3d 772 (5th Cir. 1999) ............................................................................... 4

*Am. Ad Mgmt., Inc. v. GTE*,
    190 F.3d 1051 (9th Cir. 1999) ........................................................................... 17

*Apple Inc. v. Psystar Corp.*,
    658 F.3d 1150 (9th Cir. 2011) ........................................................................ 3, 5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................ 4

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.*,
    881 F. Supp. 860 (W.D.N.Y. 1994), *decision supplemented by*, No. CIV. A. 94-6454L,
    No. CIV. A. 94-6479L 1995 WL 215307 (W.D.N.Y. Mar. 6, 1995) ..................................... 10

*Brantley v. NBC Universal*,
    675 F.3d 1192 (9th Cir. 2012) ........................................................................... 12

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) .......................................................................................... 21

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
    429 U.S. 477 (1977) ....................................................................................... 9, 10

*Cal. Computer Prods., Inc. v. IBM*,
    613 F.2d 727 (9th Cir. 1979) ............................................................................. 15

*Cascade Health Solutions v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2007) ............................................................................. 20

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ...................................................................................... 23

*DataGate, Inc. v. Hewlett Packard Co.*,
    60 F.3d 1421 (9th Cir. 1995) ............................................................................. 22

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
    703 F.2d 534 (9th Cir. 1983) ............................................................................. 15

*Fraser v. Major League Soccer*,
    284 F.3d 47 (1st Cir. 2002) ............................................................................... 16

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
    352 F.3d 367 (9th Cir. 2003) ............................................................................. 15

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997)..................................................................................... 18, 19

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)....................................................................................................... 21, 22

*John Lenore & Co. v. Olympia Brewing Co.*,
550 F.2d 495 (9th Cir. 1977).................................................................................... 11, 12

*Lambtek Yogurt Machs. v. Dreyer's Grand Ice Cream, Inc.*,
No. CIV. 96-20959 SW, 1997 WL 108718 (N.D. Cal. Mar. 3, 2007)................................... 11

*Lasercomb Am., Inc. v. Reynolds*,
911 F.2d 970 (4th Cir. 1990)........................................................................................... 23

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) (en banc)............................................................................. 8

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
884 F.2d 504 (9th Cir. 1989) ......................................................................................... 15

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
140 F.3d 1228 (9th Cir. 1998)................................................................................... 10, 11

*M&M Med. Supplies & Serv. Inc. v. Pleasant Valley Hosp.*,
981 F.2d 160 (4th Cir. 1992) (en banc).......................................................................... 19

*Marin Co. Bd. of Realtors, Inc. v. Palsson*,
16 Cal. 3d 920 (1976) .................................................................................................. 22

*Marts v. Xerox, Inc.*,
77 F.3d 1109 (8th Cir. 1996).......................................................................................... 21

*Nat'l Soc. Of Prof'l Eng'rs. v. United States*,
435 U.S. 679 (1978)...................................................................................................... 13

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013)...................................................................................... 15

*Oracle Am., Inc. v. Terix Computer Co.*,
No. 5:13-cv-03385-PSG, 2014 WL 5847532 (N.D. Cal. Nov. 7, 2014)................................. 6

*Paladin Assocs., Inc. v. Mont. Power Co.*,
328 F.3d 1145 (9th Cir. 2003)........................................................................................ 20

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*,
121 F.3d 516 (9th Cir. 1997), *amended,* 133 F.3d 1140 (9th Cir. 1998).................... 23, 24, 25

*Saxon v. Blann*,
968 F.2d 676 (8th Cir. 1992).......................................................................................... 25

*Schor v. Abbott Labs.*,
457 F.3d 608 (7th Cir. 2006).......................................................................................... 15

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992).......................................................................................... 6

*Sony Computer Entm't Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ................................................................................. 5

*Spectrum Sports, Inc. v. McQuillan*
    506 U.S. 447 (1993) ............................................................................................... 19

*Sprint Nextel Corp. v. AT&T Inc.*,
    821 F. Supp. 2d 308 (D.D.C. 2011) ................................................................... 9, 10

*Standard Oil Co. v. United States*,
    221 U.S. 1 (1911) ................................................................................................... 16

*State of Ill. Ex rel. Burris v. Panhandle E. Pipe Line Co.*,
    935 F.2d 1469 (7th Cir. 1991) .............................................................................. 15

*Stearns Airport Equip. Co., Inc. v. FMC Corp.*,
    170 F.3d 518 (5th Cir. 1999) ................................................................................ 21

*Syncsort Inc. v. Sequential Software, Inc.*,
    50 F. Supp. 2d 318 (D. N.J. 1999) ......................................................................... 6

*Tasty Baking Co. v. Ralston Purina, Inc.*,
    653 F. Supp. 1250 (E.D. Pa. 1987) ...................................................................... 10

*Tic-X-Press, Inc. v. Omni Promotions Co.*,
    815 F.2d 1407 (11th Cir. 1987) ............................................................................ 22

*Triad Sys. Corp. v. Se. Express Co.*,
    64 F.3d 1330 (9th Cir. 1995) .................................................................................. 5

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ................................................................................. 13

*United States v. Griffith*,
    334 U.S. 100 (1948) ............................................................................................... 17

*United States v. Grinnell, Corp.*
    384 U.S. 563 (1966) ............................................................................................... 16

*United States v. Loew's, Inc.*,
    371 U.S. 38 (1962) ................................................................................................. 22

*United States v. Microsoft*
    253 F.3d 34, 64 (D.C. Cir. 2001) ................................................................... *passim*

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ......................................................................................... 14, 16

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
    857 F.2d 55 (2d Cir. 1988) ................................................................................... 19

*W. Parcel Express v. United Parcel Serv. of Am., Inc.*,
    190 F.3d 974 (9th Cir. 1999) ................................................................................ 21

**STATUTES**

15 U.S.C.
§1 ............................................................................................................... 12
§ 15 ............................................................................................................. 7
§ 18 ............................................................................................................. 7

17 U.S.C.§177(c) ................................................................................................ 5

Cal. Bus. & Prof. Code § 16720(e)(3) ............................................................ 23

**OTHER AUTHORITIES**

*ABA Section of Antitrust Law, Antitrust Law Developments,* § 245 n. 111 (7th ed. 2012) ........... 17

3 Melville B. Nimmer, *Nimmer on Copyright*, § 13.09[B] (1991) ............................................. 25

DEF. ATOPTECH'S OPP. TO SYNOPSYS'S MOTION
                      TO DISMISS SECOND AMENDED COUNTERCLAIMS
                      AND TO STRIKE AFF. DEFENSES 7, 11, AND 15.

**INTRODUCTION**

Plaintiff Synopsys' Motion to Dismiss Defendant ATopTech's Second Amended Counterclaims And Striking Affirmative Defenses Nos. 7, 11 And 15 ("MTD") (Dkt. 309) ATopTech's Second Amended Answer To Amended Complaint And Second Amended Counterclaims ("SAC") (Dkt. 306) is premised on the proposition that the wrongful use of a company's intellectual property cannot give rise to antitrust liability.  That, as the DC Circuit has noted, is no more true than the proposition that the wrongful use of personal property like a baseball bat cannot give rise to tort liability.  For instance, an anticompetitive merger that violates Section 7 of the Clayton Act (because it results in a substantial reduction in competition) is not rendered lawful because the merging firms intend to use otherwise valid intellectual property post-merger to exclude competition.  Likewise, a valid copyright on one product does not give a firm the right to misuse that copyright to suppress competition in an adjacent market.  ATopTech has carefully and in sufficient detail alleged conduct by Synopsys that constitutes copyright misuse and multiple antitrust violations, even if Synopsys has valid intellectual property rights (an issue which is itself disputed).

Notably, Synopsys has abandoned its main argument from the prior round of briefing and no longer contends that ATopTech has failed to plead the existence of relevant antitrust markets for static timing verification software and place-and-route software.  As the SAC explains, these are two closely related markets involved in the design of integrated circuits.  Engineers must use "place-and-route software" to design the physical layout of a circuit and must also use "static timing verification software" to test the circuit's electrical and timing performance under various operating conditions; both steps are required before a fabricator will agree to manufacture the circuit.  SAC ¶¶66, 67, 73, 76.  ATopTech and Synopsys are competitors in the place-and-route software market.  SAC ¶71.  ATopTech sells a place-and-route software product called Aprisa; Synopsys sells the dominant place-and-route software product, called IC Compiler.  SAC ¶¶70, 71.  Synopsys has a monopoly in the place-and-route market with a 65% market share.  SAC ¶70.  Synopsys also sells the dominant static timing verification software product, called PrimeTime.  SAC ¶¶74, 76.  PrimeTime has a monopoly in the static timing verification market with an 88% market share.  SAC

¶74.  PrimeTime's monopoly has been persistent and stable for over a decade.  SAC ¶74.  A critical competitive dynamic is interoperability between place-and-route software and static timing verification software; put simply, a place-and-route program must work well with static timing programs to have any chance of success in the market.  SAC ¶¶80-81.

Synopsys has a long history of acquiring companies in the static timing verification software market that it believed presented competitive threats to its monopoly position.   SAC ¶83.  In 2011 and 2012, Synopsys acquired Extreme DA and Magma Design Automation ("Magma"), both rival static timing verification software companies.  *Id.*  ATopTech had worked closely with Extreme DA to ensure the interoperability of its Aprisa place-and-route product with Extreme DA's GoldTime static timing verification product and had an extensive co-marketing agreement with Extreme DA.  SAC ¶85.

ATopTech alleges that the acquisitions of Extreme DA and Magma by Synopsys were anticompetitive and intended to prevent the emergence of strong alternatives to Synopsys' PrimeTime static timing verification software monopoly.  SAC ¶84.  Moreover, the acquisitions significantly harmed competition in the place-and-route software market.  After acquiring Extreme DA and Magma, Synopsys discontinued their static timing verification products and thereby suppressed demand for place-and-route products (such as ATopTech's Aprisa) that had been optimized to work with the now-discontinued static timing verification products.  SAC ¶¶85–87.  At the same time, Synopsys made changes to its PrimeTime static timing verification software and pressured customers not to share their customer output reports necessary for the successful correlation of competing place-and-route software with PrimeTime static timing verification software.  SAC ¶90–92.  In particular, Synopsys imposes a broad anticompetitive restriction on customers in the PrimeTime license agreement, which prohibits them from using or allowing others to use PrimeTime *or its output* to develop or enhance any product that competes with a Synopsys product.  SAC ¶90.  Access to these output reports is necessary in order to optimize place-and-route software to generate chip designs that will "pass" the timing tests imposed by PrimeTime.  SAC ¶¶80, 81.  Synopsys has threatened at least one customer with a punitive price increase for PrimeTime unless that customer also purchases IC Compiler from Synopsys (to the exclusion of

1   Aprisa).  SAC ¶92.  The consequence of all these acts is that ATopTech is deprived of the

2   opportunity to compete on the merits and Synopsys' already very high market share in the place-

3   and-route market is reinforced.

4       As detailed below, ATopTech has properly pled each count in its SAC and each of its

5   affirmative defenses.  The MTD should be denied.

6   **I.      ATOPTECH HAS PROPERLY STATED ITS ANTITRUST COUNTERCLAIMS.**

7       "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

8   as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

9   (2009) (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads

10  factual content that allows the court to draw the reasonable inference that the defendant is liable for

11  the misconduct alleged."  *Id.*  For purposes of a motion to dismiss, the Court must "take all of the

12  factual allegations in the complaint as true."  *Id.*

13  **A.      ATopTech Has Properly Alleged Copyright Misuse.**

14      The copyright misuse doctrine prohibits copyright holders from "using conditions to control

15  use of copyrighted material" as a means "to stifle competition."  *Apple Inc. v. Psystar Corp.*, 658

16  F.3d 1150, 1159 (9th Cir. 2011).  Copyright misuse is a judicially crafted doctrine derived from the

17  Supreme Court's recognition of patent misuse.  *Id.* at 1157.  As the Ninth Circuit has explained, the

18  purpose of the copyright misuse doctrine is to prevent "holders of copyrights from leveraging their

19  limited monopoly to allow them control of areas outside the monopoly," by, for instance,

20  "prevent[ing] the development of competing products."  *Id.* at 1159.

21      On its face, the PrimeTime End-User License Agreement ("EULA") does exactly what the

22  black letter law prohibits—it seeks to restrict the development of competing products.  Paragraph

23  2.9(f) clearly states that: "You may not (and may not allow anyone else to): use [PrimeTime] *or its*

24  *output* to *develop or enhance* any product that competes with a Synopsys product."  SAC ¶90

25  (emphasis added).  Synopsys attempts to avoid the consequences of its illegal restrictions by

26  shifting the focus to whether the license prohibits the use of a competitive product as a *condition* of

27  obtaining a license.  MTD at 4.  The misuse doctrine, however, is not limited to preventing the *use*

28  of existing competitive products; it also addresses attempts to prevent the *development* of new

competitive products.  And Synopsys takes its conduct a step further: not only does it restrict the use of its software to prevent development of competing products, it restricts the use of the output reports from its software.  These restrictions have exactly the anticompetitive effect that Synopsys intends—they severely inhibit the development of competing products.  As ATopTech alleges, disabling Synopsys' customers from using PrimeTime and its output reports to work with ATopTech and enhance Aprisa precludes ATopTech from developing a fully interoperable program (particularly given the constantly changing nature of PrimeTime).  SAC ¶¶90-92.

*Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 777 (5th Cir. 1999), illustrates the principle that a firm commits copyright misuse when it attempts to leverage the copyright for its software monopoly in one market to prevent the development of interoperable products in another market.  In *Alcatel*, the plaintiff DSC licensed its software on the condition that it be used only on DSC switches and with DSC expansion cards.  *Id.* at 777–79.  The only way to develop compatible expansion cards with DSC switches was to run copyrighted software on the expansion cards, which is what the defendant did.  *Id.* at 793–94.  The Fifth Circuit held that a software license agreement which prevented competitors from designing and testing a compatible switch using the copyright holder's protocol constituted copyright misuse.  *Id.*  "[W]ithout the freedom to test its cards in conjunction with DSC's software, [the defendant] was effectively prevented from developing its product, thereby securing for DSC a limited monopoly over its uncopyrighted cards."  *Id.* at 794.  Here, ATopTech has sufficiently alleged that the only way to develop place-and-route software that can pass the PrimeTime static timing verification tests is to use data from customers' PrimeTime output reports.  Synopsys' licensing conditions contain a blanket prohibition on the use of the software or even its output reports to develop competing products.  SAC ¶90.

In *United States v. Microsoft*, the D.C. Circuit condemned a similar use of copyright licensing restrictions to protect Microsoft's monopoly in the operating system market and to leverage its control over the operating system market to stifle competition in the Internet browser market.  253 F.3d 34, 64 (D.C. Cir. 2001) ("we hold that . . . [the] license restrictions at issue represent uses of Microsoft's market power to protect its monopoly, unredeemed by any legitimate justification").  The Court noted that "Microsoft reduced rival browsers' usage share not by

improving its own product, but rather, by preventing [third-parties, through license restrictions,] from taking actions that could increase rivals' share of usage." *Id.* at 62.  The D.C. Circuit rejected Microsoft's argument that the holder of a valid copyright has the right to impose whatever license conditions it wishes. *Id.* at 63.  The Court observed that Microsoft's argument that the exercise of intellectual property rights lawfully acquired cannot give rise to antitrust liability "borders upon the frivolous" because "[i]ntellectual property rights do not confer a privilege to violate the antitrust laws." *Id.* at 63 (internal quotation marks omitted).  It noted that Microsoft's claim to "an absolute and unfettered right to use its property as it wishes . . . is no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability." *Id.*  Here, Synopsys' claim that its PrimeTime copyright gives it a right to prevent customers from sharing their own PrimeTime output data with place-and-route software companies to prevent the development of products that compete with IC Compiler should be similarly rejected.[1]

Synopsys cites *Triad Systems Corp. v. Southeastern Express Co.*, 64 F.3d 1330 (9th Cir. 1995), *superseded by statute*, 17 U.S.C. § 177(c), *as recognized in Psystar*, 658 F.3d at 1158–59, MTD at 7, but it does not support Synopsys' position.  *Triad*  recognized the "functional requirements of compatibility [are] not protected by copyright"  *id.* at 1336 (*citing Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522–24 (9th Cir. 1992)), and that even the making of entire copies of Sega's video game software programs, in order to figure out the requirements for compatibility with Sega's Genesis game console, was copying "for a legitimate, essentially non-exploitative purpose, that is, determining the compatibility requirements." *Id.* (internal quotation marks omitted).  Thus, in *Triad,* the Ninth Circuit held that the use of software to discover its "compatibility requirements" with other software is "fair use." *Id.*; *accord Sony Computer Entm't Inc. v. Connectix Corp.*, 203 F.3d 596, 602–03 (9th Cir. 2000).  The Ninth Circuit found no copyright misuse under the facts of *Triad* only because the defendant did far more than make "a minimal use of Triad's programs solely to achieve compatibility" in developing its own software product. *Id.*  Triad's efforts to protect its copyright were therefore justified.  64 F.3d at 1336–37.  In

---

[1] Synopsys has also abandoned its previous argument, made in its prior motion to dismiss (*see* MTD FAC at 5), that copyright misuse cannot form the basis of a declaratory relief claim.

1   contrast, Synopsys seeks to deny place-and-route competitors even minimal use of PrimeTime or

2   the customer output reports to determine compatibility requirements with their own software.[2]

3        Synopsys also contends that "ATopTech does not dispute that Synopsys can prohibit

4   customers from using PrimeTime to develop competing products,"  and from that premise argues

5   that prohibition of the use of output reports should be permitted as well.  MTD at 5.  The premise of

6   Synopsys' argument is false, however.  ATopTech indeed disputes whether Synopsys can prohibit

7   the use of PrimeTime for the development of competing products.  *See*  SAC ¶91.  But even if

8   Synopsys could restrict the use of the program itself, its restrictions on the use of output reports go a

9   step further by limiting customers' use of their own data—the timing values calculated for their own

10  chip designs—to work with competing firms.  ATopTech plainly alleges that the use of PrimeTime

11  customer output data is necessary to create place-and-route software that can compete with

12  Synopsys' IC Compiler.  SAC ¶81 ("PrimeTime [customer] output reports that customers generate

13  by testing their chip designs are necessary inputs for the development of place-and-route

14  software.").  Citing a leading industry text, the SAC explains that place-and-route software must use

15  compatible terms and arrive at design results that will "pass" the static timing verification software

16  tests.  SAC ¶80.  The commercial reality is that now, and for the foreseeable future, all place-and-

17  route software must interoperate with PrimeTime to be commercially viable, and the degree of

18  interoperability of place-and-route software with PrimeTime is a critical competitive dynamic.

19  SAC ¶79, 80.  ("If I report timing from Cadence ETS the majority of my partners will inevitably ask

20  'but how does that compare in PrimeTime?'.  Until the most popular STA [static timing analysis]

21  tool is Cadence ETS, I will still need to complete my work with PrimeTime analysis.").

---

23      [2] In light of the Ninth Circuit's holdings in *Psystar*, *Triad*, and *Sega* recognizing that
24  copyright may not be misused to prevent the *development* of competing products and that the use of
   a software program to determine compatibility requirements with other software is fair use,
25  ATopTech respectfully suggests that *Oracle Am., Inc. v. Terix Computer Co.*, No. 5:13-cv-03385-
   PSG, 2014 WL 5847532, at *26 (N.D. Cal. Nov. 7, 2014), wrongly suggested that copyright misuse
   is limited to cases where a software license explicitly prohibited licensees from using a competing
26  product as a term of the license. *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 335,
27  337 (D. N.J. 1999) is a distinguishable out-of-circuit case which rejected a copyright misuse defense
   because the defendant "did not plead any facts indicating Syncsort is using its copyrights to control
   competition," and because "[i]t appears instead that Syncsort is attempting to protect what it asserts
28  are trade secrets."  *Id.*  Here, ATopTech has pled substantial facts indicating Synopsys is using its
   PrimeTime copyright to suppress competition.

1   Finally, that Cadence and ATopTech have engineered place-and-route software that to some

2   degree interoperates with PrimeTime does not immunize Synopsys' misuse.  An anti-competitive

3   scheme does not have to be completely successful to be unlawful, nor does foreclosure need to be

4   complete.  *See Microsoft*, 253 F.3d at 74 ("Microsoft took steps to 'maximize the difficulty with

5   which applications written in Java could be ported from Windows to other platforms' . . . [to

6   prevent] Java from developing as a viable cross-platform threat").

   **B.      ATopTech Has Sufficiently Alleged That Synopsys Violated Section 7 Of The
7            Clayton Act By Acquiring Competitors In The Static Timing Verification
8            Market.**

9   Section 7 of the Clayton Act makes unlawful any acquisition that may "substantially . . .

10  lessen competition, or tend to create a monopoly."  15 U.S.C. § 18.  Section 4 of the Clayton Act

11  confers standing on any person who has been "injured in his business or property by reason of

12  anything forbidden in the antitrust laws."  15 U.S.C. § 15.  In moving to dismiss Count II, Synopsys

13  does not dispute that the complaint sufficiently alleges that Synopsys' acquisitions substantially

14  lessened competition in a relevant market.  It also appears to have abandoned its previously asserted

15  arguments that conduct that might be lawful for a single firm under Section 2 is immune from

16  antitrust scrutiny under Section 7.  Instead, Synopsys argues solely that ATopTech has failed to

17  allege antitrust injury.  Synopsys' arguments reflect a cramped and untenable reading of

18  ATopTech's complaint.  ATopTech has carefully alleged that it has been injured by the

19  competition-reducing aspects of Synopsys' acquisitions.

   **1.      ATopTech Does Not Complain Only Of Injury To Itself.**

21  Synopsys concedes that ATopTech has pled a particularized injury to itself—the loss of

22  cooperation and technical support offered by Extreme DA, resulting lost sales, and far greater

23  challenges in developing interoperable place-and-route software.  *See* SAC ¶112 (describing

24  ATopTech's co-marketing agreement with Extreme DA and the companies' technical cooperation).

25  But Synopsys wrongly claims that this alleged injury is only injury to ATopTech.  In fact,

26  ATopTech  properly alleges an injury to competition in at least two markets, static timing

27  verification software and place-and-route software.  With respect to static timing verification, the

28  SAC alleges that Synopsys' conduct increased concentration in that market, depriving customers of

1   choices, and eliminating products that posed a competitive threat to Synopsys' entrenched position.

2   With respect to place-and-route, the SAC alleges that Synopsys' acquisitions in the static timing

3   market enabled Synopsys to engage in exclusionary acts in the place-and-route market by depriving

4   place-and-route competitors of technical cooperation.  *See* SAC  ¶¶83, 84.  Synopsys' conduct also

5   has the tendency to force potential competitors to try to enter into both markets simultaneously,

6   thereby increasing barriers to entry.  In regards to both markets, the harm is to competition itself and

7   there is injury suffered by consumers in the market.  That is not injury only to a single competitor.

8   *See LePage's Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) (en banc) ("When a monopolist's actions

9   are designed to prevent one or more new or potential competitors from gaining a foothold in the

10  market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the

11  potential competitor but also to competition in general.").

### 2.    ATopTech's Injury Flows From The Competition-Reducing Aspects Of Synopsys' Conduct.

14         Synopsys next contends that the alleged injuries to ATopTech's business do not flow from

15  the anticompetitive effects of Synopsys' increased market power following the acquisitions.  MTD

16  at 9.  That too is false and reflects an overly narrow reading of the SAC.  ATopTech clearly alleges

17  that when Synopsys acquired Extreme DA and discontinued GoldTime, "customers that had

18  adopted Aprisa and GoldTime" were forced "to switch to other static timing verification software:

19  namely, Synopsys' PrimeTime," which harmed not only those customers but also ATopTech, which

20  faced much greater challenges guaranteeing the interoperability of Aprisa with PrimeTime" due to

21  Synopsys' "restrictive licensing agreements that forbade PrimeTime customers from sharing

22  PrimeTime output data" results from the testing of customers' own chips.  SAC ¶113.  The SAC

23  also clearly alleges that "Synopsys acquired Magma and Extreme DA in order to remove their

24  upstart static timing verification tools . . . from the marketplace . . . to the detriment of consumers

25  and ATopTech."  SAC ¶117.  Only the anticompetitive acquisitions gave Synopsys the ability to

26  discontinue these competing products, and only the market power it gained as a result gave it the

27  ability to extend its anticompetitive conduct into the place-and-route market via its illegal licensing

28  restrictions.  The anticompetitive harm to the market, and the anticompetitive harm to ATopTech,

are a direct result of the Section 7 violation.[3]  This is a far cry from *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* 429 U.S. 477, 489 (1977), where the plaintiff complained that it suffered injury as a result of *increased* competition.

   In a recent case, the District Court for the District of Columbia recognized the danger that acquisitions can inflict antitrust injury by creating compatibility issues for competitors in related markets.  In *Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 326 (D.D.C. 2011), the court considered a claim by plaintiffs Sprint and Cellular South that AT&T's acquisition of T-Mobile "would exacerbate [their] network interoperability woes,"  (*id.*), and noted that "Cellular South claims that AT&T and Verizon have exercised their purchasing power in the markets for devices and network equipment to propagate their own separate ecosystems of compatible infrastructure that cannot be utilized by other competitors and that the proposed acquisition would increase the big carriers' incentive and power to exclude competitors from those ecosystems." *Id.* (internal quotation marks omitted).  The court held that "Cellular South's complaint . . . satisfies *Twombly* as regards its claim of threatened injury-in-fact from an anticompetitive aspect of the proposed merger."  *Id.*  Here, Synopsys has similarly "attempted to exclude its place-and-route software competitors from the [electronic design automation] ecosystem" through its restrictive PrimeTime licensing agreement and its anticompetitive acquisitions.  SAC ¶81.

   More generally, "[w]here a defendant, by means of anticompetitive conduct, restricts or forecloses a competitor plaintiff's access to a necessary input, courts have found that the resulting loss is injury of the type that antitrust laws were designed to prevent."  *Sprint Nextel*, 821 F. Supp. 2d. at 320 (citing cases).  ATopTech has also alleged that it has suffered injury as a result of restrictions on its ability to use compatible command terms and review customer output reports necessary for the full development of interoperable software.  SAC ¶81.  Because the acquisitions enabled Synopsys to engage in this restrictive conduct even more broadly, they have caused antitrust injury to ATopTech.  *See also Microsoft*, 253 F.3d at 77 (affirming district court ruling that

---

[3] This is why ATopTech was "worse off" following the acquisitions of Extreme DA and Magma by Synopsys, *contra* MTD at 9 n.10, which increased Synopsys' market share and eliminated competitive product alternatives in the static timing verification software market. ATopTech stood to gain nothing from supra-competitive pricing by Synopsys in the static timing verification market.  It does not sell in that market; rather, it benefits from competition in that market.

"Microsoft acted unlawfully with respect to Java by using its 'monopoly power to prevent firms such as Intel from aiding in the creation of cross-platform interfaces,'" that "would threaten Microsoft's monopoly in the operating system market"); *Sprint Nextel*, 821 F. Supp. 2d at 320–25.[4]

### 3. ATopTech Would Not Have Suffered The Same Injury If A Small Firm Had Acquired Magma And Extreme DA.

As a screen to determine if an injury derives from the competition-reducing aspect of an acquisition, courts often ask whether the plaintiff would have suffered the same injury if a small firm had acquired the target. *See, e.g., Lucas Auto. Eng'g, Inc. v. Bridgestone / Firestone, Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998); *see also Brunswick*, 429 U.S. at 487. Synopsys presses the argument that this screen applies here and that ATopTech "would have suffered 'the identical 'loss'-but no compensable injury' had Extreme DA or Magma been purchased by a company with a lower share (like Cadence) that later decided to discontinue products or not to do business with ATopTech at all." MTD at 9. This argument again ignores the well-pled allegations of the SAC.

ATopTech alleges that Synopsys, as a monopolist with 88% market share in the static timing verification market, was quite unlike any other potential firm that might have acquired Extreme DA and Magma. Because of its market power, Synopsys had a unique incentive and ability to remove GoldTime and Tekton from the market because of the competitive threat they posed to PrimeTime's monopoly. SAC ¶117. A smaller firm would not *and could not* have risked the ire of customers by rapidly terminating attractive programs in which the customers had made substantial investments. Indeed, a firm without market power would not benefit by spending heavily to acquire software products and related intellectual property, only to throw them in the trash. That conduct only makes

---

[4] *Sprint Nextel* noted that other plaintiffs have demonstrated antitrust injury based "on similar theories in the past." 821 F. Supp. 2d at 322. In *Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860 (W.D.N.Y. 1994), the Bon-Ton department store chain sough to enjoin the acquisition of one of its local competitors by one of its large national competitors. *Id.* at 862–63. Bon-Ton argued that the merger would hinder its ability to enter the Rochester market because store space in malls was critical to the department store business. *Id.* at 876–77. The court agreed and found that the threat of "effective exclusion from the Rochester market" constituted antitrust injury. *Id.* at 878. In *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250 (E.D. Pa. 1987), the Court found that the manufacturer of Tastykake snack cakes had antitrust standing to sue to unravel the merger of the Hostess and Drake snack cake brands. *Id.* at 1254. The Court paid particular attention to the plaintiff's allegations of "threatened predatory non-pricing actions," *id.* at 1276, and "concluded that because plaintiff's 'entry into, expansion within, and preservation of share in relevant markets could be frustrated by defendants'" anticompetitive strategies, the plaintiff had standing to sue. *Id.* at 1273–74.

sense for a firm that wishes to perpetuate its monopoly in static timing verification—as well as to exclude competitors like ATopTech in the place-and-route market that had optimized their programs to work with the static timing products of the acquired firms.  It would have been irrational for a smaller firm to discontinue the products of the acquired firms.  *See* SAC ¶118.

That makes this case quite different from the summary judgment cases relied upon by Synopsys.  In *Lucas*, the Ninth Circuit affirmed a ruling that Lucas Automotive, a vintage tire distributor, lacked standing to bring a Section 7 claim after a merger resulted in its termination as a distributor.  140 F.3d at 133–34.  A small acquirer as well as a large acquirer may have no need for a particular distributor, and Lucas failed to explain how its injury derived from the increase in concentration in the vintage tire market.  The Third Circuit's decision in *Alberta Gas Chemicals Limited v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235 (3d Cir. 1987) is also inapposite.  In *Alberta Gas*, the plaintiff complained that a "merger led to cancellation of the acquired company's plans to produce methanol by a new process, preceded by large scale purchases to stimulate the market before beginning production."  *Id.* at 1236.  Alberta Gas's Section 7 claim was that after Du Pont's acquisition of Conoco, the combined entity failed to follow through on a planned coal gasification project that would have fueled an increase in demand for methanol produced by Alberta Gas—the so-called "demand creation" claim.  *Id.* at 1237.  However, as in *Lucas*, the plaintiff failed to show that a smaller acquirer would not have undertaken exactly the same action, *id.* at 1246, and likewise failed to show that the foreclosure of the methanol market from the loss of Conoco as a customer was at all substantial.  *Id.* at 1245-46.  In contrast to these cases, ATopTech alleges that Synopsys was uniquely positioned to foreclose competition in adjacent markets.  SAC ¶118.[5]

---

[5] The other cases cited by Synopsys are concerning antitrust injury are also distinguishable.  In *Lambtek Yogurt Machs. v. Dreyer's Grand Ice Cream, Inc.*, No. CIV. 96-20959 SW, 997 WL 108718, at *4 (N.D. Cal. Mar. 3, 2007), a distributor of frozen yogurt dispensers, complained that an acquisition had actually increased competition in the market rather than suppressing it.  *Id.* ("Before the acquisition, Lambtek distributed Grand Soft dispensers. After the acquisition, Dreyer's entered into competition with Lambtek for the distribution of such dispensers.").  In addition to complaining about an *increase* in competition, the plaintiff in *Lambtek* asserted an injury that—as in *Lucas*—flowed from a decision to consolidate distribution that was independent of any anti-competitive effect of the acquisition.  *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 500 (9th Cir. 1977) is also inapposite.  ATopTech alleges here the targets of Synopsys' acquisitions were uniquely situated to challenge Synopsys in the static timing verification market and that ATopTech was uniquely situated to challenge Synopsys in the place-and-route market.  In *Lenore*, by contrast, the termination of Lenore's beer distributorship agreement following an acquisition was of no competitive significance to the market because Lenore was only "one of hundreds of beer

1

2

**C.      Synopsys Violated Section 1 of the Sherman Act By Forcing Its Customers To Sign An Anticompetitive Licensing Agreement For PrimeTime.**

3      Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or

4    otherwise, or conspiracy, in restraint of trade among the several States."  15 U.S.C. §1.  To state a

5    Section 1 claim under the rule of reason, a plaintiff must plead "(1) a contract, combination or

6    conspiracy among two or more persons or distinct business entities; (2) by which the persons or

7    entities intended to harm or restrain trade or commerce among the several States, or with foreign

8    nations; (3) which actually injures competition."  *Brantley v. NBC Universal*, 675 F.3d 1192, 1197

9    (9th Cir. 2012).  ATopTech alleges that Synopsys' End-User Software License and Maintenance

10   Agreement, in which Synopsys and numerous customers have agreed that customers must not "use

11   [PrimeTime] or its output to develop or enhance any product that competes with a Synopsys

12   product" constitutes an agreement between two or more persons in restraint of trade by preventing

13   the development and sale of place-and-route software by Synopsys' competitors, SAC ¶¶121–122,

14   and has harmed competition.

15

16

**1.      The PrimeTime License Restrictions Violate Section 1 Under the Rule of Reason.**

17      As discussed in Section I.A., Synopsys has used the PrimeTime End-User License

18   Agreement to restrain the development of competing products.  Paragraph 2.9(f) of the license

19   states that licensees "may not (and may not allow anyone else to): use [PrimeTime] or its output to

20   develop or enhance any product that competes with a Synopsys product."  SAC ¶90.  On its face,

21   this provision is a bald attempt by a monopolist with 88% of the static timing verification software

22   market, SAC ¶73, to leverage its market power to restrain the development of competing products

23   in both the static timing verification market and the place-and-route software market.  Synopsys

24   may have  a right to decide to whom it wishes to sell its copyrighted software, but the right to select

25   one's customers does not allow a firm to enter into unlawful exclusionary restrictions with its

26

27   _____

(continued…)

28   distributors . . .  throughout the Western United States."  *Id.*  The Ninth Circuit found that "Lenore was a component of minimal significance in that market."  *Id.*  (internal quotation marks omitted).

1   customers.  *See, e.g., United States v. Dentsply Int'l, Inc.,* 399 F.3d 181, 193–94 (3d Cir. 2005)

2   (unlawful for firm with high market share to contractually restrict customers from dealing in goods

3   of competitor).  As with most other vertical agreements, restrictive licensing precluding the use of a

4   competitor's products is evaluated under the rule of reason.  *Microsoft Corp.*, 253 F.3d at 59–71.

5   "[T]he inquiry mandated by the Rule of Reason is whether the challenged agreement is one that

6   promotes competition or one that suppresses competition."  *Nat'l Soc. Of Prof'l Eng'rs. v. United*

7   *States*, 435 U.S. 679, 691 (1978).  This "can only be evaluated by analyzing the facts peculiar to the

8   business, the history of the restraint, and the reasons why it was imposed" in order "to form a

9   judgment about the competitive significance of the restraint."  *Id.* at 692.  Thus, the court must

10   weigh the anticompetitive effects of licensing conditions against their pro-competitive effects, and

11   licensing conditions, to the extent they create anticompetitive effects, must have legitimate business

12   justifications.  *Id.*

13       Here, the broader context demonstrates that the PrimeTime licensing conditions are intended

14   to suppress competition. As discussed *supra* at 10, Synopsys—a monopolist with 88% market share

15   in the static timing verification market—undertook a series of acquisitions to foreclose competition

16   in the static timing verification market, and then used the resulting monopoly power to insist on

17   static timing licensing restrictions that aim to "eliminate competition in the place-and-route

18   software tool market" to the detriment of customers and competition.  SAC ¶117.  Synopsys has not

19   offered a business justification for its conduct, much less a legitimate justification sufficient to

20   offset the clear anticompetitive effects of the licensing restrictions.  *Cf. Microsoft*, 253 F.3d at 64

21   ("license restrictions at issue represent uses of Microsoft's market power to protect its monopoly,

22   unredeemed by any legitimate justification").  Moreover, as described earlier, the restrictions

23   imposed by Synopsys extend even beyond the software, to the customer output reports generated

24   when customers utilize the software.  There is no legitimate business justification for these

25   restraints.

26

27

28

1

2

          **2.**          **Synopsys' Intellectual Property Rights Do Not Immunize Its Anticompetitive Conduct.**

3         Synopsys argues that ATopTech's Section 1 claim is improper because "the restriction on

4   the use of" PrimeTime output data "does not prevent others from independently developing place-

5   and-route software" and therefore does not harm competition.  MTD at 12–13.  That is false.  As

6   previously discussed, the PrimeTime licensing condition prohibiting customers from sharing their

7   output reports is tantamount to a prohibition on creating competing place-and-route products

8   because place-and-route software must use compatible terms and arrive at design results that will

9   "pass" the static timing verification software tests,  SAC ¶80.  Given PrimeTime's static timing

10   verification software monopoly, all place-and-route software must interoperate with it to be useful

11   to customers now and for the foreseeable future.  SAC ¶79, 80.  By forcing PrimeTime customers to

12   agree not to share their company's output data with rival place-and-route vendors, Synopsys is not

13   competing on the merits, but deliberately trying to restrain the development of competing place-

14   and-route software without legitimate justification.  *See Microsoft*, 253 F.3d at 62 ("Because this

15   [Windows licensing] prohibition has a substantial effect in protecting Microsoft's market power,

16   and does so through a means other than competition on the merits, it is anticompetitive.").

17         Synopsys also improperly characterizes the claims here.  ATopTech has not made a

18   predatory pricing claim or a refusal to deal claim.  ATopTech does not ask or expect Synopsys to

19   assist it, or to share a product with it, and its allegations are far different than what Synopsys argues.

20   ATopTech's claims are about the anticompetitive agreements which Synopsys has imposed on its

21   customers, agreements in restraint of trade that foreclose competitor access to the market, harm

22   customers, and harm competition.  The cases Synopsys cites that hold that a monopolist has "no

23   duty to aid competitors" or to "share the source of [its] advantage," *Verizon Commc'ns Inc. v. Law*

24   *Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407–08 (2004), are Sherman Act Section 2 cases,

25   not Section 1 cases, and they are off point.  They establish only that a monopolist has no general

26   duty to aid its competitors and do not in any way undermine the well-established precedent that a

27

28

1    monopolist violates Section 1 of the Sherman Act when it makes agreements with other entities that

2    restrain trade or commerce and injure competition.[6]

### 3.  ATopTech Has Alleged Injury To Competition.

4          Finally, Synopsys argues that ATopTech has not alleged injury to competition because the

5    restrictive PrimeTime licensing conditions have not succeeded in fully preventing competitor place-

6    and-route software companies from designing place-and-route software capable of interoperating

7    with PrimeTime.  MTD at 14.  As discussed previously, the fact that Cadence and ATopTech have

8    overcome the odds and engineered place-and-route software capable of interoperating to some

9    extent with PrimeTime does not undermine ATopTech's allegations that the licensing restriction is

10   an unjustified anticompetitive act by Synopsys with the effect of restraining competition in the

11   place-and-route software market.  To state a Section 1 claim, ATopTech need not show Synopsys

12   succeeded in foreclosing all competition in the place-and-route market, only that Synopsys made

13   agreements with others that unreasonably restrained trade and injured competition.  *Glen Holly*

14   *Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 378 (9th Cir. 2003) ("competitors may be able to

15   prove antitrust injury before they actually are driven from the market and competition is thereby

16   lessened.") (internal quotation marks and brackets omitted).[7]

---

19        [6] For this reason, the authorities cited by Synopsys are not relevant to the Section 1 claim. *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983) (The antitrust laws did not impose a duty on Kodak to assist . . . manufacturers of competing cameras, film, paper or chemicals to survive or expand"); *State of Ill. Ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1484 (7th Cir. 1991); ("a monopolist's duties are negative—to refrain from anticompetitive conduct rather than affirmative—to promote competition"); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) ("Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival."); *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) ("Cooperation is a *problem* in antitrust, not one of its obligations."); *Cal. Computer Prods., Inc. v. IBM*, 613 F.2d 727, 744 (9th Cir. 1979) ("IBM, assuming it was a monopolist . . . was under no duty to help CalComp or other peripheral equipment manufacturers survive or expand").

        [7] *Les Shockley Racing, Inc. v. National Hot Rod Association*, 884 F.2d 504 (9th Cir. 1989) is inapposite because ATopTech has alleged significant "detrimental effects from the challenged restraint" and "injury to competition within a framework of market analysis." *Id.* at 508.  In terms of the market framework, because Synopsys is a monopolist both in the place-and-route and static timing verification software markets, this case, unlike *Les Shockley*, is one where "convergence of injury to a market competitor and injury to competition" occurred, because "the relevant market is both narrow and discrete and the market participants are few."  *Id.* at 508–09.

**D.**      **ATopTech Has Properly Alleged That Synopsys Monopolized And Attempted to Monopolize Both The Static Timing Verification Market (Count V) And The Place-And-Route Market (Count VI).[8]**

To state a monopolization claim under Section 2 of the Sherman Act, a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541 (9th Cir. 1991).  "[P]ossession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Trinko*, 540 U.S. at 407.  ATopTech has alleged both of the elements of monopolization and anticompetitive conduct. SAC ¶¶137–60.

**1.      Synopsys' Monopolization Of The Static Timing Verification Market.**

Synopsys does not dispute that the complaint sufficiently alleges that it is a monopolist in the static timing verification market with an 88% market share and that its monopoly power in that market has been persistent and stable over time.  SAC ¶139.  Synopsys has also dropped its argument that the counterclaims fail to define the static timing verification market adequately. Instead, it contends that ATopTech has failed to adequately allege anticompetitive conduct.  MTD at 20.  But ATopTech's well-pled claims of copyright misuse, violation of Section 7, and unlawful agreements in restraint of trade are more than sufficient to allege anticompetitive conduct by Synopsys.  Anticompetitive acquisitions of competitors that result in a substantial reduction in competition not only violate Section 7 of the Clayton Act but also constitute anticompetitive conduct under Section 2 of the Sherman Act.  *Fraser v. Major League Soccer*, 284 F.3d 47, 61 (1st Cir. 2002) ("merger to monopoly, benign as to the merged competitors, is a feasible section 2 claim . . . even if it is more often challenged under Clayton Act section 7") (internal quotation marks and citation omitted);  *Standard Oil Co. v. United States*, 221 U.S. 1, 72–75 (1911) (holding that Standard Oil had monopolized the petroleum industry in violation of Section 2 by acquiring a controlling interest in multiple competitors); *United States v. Grinnell, Corp.*, 384 U.S. 563, 576 (1966) (holding that defendant had engaged in monopolization by acquiring control over three companies, which combined held 87% of the relevant market).  ATopTech has alleged that

---

[8] Count VI is mislabeled as "Count XI."

DEF. ATOPTECH'S OPP. TO SYNOPSYS'S MOTION
TO DISMISS SECOND AMENDED COUNTERCLAIMS
AND TO STRIKE AFF. DEFENSES 7, 11, AND 15.

Synopsys pursued an anticompetitive scheme in which it acquired two of its leading static timing verification software competitors, one of which   had a significant business alliances with ATopTech (and one of which was a potential source of future cooperation with ATopTech) in order to protect its monopoly in the static timing verification software market and reduce competition in the place-and-route software market.  Likewise, when a monopolist enters into agreements that violate Section 1 of the Sherman Act, it also violates Section 2.  *See ABA Section of Antitrust Law, Antitrust Law Developments,* § 245 n. 111 (7th ed. 2012) ("[a]s a general matter, conduct that would violate § 1 also will violate § 2 if it is engaged in by a monopolist") (citing *United States v. Griffith*, 334 U.S. 100, 106 (1948)).

Synopsys also argues that the Section 2 monopolization of the static timing verification market claim fails because "ATopTech does not participate in the static timing verification market." MTD at 20.  Synopsys argues that because ATopTech is neither a seller nor a buyer of static timing verification software, it is not a participant in the static timing verification market and has suffered no actionable antitrust injury.  *Id*.  That is not the law.  The Ninth Circuit has explained that:

> The Supreme Court has never imposed a 'consumer or competitor' test but has instead held that the antitrust laws are not so limited . . . . While consumers and competitors are most likely to suffer antitrust injury, there are situations in which other market participants can suffer antitrust injury.

*Am. Ad Mgmt. v. GTE*, 190 F.3d 1051, 1057–58 (9th Cir. 1999) (citations and footnotes omitted). Under the flexible standard announced in *American Ad*, no rigid definition of "market participant" prevents a party suffering an antitrust injury in the relevant market from bringing suit.  *Id.* & n.6 (recognizing potential for antitrust injury among indirect purchasers, potential entrants, suppliers, and others).  Here, the injury to ATopTech is generated by Synopsys' unlawful acquisition of Extreme DA and Magma, two highly promising innovative competitors to Synopsys in the static timing verification market.  ATopTech enjoyed close technical cooperation with Extreme DA aimed at assuring the interoperability of their complementary software products.  SAC ¶¶110, 112 113. This technical and marketing cooperation between ATopTech and Extreme DA was correctly seen by Synopsys as a threat to its PrimeTime monopoly, and it acted to eliminate the competitive threat

1    by unlawfully acquiring Extreme DA and Magma.  SAC ¶¶108-18.  This anticompetitive act in the

2    static timing verification market created anticompetitive harm in the place-and-route market.

3            Synopsys briefly argues that ATopTech has failed to allege harm to competition in the static

4    timing verification market.  MTD at 21.  But ATopTech has clearly done so.  The anticompetitive

5    acquisitions of Extreme DA and Magma substantially reduced competition in the static timing

6    verification market and protected Synopsys' PrimeTime monopoly.  This reduction in competition

7    harmed ATopTech because it benefitted from vibrant competition in the static timing verification

8    market in the form of business partners who had strong incentives to pursue close technical

9    cooperation and sales/marketing partnerships with it in order to confront the Synopsys monopolies.

10           **2.       Synopsys' Monopolization Of The Place-And-Route Market.**

11           Synopsys does not dispute that it has monopoly power in the place-and-route software

12    market with a 65% share of the market and that its monopoly power is persistent and stable.  SAC

13    ¶66.[9]  Nor does Synopsys dispute that it willfully acquired and maintained its monopoly power as

14    distinguished from the development of monopoly power as a result of a superior product.   Instead,

15    Synopsys contends that ATopTech has failed to plead the anticompetitive conduct element required

16    to state a Section 2 violation.  MTD at 18.  Synopsys argues that ATopTech's allegations that it

17    refused to allow competitors access to "essential sign-off information within its PrimeTime

18    verification software necessary to assure interoperability of competitors' place-and-route software,"

19    (SAC ¶152(b)), and "periodically alter[ed] the verification tests within its PrimeTime [static timing

20    verification software] . . . [to prevent the] interoperability of competitors' place-and-route

21    software," offer insufficient details about what specific PrimeTime software updates had the alleged

22    anticompetitive effect or when these updates were released.  MTD at 18.  That is not required at the

23    pleading stage.  It is sufficient that ATopTech has alleged that Synopsys made updates to

24    PrimeTime with the goal and effect of  frustrating competitors' ability to produce interoperable

25    place-and-route software.  Synopsys knew that place-and-route competitors would struggle to adjust

26    to these updates because they would not be able to determine exactly what they were.  Moreover,

27    _____

28           [9] As Synopsys points out (MTD at 18 n. 16), the figure cited in ¶151 (87.5%) is in error; the
     correct figure is 65%, which is sufficient for an allegation of monopoly power. *Image Tech. Servs.
     v. Eastman Kodak Co.,* 125 F.3d 1195, 1206 (9th Cir. 1997).

PrimeTime's restrictive licensing conditions barred PrimeTime customers from sharing their chip testing output data and therefore would hinder any efforts by competitors to make adjustments after each PrimeTime update.

The anticompetitive conduct alleged here is not (as Synopsys would have it) that "Synopsys has refused to provide [technical specifics to competitors] to assist them in creating interoperable products." MTD 18. Rather, the anticompetitive conduct is Synopsys' strategy of using its copyright for PrimeTime to block customers from sharing *their own output data* with rival place-and-route firms that, if allowed a fair use of that data, can ensure interoperability and allow customers a choice of software. This anticompetitive restriction on customer conduct is not supported by a "legitimate business justification," and Synopsys has not even attempted to argue what such a legitimate business justification might be. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212 (9th Cir. 1997) (if "a legitimate business justification supports a monopolist's exclusionary conduct, that conduct does not violate §2 of the Sherman Act"). Synopsys' other anticompetitive actions including its false and misleading statements to customers about supposed copyright infringement by ATopTech and Synopsys' baseless copyright litigation against its competitors are part and parcel of its effort to restrict customers from sharing their output data with rival place-and-route software makers. *See* SAC ¶94.

### 3. ATopTech Has Properly Alleged Attempted Monopolization.

To properly state a Sherman Act, Section 2 attempted monopolization claim, a plaintiff must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993). ATopTech has alleged all of these elements for both Count V (Monopolization of the Verification Software Market), SAC ¶¶137–48, and Count VI (Monopolization of the Place-and-Route Software Market), SAC ¶¶149–60. "Specific intent may be inferred from the defendant's anticompetitive practices." *M&M Med. Supplies & Serv., Inc.  v. Pleasant Valley Hosp.*, 981 F.2d 160, 166 (4th Cir. 1992) (en banc); *see also Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988) ("[p]roof of . . . anticompetitive or exclusionary conduct, may be used to infer . . . specific intent to

1    monopolize"). Synopsys does not dispute its monopoly power in both the static timing verification

2    and place-and-route software markets, and the allegations regarding Synopsys' anticompetitive

3    conduct are sufficient to infer anticompetitive intent.

4          **E.**      **ATopTech Has Properly Alleged A Tying Claim (Count IV).**

5         To state a claim for illegal tying, a plaintiff must allege: "(1) that there exist two distinct

6    products or services in different markets whose sales are tied together; (2) that the seller possesses

7    appreciable economic power in the tying product market sufficient to coerce acceptance of the tied

8    product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the

9    tied product market." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir.

10   2003) (internal quotation marks omitted). Synopsys does not dispute that static timing verification

11   software and place-and-route software are two separate products. Instead, it argues that ATopTech

12   has not alleged a tie or sufficient harm to competition, based on the unfounded notion that a tie

13   cannot exist if two products are nominally available separately. MTD at 15–16.

14
15         **1.**     **ATopTech Has Alleged The Use of Economic Coercion To Force Customers To Accept The Tied Product.**

16        Synopsys forces customers who wish to purchase its verification software PrimeTime (the

17   tying product) to also purchase place-and-route software (the tied product) by eliminating

18   substantial discounts on PrimeTime for customers who purchase place-and-route software from a

19   competitor like ATopTech such that "a customer who wishes to buy Aprisa (instead of IC

20   Compiler) must pay more for PrimeTime than a customer who does not buy Aprisa." SAC ¶95.

21   The higher price charged by Synopsys to PrimeTime customers that use Aprisa is punitive and

22   "does not reflect any genuine savings or efficiency for Synopsys if it sells its products as a

23   package"; rather, it is "intended to and in fact renders it economically unviable" for customers to

24   purchase place-and-route software from Synopsys' competitors. SAC ¶96. This level of coercion is

25   sufficient to create a tie under the case law.

26        Synopsys does not dispute that it possesses appreciable market power in the static timing

27   verification market—sufficient to coerce buyers into purchasing the tied product (IC Compiler).

28   *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 915 (9th Cir. 2007) ("The substantial

1   market power PeaceHealth possessed as a result of being the exclusive provider of tertiary services

2   in Lane County creates a possibility that PeaceHealth was able to force unwanted purchases of

3   primary and secondary services."); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12

4   (1984) ("an invalid tying arrangement lies in the seller's exploitation of its control over the tying

5   product to force the buyer into the purchase of a tied product the buyer . . . might have preferred to

6   purchase elsewhere on different terms").

7          But Synopsys argues that the fact that the two products are offered for sale separately is

8   sufficient by itself to defeat the tying claim. MTD at 15 (noting it is undisputed that PrimeTime and

9   IC Compiler are offered separately).  That is not the law.  To the contrary, Synopsys' argument

10  overlooks well-established precedent that coercion can be established "as a matter of economic

11  imperative"—by showing that an arrangement left buyers "with no rational economic choice other

12  than purchasing [the tied product]."  *Cascade Health*, 515 F.3d at 916 & n. 27.  For example, where

13  there is evidence of "a trivial proportion of separate sales . . . the package discount is as effective as

14  an outright refusal to sell the tying product separately."  *Id.* at 915 (quotation marks and brackets

15  omitted).  Accordingly, the issue of economic imperative cannot be decided at the pleading stage.

16  *Cascade Health*, 515 F.3d at 915 ("whether [defendant] in fact used its market power to effectively

17  coerce purchases of [the tied products] is a question that can be answered only through further

18  factual development"); *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1113 (8th Cir. 1996) (unlawful tying

19  arrangement is possible even where products are offered separately if purchasing them together is

20  the only viable option).  This is the type of coercion ATopTech alleges here.  SAC ¶¶95, 96.

21         Synopsys goes on at some length regarding the need to establish that "the prices at issue

22  were below an appropriate measure of its rival's costs."  *See* MTD at 16.  The cases cited would be

23  relevant if ATopTech alleged that Synopsys engaged in predatory pricing, but it has not; rather, it

24  has clearly and sufficiently alleged that Synopsys has used punitive pricing to coerce customers into

25  a de facto tying arrangement.[10]  If the "discount" pricing is such that the customer has no rational

26  economic choice but to buy both products together, an unlawful tie exists; that is the case here.

27  ────────────────

    [10] For this reason, the authorities Synopsys cites concerning predatory pricing are off point.

28  *See Stearns Airport Equip. Co., v. FMC Corp.*, 170 F.3d 518, 532 (5th Cir. 1999) (no illegal tying
    claim alleged); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993)
    (no illegal tying claim at issue).  *W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 190 F.3d

1

2.      **ATopTech Has Alleged A Sufficient Effect In The Tied Product Market.**

2

Synopsys argues that ATopTech has failed to provide facts tending to show that competition

3

was harmed in the place-and-route software market.  MTD at 16.  All that is required is that

4

ATopTech ultimately show that a "not insubstantial volume of commerce in the tied product

5

market" is affected.  *Paladin Assocs.*, 328 F.3d at 1159.  ATopTech has pled that it knows of at

6

least one major customer that wished to purchase Aprisa that was effectively forced to purchase IC

7

Compiler from Synopsys because Synopsys threatened that it would impose punitive price increases

8

for PrimeTime on the customer if the customer did not purchase IC Compiler as its place-and-route

9

software.  SAC ¶97.  The threatened price increase was so great that it was not economically

10

rational for Company C to purchase place-and-route software from ATopTech and it instead

11

purchased IC Compiler from Synopsys.  SAC  ¶97.  Given Synopsys' other anticompetitive conduct

12

in this case, including its restrictive PrimeTime licensing conditions and anticompetitive

13

acquisitions of competitors, ATopTech alleges on information and belief that this threatened

14

punitive pricing is suffered by many PrimeTime customers that express interest in purchasing place-

15

and-route software from Synopsys' competitors.  The Supreme Court's admonition in *Jefferson*

16

*Parish*, that if "only a single purchaser were 'forced' with respect to the purchase of a tied item, the

17

resultant impact on competition would not be sufficient to warrant the concern of antitrust law," *id.*

18

at 16, came after a trial, not at the pleading stage.  *Id.* at 5.  And the Supreme Court has held that as

19

little $60,800 was a not insubstantial volume of commerce in the tied product market.  *United States*

20

*v. Loew's, Inc.*, 371 U.S. 38, 49 (1962); *see also DataGate, Inc. v. Hewlett Packard Co.*, 60 F.3d

21

1421, 1424 (9th Cir. 1995) (sales of $100,000 per year deemed to be not insubstantial volume of

22

commerce affected); *Tic-X-Press, Inc. v. Omni Promotions Co.*, 815 F.2d 1407, 1419 (11th Cir.

23

1987) ($10,091.07 not insubstantial volume of commerce affected).

24

F.      **ATopTech Has Properly Alleged A Cartwright Act Claim.**

25

Because the Cartwright Act is patterned after the Sherman Act, *Marin County Board of*

26

*Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925 (1976), ATopTech has properly alleged claims under

27

_____

(continued…)

28

974, 976 (9th Cir. 1999) (volume discount contracts at issue; no illegal tying claim alleged).

1    the Cartwright Act based on its Section 1 claim and its illegal tying claim.  *See* Cal. Bus. & Prof.

2    Code § 16720(e)(3) (making it unlawful to "settle the price of any article . . . so as directly or

3    indirectly to preclude a free and unrestricted competition . . . in the sale . . . of any such article").[11]

### G.    ATopTech Has Properly Alleged Unfair Competition Law Claims.

5          ATopTech's antitrust claims form the basis for its UCL claims.  ATopTech has properly

6    alleged unlawful conduct by Synopsys in the form of violations of the Sherman Act, the Clayton

7    Act, and the Cartwright Act.  Because the UCL borrows from all of these laws, *Cel-Tech*

8    *Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186–187 (1999), ATopTech may proceed

9    under the UCL.  In addition, even if for some reason Synopsys' conduct is not found to be unlawful,

10   ATopTech may proceed under the unfairness prong of the UCL.  *See id.* at 187 ("the word 'unfair'

11   in [section 17200] means conduct that threatens an incipient violation of an antitrust law, or violates

12   the policy or spirit of one of those laws because its effects are comparable to or the same as a

13   violation of the law, or otherwise significantly threatens or harms competition").

## II.    THE COURT SHOULD DENY SYNOPSYS' MOTION TO STRIKE AFFIRMATIVE DEFENSES 7, 11, AND 15.

16         Synopsys asks the Court to strike ATopTech's Seventh Affirmative Defense for copyright

17   misuse.  MTD at 22. It should deny this request for the reasons stated in Section I.A, and because

18   the Ninth Circuit has explicitly recognized copyright misuse as a valid affirmative defense to

19   copyright infringement.  *See Practice Mgmt. Info. Corp. v. Am. Med. Ass'n,* 121 F.3d 516 (9th Cir.

20   1997), *amended*, 133 F.3d 1140 (9th Cir. 1998).  *Practice Management* held that the affirmative

21   defense of copyright misuse may apply even if all of the formal requirements of an antitrust

22   violation are not met.  *Id.* at 521; *see also Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 978 (4th

23   Cir. 1990) ("misuse need not be a violation of antitrust law in order to comprise an equitable

24   defense to an infringement action").  Copyright misuse occurs whenever a copyright holder violates

25   the public policy underlying the grant of a copyright, *Practice Mgmt.*, 133 F.3d at 521, by

26   attempting to leverage the copyright to gain control over areas outside its limited monopoly.  *Id.* at

---

[11] Because the Cartwright Act generally concerns agreements in restraint of trade (such as price fixing agreements and tying arrangements), ATopTech's Cartwright Act claim is based on the Section 1 and tying claims alleged in the complaint and not on the allegations of anticompetitive acquisitions or monopolization.

520.  That is exactly what ATopTech has alleged in this case.  SAC ¶44.  ATopTech alleges that Synopsys is improperly attempting to expand its claim of copyright to certain command  terms (and "formats") contained in its PrimeTime software product manuals to exclude competition related to different products in a different market—place-and-route software—over which the PrimeTime copyright gives it no valid claim.  SAC ¶46, 49.  Synopsys is attempting to expand its copyright claim even to commonly used command terms that it did not originate.  SAC ¶44.  This attempt to expand the role of its copyright protection beyond its legitimate bounds violates the public policy behind the copyright law and constitutes copyright misuse.

The Eleventh Affirmative Defense, (SAC ¶50), states a valid estoppel claim.  It incorporates the other factual allegations within the SAC.  ATopTech alleges that Synopsys has incorporated into its PrimeTime and GoldTime Product Manuals numerous generic and widely-used "commands" that it did not originate but rather took from those who went before.  SAC ¶¶41, 43, 44.  Many of these commands (and their related options and parameters) are nothing more than functional command terms that software engineers have commonly recognized for many years.  SAC ¶44.  They are not properly the subject of copyright claims.  Moreover, by honoring  and ratifying the existing CPLA contract, and in its dealings with ATopTech related to that contract, Synopsys effectively urged that these command terms and "formats" be used in Aprisa in order to make Aprisa interoperable with GoldTime (and, by extension, with PrimeTime), in order to enhance the sales and market share of Synopsys' own verification tools.  SAC ¶48.  ATopTech therefore does allege reliance.

The Fifteenth Affirmative Defense asserting equitable estoppel—including laches, waiver, estoppel, implied license, and/or unclean hands— similarly relies upon facts elaborated throughout the SAC.  Synopsys has incorporated into its Product Manuals many commonly used command terms (and related "formats") that it did not create and urged that others, including ATopTech, use to make place-and-route tools interoperable with GoldTime and PrimeTime.  SAC ¶49.  Having done so, it cannot now claim that use of these very same common command terms (and "formats") in place-and-route software constitutes copyright infringement simply because the terms appear in Synopsys' copyrighted manuals for its verification software.  Synopsys is falsely claiming

1   ownership of common command terms that it did not develop and that it formerly urged others to

2   use in order to enhance interoperability with GoldTime and PrimeTime (and thus increase its sales

3   of those products) in order now to prevent ATopTech from competing in the separate place-and-

4   route software market.

5        The affirmative defense of unclean hands is also a recognized defense in copyright actions.

6   The defense applies to bar enforcement of a copyright "when a plaintiff commits wrongdoing 'of

7   serious proportions.'" *Saxon v. Blann*, 968 F.2d 676, 680  (8th Cir. 1992) (*quoting* 3 Melville B.

8   Nimmer, *Nimmer on Copyright*, § 13.09[B] at 13-148-49 (1991)).  The defense applies where this

9   alleged wrongdoing "relates to the merits of the controversy between the parties" that is before the

10  Court.  *Id.*;  *see also Practice Mgmt.*, 133 F.3d 1140.  The Court has recognized that a showing of

11  copyright misuse can form the basis of an unclean hands defense.  May 8, 2015 Hearing Transcript

12  54 (Dkt. 303) ("I think if you could show copyright misuse, then you could show unclean hands.").

13  There is therefore a valid factual allegation of "wrongful conduct of serious proportions"—

14  copyright misuse—that relates directly to the merits of the dispute before the Court.

**CONCLUSION**

16       For the foregoing reasons, Synopsys' Motion to Dismiss ATopTech's Second Amended

17  Counterclaims and to Strike Affirmative Defenses 7, 11, and 15, should be denied.

18  Dated:  July 2, 2015                          ARNOLD & PORTER LLP

20                                                By:  /s/  Paul Alexander
                                                  Paul Alexander
21                                                Martin R. Glick
                                                  Daniel Asimow
22                                                Willow Noonan
                                                  Daniel Pastor
23                                                Denise McKenzie
                                                  Ryan M. Nishimoto
24
25                                                Attorneys for Defendant
                                                  ATOPTECH, INC.

26

27

28