1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SYNOPSYS, INC.,

        Plaintiff,

  v.

ATOPTECH, INC.,

        Defendant.

_____/

No. C 13-2965 MMC

**ORDER GRANTING MOTION TO DISMISS COUNTERCLAIMS AND MOTION TO STRIKE AFFIRMATIVE DEFENSES**

    Before the Court is the "Motion to Dismiss Defendant ATopTech's Second Amended Counterclaims and Striking Affirmative Defenses Nos. 7, 11 and 15," filed June 18, 2015, by plaintiff Synopsys, Inc. ("Synopsys"), pursuant to Rules 12(b)(6) and 12(f) of the Federal Rules of Civil Procedure.  Defendant ATopTech, Inc. ("ATopTech") has filed opposition, to which Synopsys has replied.  Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

**BACKGROUND**[2]

    ATopTech and Synopsys sell software tools for the design and testing of integrated

---

[1]By order filed August 5, 2015, the Court found the matter appropriate for decision on the parties' respective written submissions, vacated the hearing scheduled for August 7, 2015, and took the matter under submission.

[2] For purposes of the instant motion, the following facts, which are taken from ATopTech's Second Amended Answer to Amended Complaint and Second Amended Counterclaims ("SACC"), are accepted as true and construed in the light most favorable to ATopTech, the nonmoving party.  See NL Industries, Inc. v. Kaplan, 792 F. 2d 896, 898 (9th Cir. 1986).

1   circuits ("chips").  (See SACC, filed June 1, 2015 ¶ 65.)  Because of the complexity of

2   modern chip design, engineers cannot design the physical layout of a chip without the aid

3   of what is known as "place-and-route" software.  (Id. ¶ 67.)  Synopsys offers a

4   place-and-route software product, IC Compiler, which "competes directly" with ATopTech's

5   place-and-route software, Aprisa.  (Id. ¶¶ 70, 71.)  The respective shares of the producers

6   in the place-and-route market, as estimated by a "leading industry analyst," are as follows:

7   Synopsys (65%), Cadence Design Systems ("Cadence") (30%), Mentor Graphics (4%),

8   and ATopTech (1%).  (Id. ¶ 66.)[3]

9        "[V]erification software," also necessary in modern chip design (see id. ¶ 76), "is

10   used to verify the timing of the electronic signals of an integrated circuit design by testing its

11   electrical and timing performance . . . under various operating conditions" (id. ¶ 73).

12   Synopsys offers a verification software product called PrimeTime.  (Id. ¶ 74.)  Synopsys

13   has filed with the U.S. Copyright Office certain written manuals relating to its verification

14   software and claims copyright protection with respect to those materials.  (Id. ¶ 90.)

15   Although ATopTech does not sell verification software, its place-and-route software "must

16   be interoperable with static timing verification software" and the "level of interoperability and

17   compatibility between place-and-route software and static timing verification software is a

18   critical competitive dynamic."  (Id. ¶ 80.)  "[S]tatic timing verification software vendors . . .

19   will often provide close technical cooperation to place-and-route software vendors so that

20   the place-and-route software can work as well as possible with the static timing verification

21   software."  (Id. ¶ 85.)

22        Extreme DA was a company that sold a verification software product called

23   GoldTime.  (Id. ¶¶ 84, 85.)  Extreme DA and ATopTech jointly marketed GoldTime and

24   Aprisa (id. ¶ 85), and customers who had installed GoldTime "often purchased Aprisa

25   because of its level of interoperability and compatibility with GoldTime" (id.).  ATopTech

26

27        [3]ATopTech "believes its market share may be slightly higher, but . . . less than 3%."
     (See id. ¶ 71.)

28

2

previously licensed Extreme DA's patent for GoldTime, and "worked closely with Extreme DA to assure the interoperability of Aprisa and GoldTime."  (Id. ¶ 112.)  In 2011, Synopsys acquired Extreme DA (id. ¶ 83), thereafter "eliminated" GoldTime from the verification market (id. ¶ 84), and "deprived ATopTech of the technical cooperation it previously enjoyed with Extreme DA" (see id. ¶ 110.  Magma Design Automation ("Magma") was a company that sold a verification software product called Tekton.  (See id. ¶ 84.)  In 2012, Synopsys acquired Magma, and "eliminated" Tekton (see id.).

In the SACC, ATopTech asserts eighteen affirmative defenses and the following eight counterclaims: (1) "Declaratory Judgment And Injunctive Relief Arising From Copyright Misuse"; (2) "Violation of the Clayton Act, Section 7 (15 U.S.C. § 18)"; (3) "Violation of the Sherman Act, Section 1 (15 U.S.C. § 1)"; (4) "Violation of the Sherman Act, Section 1 (15 U.S.C. § 1) and the Clayton Act, Section 3 (15 U.S.C. § 14) (Tying)"; (5) "Violation of the Sherman Act, Section 2 (Static Timing Verification Software Market)"; (6) "Violation of the Sherman Act, Section 2 (Place-and-Route Software Market)"; (7) "Violation of Business & Professions Code Sections 16720 et seq. [Cartwright Act]"; (8) "Violation of Business & Professions Code Sections 17200 et seq. [Unfair Competition Law]".

By the instant motion, Synopsys seeks an order dismissing all eight counterclaims for failure to state a claim, and striking the Seventh, Eleventh, and Fifteenth Affirmative Defenses as insufficiently pleaded.  The Court addresses each issue in turn.

**MOTION TO DISMISS**

**A. Legal Standard**

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

1    cognizable legal theory.  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

2    1990). Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim

3    showing that the pleader is entitled to relief.'"  See Bell Atlantic Corp. v. Twombly, 550 U.S.

4    544, 555 (2007) (quoting Fed.R.Civ.P. 8(a)(2)).  Consequently, "a complaint attacked by a

5    Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."  See id.

6    Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief

7    requires more than labels and conclusions, and a formulaic recitation of the elements of a

8    cause of action will not do."  See id. (internal quotation, citation, and alteration omitted).

9         In analyzing a motion to dismiss, a district court must accept as true all material

10   allegations in the complaint, and construe them in the light most favorable to the

11   nonmoving party.  See NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).

12   "To survive a motion to dismiss, a complaint must contain sufficient factual material,

13   accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal,

14   556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "Factual allegations must

15   be enough to raise a right to relief above the speculative level[.]"  Twombly, 550 U.S. at

16   555.  Courts "are not bound to accept as true a legal conclusion couched as a factual

17   allegation."  See Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

18        **B. Discussion**

19             **1. Count I: Copyright Misuse**

20        "Copyright misuse is a judicially crafted affirmative defense to copyright

21   infringement, derived from the long-standing existence of such a defense in patent

22   litigation."  Apple Inc. v. Psystar Corp., 658 F.3d 1150, 1157 (9th Cir. 2011).  The doctrine

23   "does not prohibit using conditions to control use of copyrighted material," it does, however,

24   "prevent copyright holders from using the conditions to stifle competition."  Apple Inc. v.

25   Psystar Corp., 658 F.3d 1150, 1159 (9th Cir. 2011).  The purpose of the doctrine is to

26   "prevent[] holders of copyrights 'from leveraging their limited monopoly [granted by the

27   copyright] to allow them control of areas outside the monopoly.'"  Id. at 1157 (9th Cir. 2011)

28

4

1   (quoting A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1026 (9th Cir. 2001)).  "A

2   software licensing agreement may reasonably restrict use of the software as long as it does

3   not prevent the development of competing products."  Id. at 1159.

4       Here, citing Alcatel USA, Inc. v. DGI Tech., Inc., 166 F.3d 772 (5th Cir. 1999),[4]

5   ATopTech contends a restriction in Synopsys' standard licensing agreement constitutes an

6   attempt by Synopsys to leverage its copyright to control areas outside the monopoly

7   afforded by such copyright and, consequently, constitutes copyright misuse. See id. at 794

8   (finding copyright misuse where sole means of developing competing microprocessor card

9   was through use of plaintiff's software, which use was prohibited by license agreement;

10  finding agreement "effectively prevented [defendant] from developing its product").  In

11  particular, ATopTech alleges, "Synopsys' 'End-User Software License and Maintenance

12  Agreement' [EULA] states in Section 2.9(f) titled Restrictions: 'You may not (and may not

13  allow anyone else to): use a Licensed Product or its output to develop or enhance any

14  product that competes with a Synopsys product'" (see SACC ¶ 90),[5] which restriction,

15  ATopTech alleges, precludes ATopTech from developing a program that is fully

16  interoperable with verification software, a requisite feature of a competitive product (see id.

17  ¶¶ 80-81, 90-92).

18      As Synopsys points out, however, ATopTech's allegations make clear that

19  ATopTech does not need access to PrimeTime and its output reports in order to develop

20  place-and-route software.  As noted, ATopTech alleges its competing place-and-route

21  software, Aprisa, has between a one and three percent share of the place-and-route

22

23      [4]Synopsys also cites United States v. Microsoft, 253 F.3d 34, 64 (D.C. Cir. 2001).  In
    Microsoft, however, there was no claim of copyright misuse and, indeed, there is no
24  mention of copyright misuse in the opinion.

25      [5]In the Factual Background section of the SACC, ATopTech makes reference to
    Synopsys' Milkyway Development Kit End-User License Agreement for Synopsys Licensed
26  Software ("Milkyway Agreement").  (See SACC ¶ 90.)  In Count I, however, ATopTech,
    although incorporating all prior paragraphs, sets forth allegations based solely on the EULA
27  (see SACC ¶¶ 99-104), and in its opposition to the instant motion makes no argument
    addressing any alleged copyright misuses based on the Milkyway Agreement (see Opp'n at
28  3-7).

5

market (see id. ¶ 71), and, perhaps of greater significance, that another company, Cadence

Design Systems, has a competing place-and-route software product accounting for thirty

percent of the place-and-route market (see id. ¶ 66).  If access to PrimeTime and its output

reports was, in fact, necessary for the development of competitive place-and-route

software, there would be no such competing products, let alone a product capable of

garnering almost a third of the market.  In sum, and in contrast to the situation presented in

Alcatel, the EULA does not prevent the development of competing place-and-route

software and, consequently, ATopTech has failed to state a claim for copyright misuse.

See Psystar, 658 F.3d at 1155, 1159 (affirming dismissal of computer manufacturer's claim

that competing computer manufacturer engaged in copyright misuse by requiring its

copyrighted operating system be used exclusively on its computers; noting agreement did

"not prohibit[] others from independently developing and using their own operating systems"

(internal quotation and citation omitted).)

    Synopsys argues dismissal of the claim should be without leave to amend because

ATopTech has already amended its complaint twice[6] and further amendment would be

futile.  The Court agrees.  See Allen v. City of Beverly Hills, 911 F.2d 367, 373 (9th Cir.

1990) (listing futility among grounds upon which amendment may be denied and noting

"district court's discretion to deny leave to amend is particularly broad where plaintiff has

previously amended the complaint") (internal quotation and citation omitted).

    Accordingly, Count I will be dismissed without further leave to amend.

## 2. Count II: Clayton Act § 7

    Section 7 of the Clayton Act makes unlawful any acquisition where the effect thereof

"may be substantially to lessen competition, or tend to create a monopoly."  15 U.S.C. § 18.

"Only those who meet the requirements for 'antitrust standing' may pursue a claim under

the Clayton Act; and to acquire 'antitrust standing,' a plaintiff must adequately allege and

---

[6]On May 8, 2015, at the hearing conducted on Synopsys' motion to dismiss
ATopTech's First Amended Counterclaims, the Court dismissed each of ATopTech's
counterclaims with leave to amend.

1   eventually prove 'antitrust injury.'" <u>Glen Holly Entm't, Inc. v. Tektronix, Inc.</u>, 352 F.3d 367,

2   371 (9th Cir. 2013).  Antitrust injury has four elements: "(1) unlawful conduct, (2) causing

3   an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4)

4   that is of the type the antitrust laws were intended to prevent." <u>Id.</u> at 372.  Antitrust injury

5   requires pleading an injury to "competition," not competitors.  <u>Brunswick Corp. v. Pueblo</u>

6   <u>Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 488 (1977).  In other words, plaintiffs "must plead an injury

7   to competition beyond the impact on the plaintiffs themselves."  <u>See</u> <u>Brantley v. NBC</u>

8   <u>Universal</u>, 675 F.3d 1192, 1198 (9th Cir. 2012).

9        ATopTech contends Synopsys' acquisitions of two companies, Extreme DA and

10   Magma, harmed ATopTech and competition.  Specifically, ATopTech alleges that

11   Synopsys, after those acquisitions, discontinued the sale of Extreme DA's GoldTime

12   verification software, discontinued the sale of a Magma's Tekton verification software, and

13   stopped offering ATopTech the same level of technical assistance and other cooperation

14   previously offered by Extreme DA.[7]  (<u>See</u> SACC ¶¶ 84-85, 110, 112-13.)  Such conduct,

15   according to ATopTech, caused it to "lo[se] its ability to secure new customers through the

16   Aprisa/GoldTime joint marketing effort with Extreme DA" (<u>id.</u> ¶ 113), created "much greater

17   challenges" for ATopTech in "guaranteeing the interoperability of Aprisa [and] PrimeTime

18   due to Synopsys' refusal to share output data essential to static timing verification"

19   (<u>see</u> <u>id.</u>), and "forc[ed] customers that had adopted Aprisa and GoldTime to switch to . . .

20   Synopsys's PrimeTime" (<u>id.</u>).

21        Synopsys argues the injuries alleged do not constitute antitrust injury, and,

22   consequently, that ATopTech has not established standing.  According to Synopsys, the

23   alleged injuries do not flow from that which would make the acquisitions unlawful, i.e., the

24   anticompetitive effects due to increased market power, but instead from Synopsys' decision

25   to discontinue GoldTime.  In support of its position, Synopsys relies primarily on two cases,

26

27        [7]ATopTech does not allege that it previously cooperated with or received any
28   technical assistance from Magma.

1  Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc., 140 F.3d 1228 (9th Cir. 1998) and

2  Alberta Gas Chem., Ltd. v. E.I. Du Pont de Nemours & Co., 826 F.2d 1235 (3d Cir. 1987).

3          In Lucas, a distributor of vintage automobile tires, including Firestone brand tires,

4  brought a § 7 action against a competitor that had acquired the exclusive right to

5  manufacture and distribute vintage Firestone tires, thereby increasing its share of the

6  vintage tire market from 49% to 74% and its share of the original equipment vintage tire[8]

7  market to 90%.  The Ninth Circuit found the plaintiff could not demonstrate "antitrust injury"

8  and thus lacked standing to sue as a competitor, reasoning the plaintiff would have suffered

9  the same injury had a small business, instead of a large one, acquired the right to

10  manufacture and distribute the vintage tires.  Because Lucas's injury bore "no relationship

11  to the size of either the acquiring company or its competitors," it had not suffered an injury

12  of "the type the statute was intended to forestall."  See Lucas, 130 F.3d at 1233.

13          In Alberta, a methanol producer challenged a merger between DuPont, the largest

14  producer of methanol in the United States, and Conoco, an owner of coal reserves and a

15  consumer of methanol.  Prior to the merger, Conoco had planned to build a new plant to

16  convert coal into methanol and, in the interim, to make large-scale purchases of methanol

17  for resale, in order to spur demand for methanol fuel.  After the acquisition, however,

18  DuPont cancelled the plans to build a plant for methanol conversion.  Alberta claimed

19  damages for loss of sales to Conoco and loss of sales resulting from the previously

20  anticipated increase in demand for methanol as fuel.  The Court of Appeals found Alberta

21  had failed to show antitrust injury, noting "Alberta's alleged losses were neither connected

22  with, nor resulted from, DuPont's market power in the methanol-producing industry" and

23  that "the same harm would have occurred had any acquirer decided to curtail Conoco's

24  production and marketing plans."  See Alberta, 826 F.2d at 1241.

25          Synopsys argues that here, as in Lucas and Alberta, a smaller company could have

26  

27          [8]Original equipment vintage tires "bear the trademarks of tires which originally were
sold on vintage cars."  Id. at 1230.

28

8

1    acquired Extreme DA and Magma, eliminated their products, and refused to cooperate with

2    ATopTech, all without running afoul of the Clayton Act.  In response, ATopTech argues

3    Lucas and Alberta are distinguishable because, in those cases, the plaintiff failed to show

4    that a smaller acquirer would not have undertaken the same action as did the larger

5    acquirer, whereas here, according to ATopTech, a smaller company would not have

6    discontinued GoldTime or Tekton because a smaller competitor in the verification software

7    market "would not have had the market power to force customers to switch" to its own

8    verification software (see SACC ¶ 88), and a company without its own place-and-route

9    software, "would not have had an incentive to discontinue [GoldTime or Tekton] in order to

10   force customers to switch to the firm's [own] place-and-route software" (id.).

11          ATopTech's allegation that a smaller company would lack the power or financial

12   incentive to discontinue GoldTime is, in essence, no more than conjecture.  First, there are

13   many reasons why a consumer may choose to do business with a smaller rather than

14   larger provider without being "forced" to do so, including but by no means limited to, the

15   quality and price of the products, the level of service offered, and established or the

16   potential for establishing working relationships with personnel; nor, as the SACC makes

17   clear, is Synopsys the only company capable of producing both verification and place-and-

18   route software.  Further, as the Court of Appeals recognized in Alberta, there may be a

19   number of different economic reasons why two acquiring companies, although not similarly

20   situated, may come to the same business decision.  See Alberta, 826 F.2d at 1241-42

21   (finding acquiring company's possible anticompetitive reason for termination of production

22   after acquisition irrelevant when same harm would have occurred had there been different

23   acquirer that did not pose anticompetitive concerns and made same decision for other

24   reason, such as disinclination to take on additional costs of production).[9]  In sum,

25

26          [9]Indeed, the motivation for one company's decision to acquire another may have
     nothing to do with an intent to continue the acquired company's product, including, but
27   again not limited to, a need to expand production facilities, a need for additional skilled
     labor or technical expertise, or an interest in increasing market share in another
28   geographical area.

1    ATopTech has failed to allege antitrust injury.

2         Moreover, even assuming ATopTech had adequately alleged standing, ATopTech

3    has failed to allege sufficient facts demonstrating how the acquisition harmed competition,

4    as opposed to merely ATopTech.  Although ATopTech alleges ATopTech's conduct

5    "reduced competition, deprived consumers of choices, and increased prices for consumers"

6    (SACC ¶ 117), ATopTech has not alleged any facts showing the state of the market before

7    the challenged acquisitions, e.g., the market share attributable to Extreme DA and Magma

8    prior to their acquisition, the market share attributable to Synopsys, Cadence, and CLK

9    prior to such acquisitions, or whether any other place-and-route software producers used

10   either GoldTime or Tekton.  See Iqbal, 556 U.S. at 678 (holding complaint does not suffice

11   "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement'" (quoting Bell

12   Atlantic Corp. v. Twombly, 550 U.S. 544, 557 (2007)).

13        Although the latter of the above-discussed deficiencies may be capable of

14   amendment, any further leave to amend, given the former, would be futile.

15        Accordingly, Count II will be dismissed without leave to amend.

16              **3. Count III: Sherman Act § 1 (Agreement in Restraint of Trade)**

17        Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of

18   trust or otherwise, or conspiracy, in restraint of trade among the several States."  15 U.S.C.

19   § 1.  ATopTech alleges that Section 2.9(f) of the EULA "unlawfully restrain[s] trade in the

20   development and sale of competing place-and-route software" in violation of § 1.  (See

21   SACC ¶ 121.)[10]  Agreements that cannot be characterized as illegal per se are analyzed

22   under what has been termed the "Rule of Reason."  Nat'l Soc. of Prof'l Engineers v. United

23   States, 435 U.S. 679, 690-92 (1978).  The parties agree Section 2.9(f) should be analyzed

24   under the Rule of Reason.

25        To state a § 1 claim under the Rule of Reason, a plaintiff must plead "(1) a contract,

26   _____

27        [10]Section 2.9(f), as noted above, provides that customers using PrimeTime "may not
     (and may not allow anyone else to): use [PrimeTime] or its output to develop or enhance
28   any product that competes with a Synopsys product."  (See SACC ¶ 90.)

                                        10

1   combination or conspiracy among two or more persons or distinct business entities; (2) by

2   which the persons or entities intended to harm or restrain trade or commerce among the

3   several States, or with foreign nations; (3) which actually injures competition."  Brantley v.

4   NBC Universal, 675 F.3d 1192, 1197 (9th Cir. 2012).  As to the third element, "the inquiry

5   mandated by the Rule of Reason is whether the challenged agreement is one that

6   promotes competition or one that suppresses competition," Nat'l Soc., 435 U.S. at 691, and

7   the competitive effect of such agreement "can only be evaluated by analyzing the facts

8   peculiar to the business, the history of the restraint, and the reasons why it was imposed,"

9   id. at 692.

10      ATopTech's § 1 claim, however, as Synopsys correctly points out, fails to allege

11  facts showing the impact of the EULA on competition,[11] and instead only alleges harm to

12  ATopTech.  Notably, ATopTech does not allege that other competitors need or have used

13  access to PrimeTime or its output reports in order to develop interoperable place-and-route

14  software, nor does such access appear necessary, where, as noted above, Synopsys'

15  competitors have garnered approximately a third of the market without such access.

16      Citing Glen Holly, ATopTech argues it need not show Synopsys succeeded in

17  foreclosing all competition in the place-and-route market.  See Glen Holly, 352 F.3d at 378

18  (noting "competitors may be able to prove antitrust injury before they actually are driven

19  from the market and competition is thereby lessened") (internal quotation and citation

20  omitted).  Glen Holly is distinguishable, however, as in that case, the plaintiff had

21  sufficiently shown antitrust injury, whereas here, as noted above, ATopTech has not shown

22  the EULA harms competition, and, instead, has only alleged harm to itself.  See Les

23  Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n, 884 F.2d 504, 509 (9th Cir. 1989) (affirming

24  dismissal of complaint lacking factual allegations showing the effect of agreement on price

25

26      [11]As noted, ATopTech references both the EULA and Milkyway Agreement in the
     SACC's Factual Background section.  Although in Count III, in contrast to Count I,
27   ATopTech does allege that both agreements unlawfully restrain trade (see SACC ¶ 122), in
     its opposition ATopTech makes no argument referencing the Milkyway Agreement as
28   support for its § 1 claim (see Opp'n at 12-15).

or availability of product, availability of opportunity for entry into the market, "or any other characteristic or function of a competitive market").[12]

Although ATopTech's § 1 is subject to dismissal, the Court will afford ATopTech leave to amend, as the deficiencies noted above do not appear to be of the type that are incapable of amendment, see Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 701 (9th Cir. 1988) (holding leave to amend "should be granted if it appears at all possible that the plaintiff can correct the defect") (internal quotation and citation omitted), and, as the claim was asserted for the first time in the SACC, the Court has not ruled previously on the sufficiency of the allegations made in support thereof, see Allen, 911 F.2d at 373 (listing previous amendment among factors considered by court in determining whether to afford leave to amend).

Accordingly, Count III will be dismissed with leave to amend.

### 4. Count IV: Sherman Act § 1 and Clayton Act § 3 (Tying)[13]

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Eastman Kodak Co. v. Image Tech. Services, Inc., 504 U.S. 451, 461 (1992) (internal quotation and citation omitted). The Supreme Court has held that "[s]uch an arrangement violates § 1 of the Sherman Act if the seller has appreciable economic power in the tying market and if the arrangement affects a substantial volume of commerce in the tied market." See id. "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different

---

[12]In light of the above, the Court does not address herein the parties' dispute as to whether PrimeTime outputs are covered by Synopsys' copyright.

[13]Although ATopTech brings its tying claim under both § 1 of the Sherman Act and § 3 of the Clayton Act, the Court need only conduct one analysis, as "the standards used by the two statutes are the same." See Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 23 n.39 (1984).

terms." Id. at 464 n.9 (internal quotation and citation omitted). "When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." Id.; see also Paladin Associates, Inc. v. Montana Power Co., 328 F.3d 1145, 1159 (9th Cir. 2003) (holding elements of tying claim are: "(1) that there exist two distinct products or services in different markets whose sales are tied together; (2) that the seller possesses appreciable economic power in the tying product market sufficient to coerce acceptance of the tied market; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market") (internal quotation and citation omitted). Synopsys argues that ATopTech has not alleged a tie or sufficient harm to competition.

In its SACC, ATopTech alleges Synopsys engages in tying by "forc[ing] customers who wish to purchase its static timing verification software PrimeTime (the tying product) to also purchase [its] place-and-route software [IC Compiler] (the tied product) from Synopsys." (SACC ¶ 128.) ATopTech acknowledges that Synopsys offers PrimeTime and IC Compiler separately, but alleges Synopsys accomplishes the asserted "forcing" through "elimination of substantial discounts on [Synopsys'] PrimeTime and other software to any customer who purchases place-and-route software from a competitor, including ATopTech." (See id. ¶ 95.) ATopTech further contends that "the increased price charged by Synopsys to customers that use Aprisa is punitive" (id. ¶ 96), and that such price "renders it economically unviable" for customers to purchase place-and-route software from Synopsys' competitors (see id.). As Synopsys correctly points out, however, ATopTech's coercion allegations lack factual support. The SACC does not include facts that would show how the alleged discounting practice was coercive, e.g., the amount of the difference between the price of PrimeTime when purchased separately and its price when purchased together with IC Compiler, or how Synopsys' prices compare to the prices charged by competitors.

Moreover, ATopTech fails to allege facts tending to show competition was harmed in

1    the place-and-route software market.  The SACC alleges only that one customer purchased

2    both products together because it would otherwise lose the package discount.  (See SACC

3    ¶ 97.)  As the Supreme Court has observed, ""[i]f only a single purchaser were 'forced' with

4    respect to the purchase of a tied item, the resultant impact on competition would not be

5    sufficient to warrant the concern of antitrust law."  Jefferson Parish, 466 U.S. at 16.  Here,

6    absent any allegations as to whether other customers were coerced, what percentage of

7    the place-and-route market has been foreclosed by Synopsys' alleged tying, or even the

8    relative size of the one customer, the SACC fails to allege facts showing a "substantial

9    volume of commerce" has been affected by the challenged conduct.[14]

10   As ATopTech has repeated, rather than cured, the allegations previously identified

11   by the Court as deficient, no further leave to amend is warranted.  Accordingly, ATopTech's

12   tying counterclaim will be dismissed without further leave to amend..

13   **5. Count V: Sherman Act § 2 (Monopolization and Attempted**

14   **Monopolization of the Verification Market)**

15   To properly state a monopolization claim under § 2 of the Sherman Act, a plaintiff

16   must plead facts showing "(1) the possession of monopoly power in the relevant market

17   and (2) the willful acquisition or maintenance of that power as distinguished from growth or

18   development as a consequence of a superior product, business acumen, or historic

19   accident."  Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536, 541 (9th Cir. 1991).

20   To state an attempted monopolization claim under § 2 of the Sherman Act, a plaintiff must

21   plead facts showing "(1) that the defendant has engaged in predatory or anticompetitive

22   conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving

23   monopoly power."  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).

24

25   _____

     [14]In light of the above, the Court does not address herein the parties' dispute as to
26   whether ATopTech's tying claim requires an allegation that the alleged discount results in
     prices below Synopsys' costs.  See Cascade Health Solutions v. PeaceHealth, 515 F.3d
27   883, 915 (9th Cir. 2007) (declining to answer "the question of whether, to establish the
     coercion element of a tying claim through a bundled discount, [plaintiff] must prove that
28   [defendant] priced below a relevant measure of its costs").

ATopTech alleges Synopsys has an 88% market share of the verification market. (See SACC ¶ 73.)  As Synopsys does not dispute it has monopoly power in that market, the first element of ATopTech's monopolization claim is satisfied.

For the second element of its monopolization claim, ATopTech relies on the conduct alleged in support of Counts I through IV.  Synopsys argues, inter alia, that ATopTech's claim fails because ATopTech is not a market participant in the verification market and thus lacks antitrust standing.  The Court agrees.

"Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."  Am. Ad Mgmt. v. GTE, 190 F.3d 1051, 1057 (9th Cir. 1999).  Consequently, to state a claim for monopolization or attempted monopolization, a plaintiff must be "a participant in the same market as the alleged malefactors."  See Bhan v. NME Hospitals, Inc., 772 F.2d 1467, 1470 (9th Cir. 1985).  Although the term "market participant" is not limited to consumers and competitors, see Am. Ad., 190 F.3d at 1057 (noting "[t]he Supreme Court has never imposed a 'consumer or competitor' test"), where plaintiffs other than consumers or competitors have been found to have standing as participants in a market, those plaintiffs have regularly done business in that market.  See, e.g., Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 345 (recognizing "manufacturer's own dealers'" standing to sue manufacturer); Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co., 141 F.3d 947 (9th Cir.1998) (analyzing supplier's antitrust injury); Illinois Corporate Travel, Inc. v. American Airlines, Inc., 806 F.2d 722, 729 (7th Cir.1986) (permitting travel agent's claim against airline).  Here, ATopTech's alleged injuries, as described above, are far more attenuated, as ATopTech does not do business in the verification market, but, rather, solely in the place-and-route market, and, consequently, its alleged injuries are alleged to have been sustained solely in that market.  Under such circumstances, ATopTech has failed to show it is a participant in the verification market and thus fails to make the requisite

1    showing for antitrust standing.[15]

2        Given the facts alleged, the Court finds the defect noted above is not of the type that

3    is capable of amendment.  Accordingly, Count V will be dismissed without further leave to

4    amend.

5        **6. Count VI: Sherman Act § 2 (Monopolization and Attempted**

6    **Monopolization of the Place-and-Route Market)**

7        ATopTech alleges Synopsys has a 65% share of the place-and-route market.  (See

8    SACC ¶ 66.)  Synopsys does not dispute that it has monopoly power in the place-and-route

9    market, and, consequently, the first element is again satisfied.

10       As to the second element, ATopTech again relies on all of its previous allegations,

11   and in its opposition, clarifies that "[t]he anticompetitive conduct alleged here is not (as

12   Synopsys would have it) that Synopsys has refused to provide technical specifics to

13   competitors to assist them in creating interoperable products" (see Opp'n at 19:4-6 (internal

14   quotation, alteration, and citation omitted)), but, instead, "Synopsys' strategy of using its

15   copyright for PrimeTime to block customers from sharing their own output data with rival

16   place-and-route firms" (id. at 19:6-9 (emphasis in original)).[16]

17       As discussed above, ATopTech has failed to allege harm to competition based on

18   such conduct and, consequently, the instant claim fails.  See Verizon Commc'ns Inc. v. Law

19   Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) (holding "possession of

20   monopoly power will not be found unlawful unless it is accompanied by an element of

21

22

23   ────────────────

24       [15]Such failure similarly forecloses Synopsys' attempted monopolization claim.

25       [16]In the SACC, ATopTech also alleges Synopsys "has used and attempted to use its
     assertion of copyright claims as a competitive weapon by falsely asserting to customers of
26   ATopTech that ATopTech is engaging in unlawful conduct and that ATopTech will not be
     able to continue as a viable supplier of place-and-route software" (see SACC ¶ 94) and by
27   "filing objectively baseless litigation" (see SACC ¶ 152).  As Synopsys points out, however,
     said allegations lack any factual support, let alone, as to the alleged false statements, facts
28   sufficient to comply with Rule 9(b) of the Federal Rules of Civil Procedure.

1  anticompetitive conduct").[17]

2      As with Count III, ATopTech may be capable of successfully amending to cure the

3  above-noted deficiencies.  Accordingly, Count VI will be dismissed with leave to amend.

4      **7. Count VII: Cartwright Act**

5      ATopTech's Cartwright Act claim is based on its tying claim, and thus fails for the

6  reasons stated above.  See Marin Cty. Bd. of Realtors, Inc. v. Palsson, 16 Cal. 3d 920, 925

7  (1976) (holding Cartwright Act is patterned after Sherman Act).

8      Accordingly, Count VII will be dismissed without further leave to amend.

9      **8. Count VIII: Unfair Competition Law ("UCL")**

10      The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal.

11  Bus. & Prof. Code § 17200.  ATopTech's UCL claims are based on its antitrust claims,

12  which, ATopTech contends, establish a violation of both the "unlawful" and "unfair" prongs

13  of the UCL.

14      "Under its 'unlawful' prong, the UCL borrows violations of other laws . . . and makes

15  those unlawful practices actionable under the UCL."  Berryman v. Merit Prop. Mgmt., 152

16  Cal. App. 4th 1544, 1554 (2007).  Here, as discussed above, ATopTech has failed to

17  properly allege an antitrust violation.  Consequently, ATopTech has not established a

18  violation of the UCL under the "unlawful" prong.  See id.

19      Citing Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163

20  (1999), ATopTech argues that its antitrust allegations nonetheless satisfy the UCL's "unfair"

21  prong.  See id. at 188 (holding conduct not in violation of statute may satisfy UCL's unfair

22  prong where conduct "violates the policy or spirit" of antitrust law and complaint does not

23  serve as means of "plead[ing] around an absolute bar of some other provision") (internal

24  quotation omitted).

25      In Cel-Tech, sellers of cellular telephones brought an action against a company that

26

27      [17]For the same reason, Synopsys' claim for attempted monopolization of the place-and-route market likewise fails.

28

17

sold cellular telephones below cost to gain subscribers for its cellular services, alleging the defendant's below-cost sales violated the UCL as well as California's Unfair Practices Act, which prohibits below-cost sales when made for the purpose of injuring competition.  See Cal. Bus. And Prof. Code §§ 17043, 17044.  The California Supreme Court found such sales did not violate the Unfair Practices Act because the seller lacked the requisite intent, but, as to the question of whether the conduct violated the policy or spirit of the Unfair Practices Act, remanded the case for trial on the UCL cause of action, noting the California Legislature "undoubtedly did not consider below-cost sales in [the] context" of the "unusual circumstance" presented therein, namely, the defendant's "privileged status as one of two holders of a lucrative government-licensed duopoly"[18] that "enabled [the defendant] to subsidize massive losses . . . with . . . profits which by law were unavailable to its competitors."  Id. at 188-90.

Here, in contrast to the situation presented in Cel-Tech, ATopTech has not pointed to any "unusual" aspect of the alleged conduct that would make that conduct something that violates the "policy and spirit" of the antitrust laws without violating the actual laws themselves.  Rather, the conduct ATopTech challenges either is anticompetitive and thus simultaneously violates both the antitrust laws and their "policy and spirit," or it violates neither.

Accordingly, as some of the claims from which Count VIII is derived may be capable of amendment, Count VIII will be dismissed with leave to amend.

## MOTION TO STRIKE

### A. Legal Standard

A court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Where an affirmative defense is challenged as insufficient, the court looks to whether the pleading is in

---

[18]At the time, the federal government licensed only two companies to provide cellular services in the area.  Id. at 169.

18

conformity with Rule 8.  <u>See</u>, <u>Barnes v. AT&T Pension Benefit Plan–Nonbargained</u>

<u>Program</u>, 718 F. Supp. 2d 1167, 1170 (N.D. Cal. 2010) (holding "defense is insufficiently

pled if it fails to give the plaintiff fair notice of the nature of the defense"); <u>Iqbal</u>, 556 U.S. at

678 (holding, in context of challenge to adequacy of complaint, allegations "must contain

sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its

face'" (quoting <u>Twombly</u>, 550 U.S. at 570)).

**B. Discussion**

Synopsys seeks an order striking the Seventh, Eleventh, and Fifteenth Affirmative

Defenses.

**1. Seventh Affirmative Defense**

ATopTech's Seventh Affirmative Defense restates ATopTech's copyright misuse

counterclaim, and, for the reasons stated above, likewise fails.

Accordingly, ATopTech's Seventh Affirmative Defense will be stricken without leave

to amend.

**2. Eleventh Affirmative Defense**

ATopTech's Eleventh Affirmative Defense alleges Synopsys' claims are barred by

estoppel and is predicated on allegations made earlier in the SACC along with an allegation

that Synopsys "authorized" the conduct on which it now bases its claims, by stating to its

customers that it will permit rather than prohibit its verification software to be used in a

reasonable manner to verify circuitry placed and routed by ATopTech's place-and-route

software.  Synopsys seeks an order striking the Eleventh Affirmative Defense to the extent

it is based on statements allegedly made to customers, noting ATopTech has not alleged

reliance on any such statement.  <u>See</u> <u>A.C. Aukerman Co. V. R.I. Chaides Const. Co.</u>, 960

F. 2d 1020, 1041 (Fed. Cir. 1992) (listing reliance on alleged misleading communication as

element of equitable estoppel defense).  ATopTech in its opposition has neither argued that

it has alleged nor can allege such reliance.

Accordingly, to the extent ATopTech's Eleventh Affirmative Defense is based on

1   Synopsys' alleged misrepresentations to customers, said affirmative defense will be

2   stricken without leave to amend.

3                      **3. Fifteenth Affirmative Defense**

4          ATopTech's Fifteenth Affirmative Defense alleges, in its entirety, that "[o]n

5   information and belief, Synopsys' claims for relief are barred or limited in whole or in part by

6   equitable estoppel, including laches, waiver, estoppel, implied license, and/or unclean

7   hands." The Fifteenth Affirmative Defense is devoid of any factual support, and, contrary to

8   ATopTech's argument, does not rely on facts alleged elsewhere in the SACC. Given such

9   deficiency, the Fifteenth Affirmative Defense fails.[19]

10         Accordingly, ATopTech's Fifteenth affirmative defense will be stricken with leave to

11  amend.

12                            **CONCLUSION**

13         For the reasons stated above, Synopsys' motion to dismiss and strike is hereby

14  GRANTED as follows:

15         1. To the extent the motion seeks dismissal of Counts I, II, IV, V, and VII the motion

16  is GRANTED, and said counts are DISMISSED without leave to amend.

17         2. To the extent the motion seeks dismissal of Counts III, VI, and VIII, the motion is

18  GRANTED, and said counts are DISMISSED with leave to amend.

19         3. To the extent the motion seeks an order striking the Seventh Affirmative Defense,

20  the motion is GRANTED, and said affirmative defense is STRICKEN without leave to

21  amend.

22         4. To the extent the motion seeks an order striking the portion of the Eleventh

23  Affirmative Defense that is based on statements allegedly made to customers, the motion

24  is GRANTED, and said portion of the affirmative defense is STRICKEN without leave to

25  amend.

26  _____

27         [19]In light of the above, the Court does not address herein the parties' dispute as to
28  the elements of an unclean hands defense.

                                    20

1    5. To the extent the motion seeks an order striking the Fifteenth Affirmative Defense,

2  the motion is GRANTED, and said affirmative defense is STRICKEN with leave to amend.

3    ATopTech shall file its Third Amended Answer and Counterclaims no later than

4  August 28, 2015.

5    **IT IS SO ORDERED**.

6

7  Dated: August 7, 2015

            MAXINE M. CHESNEY
            United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21