Pages 1 - 179

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY

| | |
|---|---|
| SYNOPSYS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) No. C 13-2965 MMC |
| | ) |
| ATOPTECH, INC., | ) |
| | ) San Francisco, California |
| Defendant. | ) Friday |
| | ) December 18, 2015 |
| _____ | ) 9:00 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          JONES DAY
                            1755 Embarcadero Road
                            Palo Alto, California 94303
                   **BY:  PATRICK THOMAS MICHAEL, ESQ.**
                        **HEATHER NICOLE FUGITT, ESQ.**
                        **JOE CHUAN-CHE LIU, ESQ.**

                            JONES DAY
                            77 West Wacker Drive
                            Suite 3500
                            Chicago, Illinois 60601
                   **BY:  KRISTA SUE SCHWARTZ, ESQ.**

**For Defendant:**          ARNOLD AND PORTER, LLP
                            1801 Page Mill Road
                            Suite 110
                            Palo Alto, California 94304
                   **BY:  PAUL ALEXANDER, ESQ.**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:   Debra L. Pas, CSR 11916, CRR, RMR, RPR*
            *Official Reporter - US District Court*
            *Computerized Transcription By Eclipse*

1    **APPEARANCES:   (CONTINUED)**

2

3    **For Defendant:**            ARNOLD AND PORTER, LLC
                                    Three Embarcadero Center
4                                   7th Floor
                                    San Francisco, California 94111
5                          BY:  **MARTIN R. GLICK, ESQ.**

6

7    **Also Present:**             RICH RUNKEL

8                                  **SHANEE NELSON**
                                    **- Synopsys**
9

10                                      -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E; D I N G S.

 2   DECEMBER 18, 2015                              10:10 A.M.

 3            THE COURT:  Now, we're going to call the next case.

 4   There are a lot of papers that have been filed in connection

 5   with it and we just finished a very large, let's just say

 6   lengthy and involved patent trial.  So that was Ms. Lucero

 7   clearing all those papers off and now they have been replaced

 8   with all of your papers.  And I guess we're ready to proceed.

 9       If you want to come forward, whoever is in the Synopsys

10   case.  I'm just going to put something aside and get your

11   moving papers in front of me.

12            THE CLERK:  Calling Civil Case No. 13-2965, Synopsys

13   versus ATopTech.

14            THE COURT:  We'll take a moment here for counsel just

15   to get organized, and I'll move a few things out of the way as

16   well.

17       (Brief pause.)

18            THE COURT:  I want to let you know, counsel, that we

19   have one case management conference and it is scheduled for

20   10:30.  So maybe we'll get kind of organized, set up and into

21   this a bit, and then what I might do at that point is just

22   briefly defer to that one matter and then come back to you so

23   that they are not waiting through a very long hearing and we

24   don't feel pressured by somebody waiting, essentially.

25       Would counsel come forward and state their appearances,
</pre>

1  please.

2        **MR. MICHAEL:**  Good morning, your Honor.  Patrick

3  Michael with Jones Day on behalf of Synopsys.

4        **THE COURT:**  Thank you.

5        **MS. SCHWARTZ:**  Krista Schwartz, also with Jones Day,

6  on behalf of Synopsys.

7        **MR. MICHAEL:**  And, your Honor, I want to mention that

8  Rick Runkel, who is the general counsel for Synopsys, is with

9  us today, as well as Shanee Nelson, who is director of

10  litigation.  And Joe Liu and Heather Fugitt, who helped out on

11  the papers.

12        **THE COURT:**  All right.  Thank you.

13     One moment.

14     (Brief pause.)

15        **THE COURT:**  Okay.  And for the defendant.

16        **MR. ALEXANDER:**  Good morning, your Honor.  Paul

17  Alexander from Arnold and Porter for the defendant.

18        **THE COURT:**  Mr. Alexander.

19        **MR. GLICK:**  And, also, good morning, your Honor.

20  Marty Glick with Arnold and Porter for ATopTech.

21        **THE COURT:**  Mr. Glick.

22     Now, we have two motions.  The first being the defendant's

23  motion for summary judgment.  Of course, that granted, we

24  wouldn't get to the plaintiff's motion attacking all of the

25  affirmative defenses that have been raised.

```
 1        So we should start with the defendant's motion.  It
 2   doesn't mean I'm going to rule on it immediately, but who knows
 3   what I will do.
 4        I want you to know that this has been a very busy time in
 5   these chambers, and particularly with this last case.  It
 6   wasn't really that long.  It was only a couple of weeks, but
 7   it -- it had a lot of complexity and work in it.
 8        So, in any event, I have not had as much leisure as I
 9   would like to have had in going over everything in your papers.
10   Though I believe that I do, you know, generally understand the
11   issues, I'm not sure that I understand this technology in terms
12   of all of the detail that might bear on the particular motion.
13        I want to say a couple of things in advance, just
14   guidelines.  Do I understand there is going to be some sort of
15   video presentation also?
16        MR. ALEXANDER:  Your Honor, both sides have probably
17   gotten some documents and some exhibits.  We understand the
18   technology is not the simplest and so we have something to try
19   to explain that a little bit.
20        THE COURT:  Yeah, good.  The -- let me just think for
21   a moment.
22        I wanted to say a couple of things about summary judgment.
23   Of course, I'm sure that you -- both sides know the first thing
24   I'm going to say.
25        This is not about whether someone has a good case or a
```

weak case or a good defense or a weak defense.  It's whether

they have no case or no defense.  And so the -- a showing that

somebody's case is legally lacking could give rise then or

factually, too, to summary judgment in whichever direction

these motions are being made, but it's a fairly high hurdle to

come -- to get over.

The other is that, as I understand the law, the moving

party is going to have the burden of essentially killing off

the other side's case, whatever it is, even though at trial the

opposing party has the burden on those issues.

And the moving party can do it in one of two ways:  Either

by presenting their own affirmative evidence that is contrary

to whatever the element is that the other side needs to prove

up, thus, shifting the burden of going forward to the opposing

party to come back with some conflicting facts; or to show that

through the course of discovery the party who has the burden

ordinarily at trial has conceded that they can't meet it in so

many words.

If they needed to prove a particular fact and they have

conceded that they don't not answer, and there is nobody else

who knows it either, and everybody knows that only that one

person would have the answer, then that could be a showing.

But what you can't do is say:  We had discovery and nobody

said anything about X, Y, Z, unless they are precluded by the

Rules of Discovery from ever saying it later.  So I just want

1   to get those kind of parameters out there.

2        On the motion for summary judgment, there are several

3   prongs that we have that have been raised by the defendant.

4   One is on the question of whether this material is subject to

5   copyright protection.  And according to the defendant, they

6   said:  Gee, we thought, you know, you were claiming these words

7   and so we had a whole opening brief on words.  And you're

8   saying it's not really the words.  It's how they are collected

9   up and assembled and et cetera, et cetera.  That's no good

10  either, but we aren't spending as much time telling you why it

11  isn't as good.  We just know those words are no good.

12       So I want to find out, first, on that point whether the

13  plaintiff is contesting in the defendant's assertion that if

14  all you're claiming is the words, which is the verb followed by

15  a noun, let's say -- well, let's just say the words.  And I'm

16  not sure we can even decide what the words are.

17       In other words, do you stop with one word?  You've got two

18  words connected with something.  If you understand what they

19  are calling the words, are you saying that that's copyrightable

20  or do you need more?

21            **MR. MICHAEL:**  Your Honor, Patrick Michael.

22            **THE COURT:**  That's okay.  Yeah.  I guess for the

23  first time each of you maybe begins your presentation, state

24  your appearances.

25            **MR. MICHAEL:**  So one of the items I was hoping we

```
1   would address upfront is because there are a number of issues

2   in the motions, we have divided up kind of issues.  So it may

3   be a little bit fluid, so if you could indulge us through the

4   process on that.

5           THE COURT:  That's fine.

6           MR. MICHAEL:  To answer your question directly,

7   Synopsys' case has never been about individual names or

8   individual words.

9           THE COURT:  Okay.

10          MR. MICHAEL:  That's not our case.  And if ATopTech

11  wanted that to be the case, they should have broad a DJ action

12  for something on that.

13      Our case has been about the input formats and output

14  formats, and the formats consist of both the collection in the

15  original input, command names, opposites, parameters and syntax

16  that is part of that format.

17          THE COURT:  When you say the "command names," is that

18  words?  I mean --

19          MR. MICHAEL:  It's characters, certainly, that is

20  used in software.  Absolutely.

21          THE COURT:  I just want to make sure everybody is

22  talking about the same thing.  We have got semantical problems

23  along with factual, legal, et cetera, et cetera.  I want to

24  make sure everybody is on the same page with this.  I'm not

25  sure you are.  So that was one concern.
```

```
 1        Then you have this whole concern about did the plaintiff
 2   give up when they registered for this PrimeTime output or
 3   whatever they had developed before.  And that is -- is the
 4   defendant's position it's not copyrightable anyway, but if
 5   somebody thinks it is, you gave it up?
 6             MR. ALEXANDER:  It's not included in the Certificate
 7   of Registration that this suit is based upon.
 8             THE COURT:  No, no, I understand.  But, yes, you gave
 9   it up for purposes of the lawsuit.
10             MR. ALEXANDER:  Right.
11             THE COURT:  Because you need registration to sue.
12             MR. ALEXANDER:  And because you excluded that.
13             THE COURT:  Yes, okay.  But with without elaborating
14   too much on that, so the plaintiff says:  Gee, we were stuck
15   with this parenthetically stupid form that the copyright people
16   created, and they put that out there for us to use, and we --
17   we had to fill in the blank with something, and that was the
18   only blank that fit even sort of, and so that's what we were
19   stuck with.
20        Now, the defendant comes back and says, in effect, even if
21   you were -- and they don't concede you were, but even if you
22   were, you didn't fill it in with enough detail.  You just said:
23   Anything that's out there that we ever created, okay, fine, we
24   want to cover that, too.
25        That's a more serious issue, in the Court's view, than the
```

1   disclaimer of idea.  The execution being a disclaimer.

2       So you can both give me your best cases on that.  I think

3   you have already, but I have some real questions about that.

4   That's a very general, really, really general idea.

5       So those are the chief points here, I think, that we're

6   dealing with.

7       And the more complex one, frankly, is the question of

8   whether these formats are subject to copyright protection.  And

9   we have this whole special procedure, analytical model,

10  whatever you want to call it, to go through.

11      And I -- I'll be particularly interested in that first

12  aspect of it -- the third aspect of it, the third part

13  comparing.  I'm not interested at the moment as that first part

14  of what do they meet in *Oracle* or otherwise in talking about

15  this abstraction idea.

16      So anybody who is going to comment about that can say what

17  they think it means in general and how it -- that approach fits

18  into what we're dealing with here in this program.

19      All right.  So how do you want to start?

20          **MR. ALEXANDER:**  We can start two ways, your Honor.

21  We can -- we can address -- in the time we have, we can show

22  what we think is the technology and then we can address this --

23  this limitation issue, the fact that there is no derivative

24  work identified at all.  It's just everything.  We can address

25  that.  I think it's largely covered in the papers, but we

1  certainly can address that.

2  **THE COURT:**  Yeah.  I think that's less of a need to

3  be discussed than -- I mean, you can give me your one -- your

4  best case on each side, if you want to.

5      The plaintiff has -- their case is a collection concept,

6  so that's different to a certain extent, maybe to a big extent.

7  And the -- even if all the plaintiff had was whatever was

8  claimed in the registration expressly, you know, the new stuff,

9  if you will, the plaintiff says they have some considerable

10  amount of material that they would argue was infringed.  Is

11  that correct?

12  **MR. MICHAEL:**  That is correct, your Honor.

13  **THE COURT:**  Okay.

14  **MR. MICHAEL:**  I think there is a gating issue here

15  that might be appropriate to take up initially, given that it

16  is summary judgment and that's some of the evidentiary failures

17  that come with defendant's motion.

18  **THE COURT:**  Right.  I would like to talk to you about

19  that as well.

20      You know, I'm sitting here with piles of declarations and

21  reports and exhibits and whatever you've got here and

22  ultimately, of course, summary judgment is about evidence

23  submitted at this time.  And the big difference between it and

24  a trial is you don't have a witness on the stand.  But you've

25  got to have the stuff and not just the argument.

1    And so if it's not there in the record right now, it

2    would -- and even if the argument is good, if it were in the

3    record, you would have to wait until you make the record.

4        **MR. ALEXANDER:**  Although, your Honor, two things

5    there.

6        One is that whatever this allegedly copyrighted thing is

7    is sort of a moving target.  It's words.  It's formats.  It's

8    something.  And so there needs to be some definiteness about

9    that in order for you to do what you must do, which is

10   determine what's protectable expression and what's not.

11       And so -- and so when you are responding to this sort of

12   large number of terms and so forth, long lists and so forth and

13   so on, then you can respond to it:  Well, do you mean the

14   names?  In which case, we've got this to say.  If you don't

15   mean that, then we've got this to say.

16       So some of this evidentiary issue is compelled by the -- I

17   don't want to say vagueness because that's pejorative and I

18   don't want to be that, but even the lack --

19       **THE COURT:**  And that may be the whole problem with

20   this particular motion, at least in terms of getting any kind

21   of definitive ruling on it, other than denied, and I will tell

22   you why.  Because the plaintiff doesn't have to say anything at

23   the beginning.  Okay.

24       So if you haven't nailed them down already, then the

25   question is whether or not you can actually shoot them down,

1   okay?  And that's the problem.  Because there is a question

2   here about how much they have to say in response.

3        So you come in and you say:  Well, these names aren't

4   copyrightable.  Can the plaintiff just respond with:  That is

5   our claim.  That isn't our claim.  This is what our claim is.

6   And give you 15 pages to now start complaining about what is

7   their case?  Okay.

8             **MR. ALEXANDER:**  Two responses, your Honor.

9        One is that, of course, as you go there and as you think

10  through all these issues, summary adjudication of anything,

11  that is any prior version that has been excluded, that you, of

12  course, the Court can do.  And the parties --

13            **THE COURT:**  That's point two.

14            **MR. ALEXANDER:**  Okay.

15            **THE COURT:**  That's point two.  You know what they did

16  on that, all right?  You've got the registration.  If it's

17  defective in any way, you make your argument about that, that

18  you've got.  But that's separate from what I'm calling the

19  tougher issue.

20       And the tougher issue may be because they do have a moving

21  target and if nobody has actually pinned it down before today,

22  I don't know if this is the kind of procedure in which you can.

23  And that's one of the things I see as a difficulty.

24       I read your -- you know, your papers and your response and

25  I -- you know, the frustration was kind of oozing out of the

1  pages, but I don't know if that's good enough to win at this

2  stage.

3      **MR. ALEXANDER:**  But it may be good enough, your

4  Honor, to adjudicate certain issues and make -- and make

5  certain determinations, and that would be a huge step forward.

6      As we suggested at one point, if there is no case to be

7  made, the names constitute protectable copyrightable material,

8  then the Court could issue that judgment and that would move

9  the parties forward, because then we would know what we're not

10  talking about and we could begin to focus where we are.

11      **THE COURT:**  That's where the semantical difficulty

12  came in, as I started to say, names.  And I said:  What are the

13  names?  Then it wasn't clear.

14      In other words, you have a catchy argument that this is no

15  better than control-alt-delete.  Okay?

16      And, I don't know.  When they say -- when you say names,

17  are you including, then, their verb space symbol noun or what

18  you're doing in that regard, and so -- and what they are doing,

19  so...

20      **MR. ALEXANDER:**  Except in one respect, your Honor.

21      **THE COURT:**  Okay.

22      **MR. ALEXANDER:**  Except in one respect.  They have an

23  expert who put forward what he said was the copyrightable

24  material that was infringed.  And one of the points we're

25  making is what he did was to simply list the names.  And so --

1  alphabetically.  And so --

2          THE COURT:  And --

3          MR. ALEXANDER:  -- when their expert gave his report,

4  which they rely upon, that's their evidence of copyrightability

5  and infringement.  He used the names.

6          THE COURT:  Okay.  So what you're saying is -- okay.

7  They have admitted through their agent, their expert, that this

8  is their claim.  Okay.

9      Now, maybe we ought to go to that for a moment and look at

10  what that list looks like and then we can talk to the plaintiff

11  about whether that is their claim, whether you're reading it

12  properly when you say:  All I did was alphabetize it.  Was that

13  just the start of something, one comment, to his many opinions?

14  Okay.

15      I have no objection if it can be done to narrowing the

16  issues to what, in particular, you both think is the issue.

17  Okay?  I don't know if we can even do that.

18          MR. MICHAEL:  All right.  Your Honor, I would love to

19  address their moving target argument right now for the Court.

20          THE COURT:  Okay.

21          MR. MICHAEL:  Because it has not been a moving

22  target, and it hasn't been for more than a year, from the very

23  first response to interrogatories that we've provided to

24  ATopTech.

25          THE COURT:  Okay.

```
 1           MR. MICHAEL:  And they say in their brief -- make no
 2   mistake about this.  For the duration of the lawsuit, Synopsys
 3   has asserted names only.  Individual only.  Never specified
 4   syntax.
 5        Can I get AM-11, please?
 6        (Document displayed)
 7           MR. MICHAEL:  This is plaintiff's response to
 8   ATopTech's interrogatory.  This is a document that they cite in
 9   Footnote 2 to their reply to their position we have never
10   asserted syntax.
11           THE COURT:  Go ahead.
12           MR. MICHAEL:  This is Synopsys' response:  We assert
13   the collection of the commands, et cetera.  And in every place
14   it says syntax, syntax, syntax.
15           THE COURT:  Okay.
16           MR. MICHAEL:  It's individual.  It's throughout.
17   This is October, 2014.
18           THE COURT:  Okay.
19           MR. MICHAEL:  This is not a moving target at all.
20           THE COURT:  Now, did anybody ask you what you mean by
21   syntax?  What do you mean by whatever?  Which things are there
22   that you are putting together?  Because we're not talking about
23   code here.
24           MR. MICHAEL:  There has been never been a discovery,
25   written discovery question to Synopsys asking that question.
```

1    In fact, they phrase their interrogatory without defining

2    syntax.  They ignore discussion.

3        We would object to their definition of an input format and

4    make sure that it was clear that they knew it included syntax.

5            **THE COURT:**  So --

6            **MR. MICHAEL:**  Your Honor, there is one other thing

7    this I really think is important on this issue --

8            **THE COURT:**  One second.

9            **MR. ALEXANDER:**  It also says, your Honor, "individual

10   commands" in that answer.  It says "individual commands."

11       So what they have done is highlighted a couple of words,

12   but what they are claiming is individual, syntax, collection.

13   It's this.  It's that.

14           **THE COURT:**  Okay.  So it's not clear as to -- at

15   least as to the scope of the claim, if the claim includes more.

16       Although I grant you they came in and said all you ever

17   wanted was names.  They didn't say you wanted names along with

18   other stuff.  Although other stuff was difficult to understand,

19   what comes under each of those titles, if you will, or

20   headings.  And I would want to find that out.

21       And what do we have here?

22           **MR. MICHAEL:**  Can you scroll forward -- no.  Go back,

23   please.

24           **THE COURT:**  By the way, all those --

25           **MR. MICHAEL:**  Here we go.  This is what I want.

1          (Document displayed.)

2          **THE COURT:**  By the way, all the directions are to the

3   videographer here.

4          **MR. MICHAEL:**  Thank you, your Honor.

5      I urge the Court to take time looking at their record

6   citations and whether they stand for the proposition they stand

7   for.  I don't want you to rely just on what we say in our

8   interrogatories.

9      This is what ATopTech said to the Court:  Synopsys claims

10  all of this, plus their syntax to be part of the alleged

11  formats.

12     Syntax has been a central issue in this case from Day One.

13  It's the alleged proprietary commands and related syntax.

14  Every step of the way it has been clear that the input formats

15  include the commands in the syntax, both the collection and

16  individual formats.

17         **THE COURT:**  Maybe we get back to put a face to some

18  of these words then, something that's more tangible than the

19  category that something has been assigned.

20     Okay.  In any event, we have a situation where the

21  defendant, either they were not in a position to make the kind

22  of challenge that was more specific to what plaintiff is saying

23  their claim is, or otherwise.  I'm not saying it's your fault

24  that they weren't in a position to do it, okay, but I think we

25  have a real problem here.

```
 1          I certainly don't want to have to have a trial I don't
 2   have to have.  But at the moment I don't see it going away real
 3   easily here.  And when we get to the defenses, not necessarily
 4   those either.  So we may have to have the whole, full panorama
 5   of matters.
 6          And I don't take this lightly, having sat through a
 7   protracted intellectual property case that the parties have now
 8   agreed on a briefing schedule for post trial motions.  So none
 9   of this is ever ending in this field.
10          I'm thinking, though, you know, we did just past the 10:30
11   mark.  And are both counsel here on the case management?
12   Before you arrived, I had mentioned to counsel in this case
13   we'll try to leapfrog over your case and come back to them
14   because they -- they are going to be here, as you can see, for
15   quite awhile.
16          So, counsel, knowing my concerns at the moment, just kind
17   of put forward at the outset, you might kind of go back and be
18   thinking about that when you come back.
19          And I think maybe take -- our reporter has been going also
20   for awhile now.  So maybe -- she doesn't have to do the case
21   management, though she can take a break during the case
22   management.  I'm just trying to think how long.
23          Why don't you just say come back at -- I don't know.  Come
24   back at 11:00.  Okay?  That way if you want to get a cup of
25   coffee, you can do that.  We'll be out here and whatever is
```

1  left over, then Ms. Lucero and I will take a little break.

2          (Whereupon there was a recess in the proceedings

3          from 10:37 a.m. until 11:13 a.m.)

4          **THE COURT:**  Okay.  So having met-and-conferred, or

5  whatever you did out in the hallway there, or didn't do, have

6  you decided how we ought to proceed here?

7          **MR. ALEXANDER:**  I think, your Honor, you've raised

8  some questions.  I'd like to raise a brief response at least to

9  that and make sure that we've satisfied the initial questions

10 that you have.  And then I think it would be helpful to the

11 Court if we gave you a sense of what the technology is that's

12 at issue here.

13          **THE COURT:**  Yeah.  I'd like to see that.

14          **MR. ALEXANDER:**  So on this issue that we were just --

15          **MR. MICHAEL:**  Your Honor, just -- excuse me real

16 quick, Mr. Alexander.

17     We would also like to address some of the evidentiary

18 issues on the front end as well, your Honor.

19          **THE COURT:**  Let him finish and then you'll have all

20 the time you need to respond.  I'm not jumping right to

21 whatever we're doing, okay.

22     Did you have anything else you wanted to say?

23          **MR. ALEXANDER:**  Here is what I wanted to say.

24     On this issue that we were just talking about --

25          **THE COURT:**  Yeah.  I don't want to hear the legal

1   arguments on it.  This is only how we're going to proceed.

2              MR. ALEXANDER:  Oh.  The way I would like to proceed

3   is to address these, the questions that the Court raised

4   briefly.

5              THE COURT:  Okay.

6              MR. ALEXANDER:  And then go to the technology very

7   quickly.

8              THE COURT:  So you were through.  Okay.  Because

9   there was a response that was going to be made here, but

10  besides that, I thought I just raised two places where it's

11  unclear to me from the evidence exactly what there is.  And I'm

12  not sure that I have the evidence in front of me.  Okay.

13     One is what exactly the plaintiff is relying on as being

14  the formats.  I don't know if the plaintiff -- do you have any

15  kind of display or anything where you could show the Court --

16             MR. MICHAEL:  Sure.

17             THE COURT:  -- what the -- what collection of terms

18  or symbols or whatever you would say constitutes then an

19  exemplar of a format?

20             MR. MICHAEL:  We could show you an input format,

21  absolutely, your Honor.  I'm going to have Ms. Schwartz do

22  that, if you --

23             THE COURT:  That's fine.  Not this second.  Wait,

24  wait, wait, wait.

25             MR. ALEXANDER:  And I have something on that, too.

```
 1          THE COURT:  Okay.  So, one.  I don't really know what
 2    that is, and I'm not sure if it's in your evidence.  And I will
 3    be asking Ms. Schwartz where exactly it is as opposed to where
 4    it is now, where was it in the papers, where it is in the
 5    papers.
 6          Here is the other thing.  We talked briefly about this
 7    disclaimer, ambiguous reference to prior art, kind of -- prior
 8    works kind of situation.
 9          If I didn't find a disclaimer and I am going to find --
10    I'm not saying that I am, but if I found that the reference to
11    the prior copyrighted work was not sufficiently specific, where
12    in the papers at this time is there any identification of what
13    that prior work is, because you've got what they are claiming,
14    but there is -- where is it defined by the defendant or
15    identified by the defendant what came before?
16          MR. ALEXANDER:  The answer to that, your Honor -- and
17    he objects to this.
18          The answer to that is that is in Exhibits 1 and 2 to our
19    motion.  Alexander declaration, I believe it's Exhibits 1 and
20    2, and the methodology for doing that is described.
21          Simply what was done was to go through and find those
22    terms, names, whatever they are, that are in the prior
23    versions.  And if those are in the prior versions and they were
24    not sufficiently referenced, which we strongly believe is the
25    case, then those are the ones in determining what is
```

1  protectable here, what may be asserted here that must be

2  excluded.

3          **THE COURT:**  Exhibits 1 and 2.  And then, I gather,

4  the plaintiff says those aren't really our formats.  They are

5  words.  Or you have a different objection?

6          **MR. MICHAEL:**  We have several.  One is, they are not

7  our formats.

8      And, two is, this is attached to the declaration of

9  Mr. Alexander, who is --

10          **THE COURT:**  Oh, as opposed to another witness.

11          **MR. MICHAEL:**  It's not an expert.  He's not a

12  percipient witness.  It's legal conclusions as to what

13  Mr. Alexander and his team thinks is not subject to copyright.

14          **MR. ALEXANDER:**  Except it's not a legal conclusion,

15  your Honor.  It's a factual conclusion.  These terms are in the

16  prior versions.

17      And moreover, your Honor, since these terms are in the

18  prior versions, no matter how they want to describe format as

19  we go forward, those formats, whatever it may be, are also in

20  the prior version.

21      So I've got more to say on formats, but --

22          **THE COURT:**  Well, not necessarily.  Different

23  formats, if words are some kind of combinations -- formats are

24  combinations of words, but I have to wait to see that.

25          **MR. ALEXANDER:**  Wait and see.

1      **THE COURT:**  But it isn't clear to me how you

2  extracted the words.  I don't know if it's like you -- you read

3  something.  You go, okay, here are the words, and I see them in

4  the prior art, and now here they are again.  So I guess those

5  are out.

6      If you have to fish around to find this stuff, then I'm

7  not sure that you can do that without having some stated

8  ability, experience or expertise in that regard.

9      **MR. ALEXANDER:**  I can read --

10      **THE COURT:**  Not now.  Earlier.  If you didn't do it

11  earlier, it's not in the record.

12      **MR. ALEXANDER:**  I understand, but -- but we'll

13  address the substance of that.

14      **THE COURT:**  Okay.

15      **MR. ALEXANDER:**  What I wanted to say, though, on this

16  issue was we did -- this is what came up just before we left

17  about syntax and what this all means and what it is that

18  Synopsys claims.

19      The answer is, we did push and we pushed and we're told

20  that that's not proper now because this will be in our expert

21  report.  We did push.  We did seek:  What exactly do you mean?

22  And we were told in subsequent responses:  That's not proper.

23  This will be in our expert reports.

24      So then we got the expert reports.  And, your Honor, that

25  is Document 425.  That is the declaration of James Storer.

```
1   That's the expert report.  And when we get to that, what we

2   found --

3            THE COURT:  Okay.  Just wrap this up quickly because

4   we want to go to the things that you said you were going to do.

5            MR. ALEXANDER:  Okay.  Well, then I'll wrap it up

6   right now.

7        What we found were these lists of words.  That's --

8            THE COURT:  Yes.  Fine.  Okay.  That's a list of

9   words that we -- "we" being, the royal "we"?  Who is the "we"?

10           MR. ALEXANDER:  No.  That is the list of words that

11  their expert said.  This is --

12           THE COURT:  Yeah, but you found.  Okay.

13           MR. ALEXANDER:  No, no.

14           THE COURT:  You're saying that's the expert's list.

15           MR. ALEXANDER:  It's in his declaration.

16           THE COURT:  All right.  Well, you've mentioned that

17  already.  And he's got some response to that.  When given a

18  chance, I will hear that.

19       But just looking here, I just don't know if there -- as I

20  say, if somebody can tell me that you can read these words off

21  a page, fine.  If you have to find them in some fashion, you

22  may need somebody with programming experience.

23           MR. ALEXANDER:  The technology.

24           THE COURT:  All right.  Now, it's your motion, so you

25  can start.
```

 1           **MR. MICHAEL:**  Your Honor, I'm going to take a seat

 2   while he presents and if I need to get up, I will.

 3           **THE COURT:**  That's fine.

 4       (Document displayed)

 5           **MR. ALEXANDER:**  So I'm just going to -- I'll go

 6   through this fairly quickly, your Honor, but if you have

 7   questions along the way, stop me because I might have the habit

 8   of talking too fast as well.

 9           **THE COURT:**  Well, the reporter will get on you.

10           **MR. ALEXANDER:**  She will, and I invite that.

11           **MR. MICHAEL:**  Just for the record, your Honor, we're

12   going to object to this.  To the extent they are trying to

13   introduce it as evidence in the summary judgment record, it's

14   not part of the record and so our objection is noted.  I don't

15   think it's appropriate.

16       To the extent it's a tutorial and your Honor is going to

17   consider it for that purpose, fine, but we want to state our

18   objection.

19           **THE COURT:**  Okay.  Well, just -- is there any dispute

20   as to whether this material is in the record that I've got?  I

21   understood it just to be a demonstrative.

22           **MR. ALEXANDER:**  This is a demonstrative only.  You

23   can find all of this in the expert declaration of Dr. Kahng.

24           **THE COURT:**  Go ahead.

25           **MR. ALEXANDER:**  So what happens, your Honor, in this

1    technology, as the Court has seen and we've said, is that this

2    is software for the design of a computer chip, like something

3    that goes in a smart phone.  And so what happens is there is an

4    engineer -- actually, at these big companies there are 15, 20

5    engineers.  They are going to design a chip now for each smart

6    phone.

7         So they have basic components.  I've simplified it a bit.

8    Functional design.  They have to determine what the basic

9    functions are going to be.

10        The design requirements, including things like connections

11   and cells.

12        And then the component library.  What kinds of things are

13   going to go into this chip that will perform the functions that

14   we want it to do.

15        One of the things that the chip designer will do at the

16   beginning, or designers, is they know that -- timing is very

17   important.  And they know that they are going to be using an

18   STA software.  The one that is 90 percent of the time used is

19   PrimeTime.  We all know that.  So they know that PrimeTime is

20   going to be checking, testing, verifying the timing of the chip

21   when it's all finished.

22        So from our perspective, what that means is that the

23   design requirements, as they are initially written, include the

24   terminology that PrimeTime, the ultimate test on timing, will

25   have to recognize and use.

1          **THE COURT:**  Yeah.  But, see, as part of my question

2   as to how all this functions.  In other words, it -- that -- I

3   don't know how PrimeTime works.  Okay.  So I don't know if it's

4   like reading stuff of a certain sort or what it's doing in that

5   regard.

6          And if you have two different languages, so to speak -- in

7   other words, if somebody was looking for something and was

8   looking for it in a document written in Spanish and they didn't

9   speak Spanish, then they couldn't find it.  If it's something

10  like that, that's one thing.

11         If it's got some other, well, more -- that you can

12  describe in some kind of computer functioning way, that's what

13  I'd like to know.  Because there is even an argument here about

14  whether -- how much, for example, copying and what has to be

15  copied in order to make this interoperability occur.  And so I

16  don't know if -- if that's really in front of me.

17         If it is, then just point out so that I can read it

18  wherever you think it's clearest.  Because what you seem to be

19  saying is that you need their words in order to put their words

20  into your program so that their words can --

21              **MR. ALEXANDER:**  At this stage --

22              **THE COURT:**  Formats can work with your words.

23              **MR. ALEXANDER:**  At this stage I'm saying the

24  designer, the people who are designing the chip, are going to

25  be using their terms.

```
 1            THE COURT:  Who?  "Theirs" being whose?

 2            MR. ALEXANDER:  PrimeTime.

 3            THE COURT:  Okay.  Your own -- the program for

 4    whatever is going on here, the design program, the place and

 5    route program that ATopTech makes, apparently, has its own

 6    timing function of some sort, right?  In other words, it runs

 7    some kind of preliminary check to see if things are working out

 8    the way they thought they would.

 9            MR. ALEXANDER:  If you -- if we go through two more

10    iterations, you'll see that.

11            MR. MICHAEL:  Your Honor, I want to make a quick

12    clarification.

13       We disagree with the representation that's how it works.

14    The designer at that point is not using command names for

15    PrimeTime.  They are using it for a synthesis tool, which comes

16    well before the process.  You may have recalled that from

17    Dr. Blough's technology --

18            THE COURT:  When you say the "designer," the person

19    who is making the chip or designing the chip?

20            MR. MICHAEL:  Yes.

21            THE COURT:  All right.  Why don't you let him do

22    whatever he's doing.  Then you get up and say where you

23    disagree.

24            MR. MICHAEL:  Okay.

25            THE COURT:  Otherwise, we'll be here forever, which
```

 1  we're already here quite awhile.

 2          MR. ALEXANDER:  So what happens is the designer, the

 3  chip designer or team, takes together the functional design

 4  specifications, the design requirements, which do include

 5  timing constraints, and the component library, the things that

 6  are going to go in, and they put that into the circuit design

 7  software.  That's the first level that Mr. Michael was just

 8  talking about.

 9          THE COURT:  Okay.

10          MR. ALEXANDER:  That software produces back what's

11  known as a component level netlist.  That's a refinement of the

12  data that's gone in so that now this netlist or network list

13  will have a more refined collection of what must go into the

14  chip to accomplish the design.

15      And then what that design team will do, they look at the

16  component netlist and then they feed their design requirements

17  and their component library and the component level netlist

18  into Aprisa, the place and route software.  And when those

19  components are put into the software, the software does the

20  place and routing in terms of --

21          THE COURT:  I got that.

22          MR. ALEXANDER:  Okay?  Now, at -- the point that your

23  Honor was just making was that this point, as you develop a

24  design, timing is obviously a critical component.  So they have

25  got to determine, and -- and make certain that the timing meets

1    the constraints, the requirements of the design.

2              THE COURT:  So what do they do?

3              MR. ALEXANDER:  What they do is that based upon all

4    of that work and based upon checking the timing, trying to know

5    as best they can what it is that will be tested at the end,

6    they produce what's known as -- what I'm calling here an

7    optimized layout database.  That has several components.

8              THE COURT:  How are they doing it?

9              MR. ALEXANDER:  By software.  By algorithms.  By

10   using commands.  By using algorithms.  By using processing --

11             THE COURT:  They are checking the time, aren't they?

12             MR. ALEXANDER:  They are building the chip and

13   checking the time as they go.

14             THE COURT:  Otherwise, they could spend a lot of time

15   doing something that's not going to meet the timing

16   constraints.

17             MR. ALEXANDER:  Exactly.  Exactly.

18             THE COURT:  So now they get all through and they go:

19   Hah.  Great.  Look what we've got.  It's terrific.  And then

20   they want to doublecheck it with somebody else's program,

21   right?

22             MR. ALEXANDER:  Then there is another step called

23   sign-off, and that's at the end.  So when they get that, the

24   material that comes out of Aprisa, that has to meet the timing

25   constraints.  I'll go by that quickly.

1          THE COURT:  Yep, yep, yep.  We said that.

2          MR. ALEXANDER:  All right.  Because there is an

3    argument there.  But they will then put the optimized netlist

4    and layout database and the -- now the engineer gives this

5    timing constraints and requirements and the component library

6    into PrimeTime.

7       So this is as you said a moment ago sort of like the

8    second check, except it is the sign-off.  If you don't meet the

9    timing requirements as measured in PrimeTime, you don't make

10   the chip.

11         THE COURT:  No, no.  I understand.  In other words,

12   somebody said -- I'm assuming there is some customer that wants

13   this chip, that says:  I need something to do X, Y and Z.  And

14   then the chip designer goes:  Okay.  Well, we're going to put

15   this thing here and this switch there and these wires here and

16   there and whatever they do.  Then they try it out to see if it

17   works and then think it's great, but, apparently, the customer

18   doesn't think that's good enough.  They have to run it against

19   a -- what, they call it a specialist?

20      This is like, you know, you saw the GP and now you call in

21   the orthopedist, or what is it?

22         MR. ALEXANDER:  It is the sign-off test that has

23   become the standard in the industry.

24         THE COURT:  Yeah.  I know you call it the sign-off

25   test.  Why are they doing it?  It must be because the original

```
 1  review, somebody doesn't think is good enough.  They want a
 2  second opinion.
 3          MR. GLICK:  Your Honor, if I may?  It's because the
 4  foundries --
 5          THE COURT:  The what?
 6          MR. GLICK:  The foundries that actually make it,
 7  Taiwan Semiconductor and so on, they don't want to have all the
 8  stuff made without this check in advance --
 9          THE COURT:  No.  I understand that.  I just don't
10  know why they need a second check.  And it sounds like they
11  just don't trust the first one, unless there are major
12  differences that routinely happen when somebody runs what I
13  guess is a more sophisticated program.
14          MR. ALEXANDER:  What the -- the timing is very
15  important.  It is important that the chip works.  It is, in
16  part -- I think Mr. Glick is exactly right.  It's the part, the
17  foundries.
18      But, yes, having a check -- because this is what we wanted
19  to do in the beginning.  We wanted to meet, to have a chip that
20  would meet these timing constraints.
21          THE COURT:  Okay.  All right.  So everybody agrees at
22  least to this extent.  You need them to get a sign-off or you
23  need somebody who -- to me, this just sounds like -- I'm sorry.
24  It just sounds like, well, let's call in the specialist and get
25  a second opinion.
```

```
 1      But whatever it is, if they do it differently, they do it
 2   better, they do something that everybody wants done, all right,
 3   and you are saying that you need to put into your program, your
 4   client does, something that makes it easier for PrimeTime to be
 5   able to accurately assess the timing.
 6           MR. GLICK:  Can I just --
 7           THE COURT:  No.  Talk to him.  All right.
 8           MR. GLICK:  It's like the high school test.  You have
 9   to pass the state test.  It's part of the rules.
10       THE COURT:  I've got it already that you need it.
11   That isn't the issue.  That's not the technology.  That's
12   something that goes to your whole -- the infringement thing and
13   everything else that's -- we're talking about something else
14   here.
15      I'm just saying:  How does it work?  I don't care why
16   somebody wants it to do it at the moment.  I am just saying:
17   What does it do differently?  Okay?
18           MR. ALEXANDER:  Okay.
19           THE COURT:  And so far nobody has said anything.  You
20   say, we ran our program and now we want to run another program.
21           MR. ALEXANDER:  So we're trying to meet the same
22   timing requirements.
23           THE COURT:  Yeah.  Fine.
24           MR. ALEXANDER:  Okay?
25           THE COURT:  What do you need from them to do it?
```

1    Just saying "we need it" isn't good enough.

2            MR. ALEXANDER:  Since the chip has to pass the final

3    test, the people making Aprisa have to estimate, okay, what is

4    the final test going to be?   What will they be measuring?

5        Because you've got a million circuits or more and there

6    are all kinds of choices.  We could test this.  We could test

7    that.

8            THE COURT:  Okay.  Now, I've got that picture.  We've

9    got to, you know, kind of tighten up the script here a bit.

10           MR. ALEXANDER:  Tighten it up, I agree.

11           THE COURT:  Thank you.

12           MR. ALEXANDER:  So what comes out, then, of PrimeTime

13   is a timing report.  Did you meet the timing constraints or you

14   did not?

15           THE COURT:  I understand.

16           MR. ALEXANDER:  Okay?  And then, of course, if you

17   do, great, you go ahead and manufacture.

18       But in millions of circuits with -- with engineers making

19   millions of assumptions -- thousands of assumptions, it is

20   possible that this place and route tool will be measuring the

21   same thing, but it's possible that PrimeTime will measure it a

22   little differently.  And if they are and you have to pass that

23   test, then you have to look at what it is that was different.

24       So that's why, if you get an output report and it says:

25   Oh, you know what?  In all of the millions of circuits, you

```
 1  didn't meet timing on these 20 or something.  Then the
 2  engineers have to -- both at the designer and sometimes at
 3  Aprisa, they have to say:  Why?
 4      And so when they do that, they have to then make a change.
 5  Maybe it's in the design.  Maybe in the --
 6          THE COURT:  Okay.  I'm stopping you.  I get this
 7  point.
 8      What I don't understand, and I still don't, and nobody has
 9  told me, is how it works.  Okay?  All you've told me is why you
10  need it and who cares about it and what people aren't going to
11  do if you don't pass.
12      All right.  And you seem to be saying that if you design
13  something that can't be accurately tested by PrimeTime, then
14  it's not going to be a valid report or a valid test and the
15  only question is:  What is it that you need to feed in
16  technically into the Aprisa program?
17      It's your program, right?
18          MR. ALEXANDER:  Right.
19          THE COURT:  Okay.  What do you have to put in your
20  software to make it work with the plaintiff's software?
21          MR. ALEXANDER:  So, for example -- and everything
22  that goes on here is internal.  And I see the issue that we
23  should have addressed, which is what's going on inside the
24  boxes, and we will.
25          THE COURT:  Yes.  When?
```

```
 1            MR. ALEXANDER:  I guess not today, because this is
 2   the way I had prepared and I thought this was the issue.
 3            THE COURT:  Well, yeah.  This isn't going to help.
 4            MR. ALEXANDER:  But I can give you a -- I can give
 5   you a good example that I do know.
 6            THE COURT:  Okay.
 7            MR. ALEXANDER:  So one of the things that will be
 8   measured inside of Aprisa -- and, also, inside of the
 9   PrimeTime -- is the engineers have some decisions to make.
10   They can -- because the test tests in certain ways and it has
11   some switches, some on and off switches, and some true/false
12   switches.  They can say:  You know what?  In this particular
13   chip this particular set of variables, we don't need them
14   because it's not important for this chip.  So they turn those
15   off.  When you do that, obviously, it affects the timing
16   calculation.  Okay?
17        So what happens if they are not turned off in Aprisa, but
18   they are turned off in PrimeTime?  There will be
19   miscorrelation.  So somebody has to say:  Why was there
20   miscorrelation?  Oh, they turned this switch off and we didn't
21   know that, so let's turn this switch on.  Boom.  It goes back
22   through and it correlates.
23            THE COURT:  But what I'm not understanding, I guess,
24   is how PrimeTime is reading this.
25        But the main thing I guess that we're dealing with here --
```

1  I don't even know if I have to know this because so far I don't

2  quite get exactly what goes on --

3        **MR. ALEXANDER:**  Inside the two programs.

4        **THE COURT:**  Yeah, inside.

5     So that there has to be something that PrimeTime is

6  looking for and I don't know if it has to be described in the

7  same way as whatever they are doing.

8     So I think maybe if I get to Mr. Michael's description of

9  why these terms are something more than just words and why they

10 are important, maybe that will shed some light on why you need

11 them.  Okay.

12       **MR. ALEXANDER:**  It may be, your Honor.  What I just

13 wanted to do was give the overview of how these tools relate to

14 one another in the design process.

15       **THE COURT:**  No, no.  That I got from before.  And I

16 understand that from our prior, you know, hearing and all of

17 the as to the -- the basics of the process, but not the

18 workings of it.  Okay?

19       **MR. ALEXANDER:**  Okay.

20       **THE COURT:**  And that's the thing.  I mean, I

21 understand, you've got to design it.  It's got to meet the

22 constraints.  That could be a function of how close certain

23 things are.  All manner of stuff.  Like you say, turn something

24 off when you're not using it is going to speed up the time.

25     Okay.  But what I don't see at the moment is why -- other

```
 1  than to say we all have to be talking the same way.  They have
 2  to be able to read what we're doing and not misunderstand what
 3  we're doing.  I'm just saying I don't really understand at that
 4  point how it works.
 5          MR. ALEXANDER:  One quick example --
 6          THE COURT:  And I still don't.
 7          MR. ALEXANDER:  -- when you give both PrimeTime and
 8  Aprisa the instructions about what it's going to time, you
 9  might give a command like "get_clocks."  That tells the
10  software to implement algorithms to get clocks because that's
11  going to be measured.
12          THE COURT:  Let me stop you.  Are you saying this is
13  in Aprisa?
14          MR. ALEXANDER:  "Get_clocks" is in Aprisa.
15          THE COURT:  Okay.  So they say "get_clocks" and then
16  Aprisa does something.
17          MR. ALEXANDER:  Gets the clocks, right.
18          THE COURT:  All right.  Okay.  And then give me
19  another example of some command Aprisa has.
20          MR. ALEXANDER:  "Get_pins."
21          THE COURT:  Okay.  And is this fed in by the
22  designer?
23          MR. ALEXANDER:  These terms are in the design fed in
24  by the designer.
25          THE COURT:  Okay.  You say they are in the design fed
```

1   in by the designer.

2          MR. ALEXANDER:  Yes.  In what goes -- in

3   the instructions or script that goes to Aprisa.  This is what

4   goes to Aprisa.  These commands, that's part of the list of --

5          THE COURT:  That's part of the program that Aprisa

6   has?

7          MR. ALEXANDER:  Yes.  Aprisa has a program that will

8   read "get_clocks."

9          THE COURT:  Okay.

10         MR. ALEXANDER:  So when the designer says

11  "get_clocks," Aprisa knows what that means.

12         THE COURT:  Now, are you saying that PrimeTime

13  doesn't use "get_clocks."  They use something else?

14         MR. ALEXANDER:  PrimeTime uses "get_clocks."

15         THE COURT:  What doesn't it use that you use?

16         MR. ALEXANDER:  And it has to -- okay, I'll tell you.

17  It has to mean the same thing.

18      But, now let's say that we have one level further.  Let's

19  say an important command, and it turns out to be, is

20  "get_generated_clocks."  "Get_generated_clocks" is just another

21  kind of clock.  It's a clock that's generated from prior

22  clocks.  Okay?

23      Now, we have that term, but they say we can't use it.

24  They have that term and it -- it does -- it creates a set of

25  timing constraints that will produce a timing result.  And they

1  say we can't use that term.

2          **THE COURT:**  Okay.  So if you didn't use that term and

3  just had "get_clocks," all right, and then somebody runs

4  PrimeTime against the design created by Aprisa, right?

5          **MR. ALEXANDER:**  And wants to have "get_clocks" and

6  "get_generated_clocks," they wouldn't correlate.

7          **THE COURT:**  And so then what happens?

8          **MR. ALEXANDER:**  Then there is a miscorrelation and

9  then people say:  Well, I can't accept that design.  And then

10  the folks at Aprisa have to find out why there is a

11  miscorrelation.

12          **THE COURT:**  So you're saying that you have to use in

13  the design the same language, essentially.  Terms, if you want

14  to call it that for your argument.  The same terms that

15  PrimeTime uses.

16          **MR. ALEXANDER:**  I'm saying that, but let me say it in

17  the way that I would -- just let me add this to it.  PrimeTime

18  will only understand the terms that it uses.

19          **THE COURT:**  Okay.

20          **MR. ALEXANDER:**  So the reason that those terms that

21  are critical to timing are used in Aprisa is because the

22  designer and we know that those are the only terms that

23  Aprisa -- that PrimeTime will understand.  So you -- in order

24  to say the same thing, you have to use those words.

25          And these -- this is part of the argument that we'll get

```
 1   into.  "Get_clocks" is common terminology.  The engineers know
 2   what that means.
 3            THE COURT:  Okay.
 4            MR. ALEXANDER:  Now, if we can't use
 5   "get_generated_clocks," then what we have to do is to
 6   translate.
 7        This is what's come up in the last couple of months.
 8   Because the design team is going to want to pass PrimeTime from
 9   the beginning and they are going to use "get_generated_clocks"
10   on account of the fact that have to, because they cannot get
11   PrimeTime to work without it.
12            THE COURT:  Okay, okay.  I may ask Mr. Michael.  When
13   PrimeTime is run against a design, is it essentially using
14   certain commands to tell the -- in other words, are those
15   commands to -- just for design or does it make the thing sort
16   of run in some way?
17            MR. MICHAEL:  Your Honor, I have not heard a more
18   inaccurate description of the design flow for EDA tools when it
19   comes to chip design.
20        This is fundamentally wrong on a technology level.  It
21   underscores why Mr. Alexander's declaration in support of the
22   motion for summary judgment is not admissible.  It underscores
23   the factual issues that give rise to a denial of their summary
24   judgment.  But this is just --
25            THE COURT:  Okay.  But leaving all that aside and
```

1   getting to what's wrong with it then.

2           **MR. MICHAEL:**  Sure.

3           **THE COURT:**  Okay.

4           **MR. MICHAEL:**  I'm happy to walk through what's wrong

5   with it.

6       I'll tell you, I am not an expert in this area and if

7   Professor Blough were here or Storer, then they would be great

8   for this, but this is not in the record.

9           **THE COURT:**  Neither is your experts.

10          **MR. MICHAEL:**  I'd be happy to walk you through some

11  basic concepts, your Honor.

12          **THE COURT:**  Just to be clear, none of this is in the

13  record.

14          **MR. ALEXANDER:**  The background from which this is

15  taken is in the record, but this is not in the record.  This is

16  an overview for purposes of --

17          **THE COURT:**  But nobody needs that at this point, I

18  mean, any more than you've done it.  Okay.

19      No.  What I'm saying is the guts of how these two types of

20  programs, place and route and static timing -- in other words,

21  verification software -- how those two work together in

22  anything other than just these very general lay terms.  Nobody

23  really has described what they do together.

24      I don't know if I need that or not at this point.  I

25  thought I might need it in order to understand what someone is

1  saying the copyrighted material does.

2        **MR. MICHAEL:**  Your Honor, I think I can give that to

3  you in three minutes or less.

4        **THE COURT:**  All right.  And let me ask you a question

5  about that.  I do want to hear it, but I also want to ask the

6  following:  Did anybody say it in a declaration or report

7  that's in front of me?

8        **MR. ALEXANDER:**  The operations are described by

9  doctor --

10        **THE COURT:**  Excuse me.

11        **MR. ALEXANDER:**  I'm sorry.

12        **THE COURT:**  Mr. Michael.

13        **MR. MICHAEL:**  I don't believe there is any evidence

14  in the record from ATopTech on this process at all, your Honor.

15        **THE COURT:**  How about from Synopsys?

16        **MR. MICHAEL:**  Yes.  The report of Dr. Blough is in

17  the record on our motion.  I believe it was on their motion,

18  but the report of Dr. Blough is in the record, as is the report

19  of Dr. Storer.  They do describe this with actual accuracy.

20  Dr. Blough is on our motion.

21        **THE COURT:**  Okay.

22        **MR. MICHAEL:**  Can I go to Slide 40, please?

23        **MR. ALEXANDER:**  This is your Slide 40?

24        **MR. MICHAEL:**  Yes.  This is going to be my Slide 40.

25        **THE COURT:**  So I'll ask Mr. Alexander to just have a

1   seat for a moment, so he's not tempted to jump in.

2          **MR. MICHAEL:**  I'm going to try to go through this

3   real quick, because there's --

4          **THE COURT:**  Not too fast.

5          **MR. MICHAEL:**  There's a confusion that we explain

6   about ATopTech's constant conflation of these ideas of what

7   they call interoperability, correlation and script

8   compatibility.  They are very different ideas.

9          **THE COURT:**  Fine.

10          **MR. MICHAEL:**  Interoperability is the ability of two

11   tools.  These are separate tools.  They don't work together.

12          **THE COURT:**  I understand.

13          **MR. MICHAEL:**  They are different tools and the tools

14   need to be able to exchange information between them.  And it

15   starts with a logic -- again, very high level, your Honor.

16   Very high level.  A logic synthesis tool, like design compiler.

17       What design compiler has to provide to a place and route

18   tool is a netlist.  What the place and route tool then

19   generates is a physical layout.

20       And what the place and route tool needs to provide to a

21   timing analysis tool is the physical layout and then the timing

22   analysis tool can run GDSII, these parasitics that ultimately

23   will go out for fabrication.

24       That flow there, netlist, physical layout, that's

25   interoperability.  Those are the files that are exchanged

1   between the tools.

2       The input formats and output formats at issue in this

3   case.  The input formats are not part of those files.

4           **THE COURT:**  When you say "the tools"?

5           **MR. MICHAEL:**  Yes.

6           **THE COURT:**  You're talking about the -- which two

7   tools are you talking about exchanging what?

8           **MR. MICHAEL:**  So the logic synthesis tool will take

9   in a user's design, and it comes in --

10          **THE COURT:**  No, no.  I got that.  And they create the

11  netlist.

12          **MR. MICHAEL:**  Right.

13          **THE COURT:**  That's being fed into the place and route

14  tool.

15          **MR. MICHAEL:**  Yes.  Correct.

16          **THE COURT:**  All right.  But then you kept going.

17          **MR. MICHAEL:**  And then the place and route tool will

18  feed a physical layout into the timing analysis tool.

19          **THE COURT:**  All right.

20          **MR. MICHAEL:**  That's a high level interoperability.

21  All of those files are standard format.  Everybody in the

22  industry uses them.  There is no issue there.  That's not what

23  this case is about.

24          **THE COURT:**  All right.  What do you understand it's

25  about?

 1          **MR. MICHAEL:**  One thing it's also not about, it's not

 2   about correlation, which is the other term ATopTech uses over

 3   and over again.  Correlation is the idea of the timing engines

 4   in each of these tools matching.  That's driven by the

 5   algorithms of the tools themselves.  It's not driven by the

 6   input formats.

 7          **THE COURT:**  Wait a minute.  The -- what you're

 8   calling correlation is what again?

 9          **MR. MICHAEL:**  Correlation is, essentially, the

10   ability to have the timing results between these various tools.

11   When they test the timing on the design, to have those match or

12   be as close to as possible as matching for the ultimate

13   requirements that the user has set forth.

14          So giving you an example -- and this is going to be way

15   off on the actual picoseconds that they use for a chip.  But if

16   you had a design and you wanted to be able to route a signal

17   from Point A to Point B, and your design required that that

18   happened in one second, and your logic synthesis tool it says

19   it happens in .8 seconds.  That looks pretty good.

20          Then you go to the place and route tool and it says, we're

21   showing that the timing gets you to .9.  That still looks

22   pretty good.

23          Then you get to PrimeTime and it says, looks like we're at

24   .95.  That's good correlation.  Everything is under one.  It's

25   all good.

```
 1        But if you have drastically different results in the time

 2   and what you're getting is .8 in the logic synthesis tool and

 3   two seconds in the place and route tool, that's not

 4   correlation.

 5        THE COURT:  Well, you're saying everybody is doing

 6   the same thing and whether or not they agree.  I didn't

 7   understand everybody is doing the same thing at every stage.

 8   I thought they were doing different things.

 9        MR. MICHAEL:  They are doing different things as

10   well, your Honor.  They are.  They are converting in the logic

11   synthesis tool step.  They are taking the user design and

12   converting it into a netlist.

13        THE COURT:  But you're saying they're always looking

14   at the timing.

15        MR. MICHAEL:  Always.  All of these tools have timing

16   engines in them.

17        THE COURT:  Okay.  So let's say everyone is looking

18   at timing.  And why is the timing analysis tool's result better

19   than the place and route tool's result?

20        MR. MICHAEL:  The only reason that it is relied on in

21   the industry by certain people -- and it's not always

22   necessary.  As Dr. Blough told you, you can tape out with the

23   place and route tool.

24        The place and route tool provides additional

25   functionalities, including placement and routing.  So the
```

1  software is working on other things, and the timing engine is

2  not necessarily as sophisticated as a timing tool that's only

3  doing timing.

4          **THE COURT:**   Okay.  So my example of a general

5  practitioner and a specialist isn't that far off.

6          **MR. MICHAEL:**   It's not that far off.

7          **THE COURT:**   Okay.  Well, a general practitioner does

8  a lot of different things.  They may not know as much about one

9  of them.

10          **MR. MICHAEL:**   Fair enough.

11          **THE COURT:**   Okay.

12          **MR. MICHAEL:**   So let's talk about script

13  compatibility.  This is the issue in the case, your Honor.

14  Script compatibility is what ATopTech is talking about.  It's

15  not --

16          **THE COURT:**   Okay, okay.  What is it?

17          **MR. MICHAEL:**   The user, when they want to tell the

18  tool, they want to express to the tool what they would like the

19  tool to do.

20          **THE COURT:**   Okay.  "User" being the chip designer?

21          **MR. MICHAEL:**   The chip designer.

22          **THE COURT:**   Okay.  Wants to tell the tool what it

23  wants the chip to do.

24          **MR. MICHAEL:**   No.  What it -- it's going to tell --

25  it's going to say -- the user is going to give commands to the

```
 1  tool:  I want you to test the following things.

 2              THE COURT:  Is this only on now testing the timing

 3  part?

 4              MR. MICHAEL:  No.  This is on all tools.  You will

 5  tell the tool -- you will express to the tool what it is with

 6  the design that you want the tool to do with respect to the

 7  logic synthesis stage.  You will then interact with the tool

 8  and tell it what you want it to express or what you want to do

 9  on the place and route stage, and you'll also do it at the

10  timing stage.

11              THE COURT:  Okay.  All right.

12              MR. MICHAEL:  Each of these tools have different

13  languages.  They have different commands that the user uses to

14  interact with them.

15      And what ATopTech wants to do is they want to be able to

16  have a single script that they can run throughout that the user

17  can use for all these tools.  Has nothing to do with

18  interoperability or correlation.

19              THE COURT:  Okay.  Well, but interoperability, that's

20  a very general term as you are using it, right?

21              MR. MICHAEL:  I should say it has nothing to do with

22  interoperability for the purposes of copyright and the

23  Copyright Act that.

24              THE COURT:  Now, all right.  But to start with,

25  you're just saying that each of these programs has its own
```

 1   language.

 2           MR. MICHAEL:  They do.

 3           THE COURT:  And so where is the interoperability even

 4   coming in then?

 5           MR. MICHAEL:  It has -- it has --

 6           THE COURT:  Ever?  In other words, you start by

 7   saying there is interoperability, but we're not at that point,

 8   according to you, right?

 9       All right.  What is interoperating, then, between the

10   logic synthesis tool and the place and route tool?

11           MR. MICHAEL:  The interoperability between those

12   tools are the ability for a logic synthesis tool to generate a

13   netlist.

14           THE COURT:  Well, that's just within itself.

15           MR. MICHAEL:  In a standard format that the place and

16   route tool also has the ability to read.

17           THE COURT:  Ah-hah.  Well, now you've got a reader.

18   Okay.  Then their argument is the same kind of thing goes on

19   between place and route and timing analysis, and you're saying

20   it doesn't.

21           MR. MICHAEL:  It does, with the physical layout file.

22   What I'm saying is that these files, the netlist file and the

23   physical layout file, do not contain the input formats.

24           THE COURT:  But -- hold on.  But is timing involved?

25   You said it was, right?  In other words, okay, so the place and

```
 1  route tool has to read some kind of language that the logic
 2  synthesis tool uses.  And is everybody just -- in whatever the
 3  industry is, is everybody using the same language?
 4          MR. MICHAEL:  Everybody is using the same language
 5  for those file formats.  They are standard file formats.
 6          THE COURT:  What's the language, do you know?
 7          MS. SCHWARTZ:  The netlist is going to be VHDL or
 8  Verilog.
 9          THE COURT:  Or Verilog.  And the place and route
10  reads Verilog?
11          MS. SCHWARTZ:  That's going to be outputting a GDSII.
12          THE COURT:  Well, okay.  But that's a different
13  language, so...
14          MR. MICHAEL:  It's also a standard language.
15          MS. SCHWARTZ:  It's standard.
16          THE COURT:  Yeah.  Well, but they are two different
17  standard languages, and you can say that timing analysis has
18  some standard language, too.  So where are they interoperating?
19  Somebody has got to be able to read the languages.  Even if
20  they don't themselves -- even if it isn't their first language,
21  they have to be able to read it.
22          MR. MICHAEL:  Yes.
23          MS. SCHWARTZ:  The thing, at each step there is
24  additional processing that's done on the design.
25          THE COURT:  Yeah, okay.
```

1          MS. SCHWARTZ:  And so the place and route tool,

2   because it's doing additional processing, is figuring out where

3   to place the elements that the logic synthesis tool generated.

4   It needs a different file format to store that in.

5       And so the place and route tool writes it out in GDSII,

6   and the timing analysis tool can read in the results of the

7   place and route tool.

8          THE COURT:  It can read GDSII.

9          MS. SCHWARTZ:  It can read GDSII.

10         THE COURT:  All right.  But what you're saying is

11  this -- well, timing analysis means it's reading timing.  Okay.

12  Right?

13         MR. MICHAEL:  Timing analysis means that it is --

14         THE COURT:  Or not at that point?

15         MR. MICHAEL:  It's reading in the design in the

16  physical layout and then it's running an analysis on the timing

17  of that.

18         THE COURT:  At this point is it just reading the

19  layout, so to speak, without running the timing?  Is that what

20  you're saying?

21         MR. MICHAEL:  Sure.  Sure.  When it first goes in.

22         THE COURT:  Okay.  Then go to your next thing.

23      (Document displayed.)

24         THE COURT:  Okay.  Well -- all right.  Correlation,

25  you've talked about that being -- having just the same results.

```
 1            MR. MICHAEL:  You want to get consistent results
 2   between the tools.  That's ideal.
 3            THE COURT:  Right.  Okay.
 4            MR. MICHAEL:  No dispute on that.
 5            THE COURT:  Yes.  But, frankly, at some point things
 6   have to be reading.
 7      Okay.  So the correlation is just the result.  It's not
 8   the process.  Okay.  Your first slide is the process.  That is
 9   the result.  Now you're at another process, script
10   compatibility?
11            MR. MICHAEL:  No, not necessarily, your Honor.
12   Again, this is a very simplified overview.  So I probably
13   misrepresented to you when I said I could explain it in three
14   minutes or less.
15            THE COURT:  Do you want somebody else to explain it
16   or do you want to just keep going?
17            MR. MICHAEL:  I'm happy to keep going, your Honor.
18            THE COURT:  Okay.  So now you're at script
19   compatibility.  Okay.  What do you want to do with that?
20            MR. MICHAEL:  I do not intend for these slides to
21   suggest that these are running in some sort of serial fashion.
22      From the get-go the user is going to use commands and
23   scripts in order to tell the tools what it wants the tool to
24   do.
25            THE COURT:  Okay.  For the commands, whatever the
```

1  language they are using, it appears that everybody can read

2  each other's language.

3     Now, you're at what you're calling script compatibility,

4  which is something else that at least ATopTech, according to

5  you, your description of their claim, says that it can't read.

6  Well, that their product, their -- you know, their software

7  can't be -- I take it back.  They can't be read by yours.

8     So, okay.  You started with the first part, everybody

9  could read everybody's stuff.  Everybody is using something out

10 there in the world that's not claimed to be protected in some

11 way.

12         **MR. MICHAEL:**  Sure.

13         **THE COURT:**  Also, being able to -- they can all

14 communicate and it's not a big waste of time to have place and

15 route look at the netlist, down to the timing, look at the

16 place and route.

17     While this is all going on, there is, apparently, some

18 reading of timing going on at the same point that, according to

19 ATopTech, doesn't work that way; that there's -- there's some

20 kind of proprietary claim here so that they aren't using your

21 language at this point, unlike -- or a language that your

22 product can read.

23     So, do you disagree?  Are you saying that PrimeTime can

24 read whatever they use?

25         **MR. MICHAEL:**  PrimeTime will have no problem reading

1  whatever the output is of the place and route tool, which is

2  the GDSII file.

3         **THE COURT:**  Well --

4         **MR. MICHAEL:**  But it does not mean that the language

5  that is used by the human being, by the individual who is

6  communicating with these tools and explaining to the tools what

7  the human wants the tools to do, will be the same.

8         **THE COURT:**  No, and I understand that.  And,

9  apparently, it doesn't -- it doesn't matter that -- as you

10  showed in your first slide of these three, the

11  interoperability.  At that point everyone is using a different

12  language for each of those points, but, apparently, it doesn't

13  matter that it's different language.  Okay?

14      You've got Verilog at one point.  You've got some other

15  language at another point.  Ahh, it doesn't matter because

16  everybody -- the second languages can read the first language,

17  or however it's going to work.

18      Then you get this particular function, which you say is

19  not sequential in time, that it's all going on kind of at the

20  same point, where the tool, the timing analysis tool is

21  using -- at least arguably, if you enforced your copyrights, as

22  you are endeavoring to, it's using its own words and nobody

23  else is using those.  And then the place and route tool is

24  using some other set of words.

25      And the argument made by the defendant is that at that

1  point, unlike the other points, if you want to say that the

2  other points are different, at this particular stage of the

3  analysis the -- they are saying that your timing analysis tool

4  can't read their commands; that they are different enough that

5  it's not meshing in some way and so they are running a

6  different program, in effect, or a different test, I guess.

7  However they are doing it.

8       Is that disputed?  And then we can talk about what your --

9  because it goes to a certain extent to also just what these

10  commands are.

11            **MR. MICHAEL:**  Sure.  Yeah.  I know this is very, very

12  complicated technology, your Honor.

13       The point that we really want to make clear, and I

14  apologize if this is not doing it, is that the input formats

15  that are at issue in this case that have to do with how the

16  human being expresses what it wants the tool to do, has nothing

17  to do with correlation or interoperability.

18            **THE COURT:**  Okay.  Let's assume it doesn't.  There's

19  still -- just for argument's sake.  It doesn't have anything to

20  do with any of this other stuff here.

21       But what it does have to do with in some way is this

22  script compatibility, which, apparently, is important in some

23  way.

24       You don't think it makes any difference to the

25  correlation, is that what you're saying?

1          **MR. MICHAEL:**  Yeah.  I don't think it makes any

2  difference.  In fact, if it made a difference to the

3  correlation, your Honor, what you would find is you would find

4  that all of the companies that are using these tools, including

5  Cadence and other companies in the market, have the -- they'd

6  have to have the same exact input formats, and they don't.

7  Everybody is not copying everybody's input formats, only

8  ATopTech.

9          **THE COURT:**  Well, Cadence makes it's own place and

10  route and its own verification.  So it doesn't have that

11  problem.

12          **MR. MICHAEL:**  Oh, but it also -- oh, your Honor,

13  trust me.  There are many design flows that work where there is

14  a combination of these tools within the design flows.  Yeah.

15          **THE COURT:**  Okay.  Well, whether you need it or not,

16  it's doing something.  Something is happening.  The fact that

17  somebody is using a particular language to tell the program to

18  do something.

19      As I say, I don't know what your program is reading.  In

20  other words, how is it figuring out the timing?  Is it looking

21  at their terms, their command terms at all?

22          **MR. MICHAEL:**  No.

23          **THE COURT:**  What's it looking at?

24          **MR. MICHAEL:**  It's looking at the layout file that

25  the place and route tool feeds into the timing tool.

```
 1        And I think -- again, so there's two files, right?
 2   There's the file that comes from the place and route tool, the
 3   layout, the GDSII, and then there is the human communication
 4   with the tool, which is different.  That's what this case is
 5   about.
 6        And I think this might be a good time for you to see what
 7   one of these input formats look like.
 8             THE COURT:  Go ahead.
 9             MR. MICHAEL:  Do you want to walk through the input
10   formats, Krista?
11        I think Ms. Schwartz will walk you through some of the
12   input formats, your Honor.
13             MS. SCHWARTZ:  If we can get Slide 8, please?
14        (Document displayed.)
15             MS. SCHWARTZ:  All right.  This is an example from --
16   this is an ATopTech-produced document.  This is in the record.
17   It's Exhibit 6 to the Michael declaration that's in support of
18   our opposition.
19        So this is an excerpt from a PrimeTime manual, and this
20   is -- the manual is trying to describe what an input format
21   looks like so that the human user can type this in.  And so it
22   lists the -- let me see if I can figure out how to use this --
23   the name of the command that the user would type into the
24   prompt.  And this had one at "report_delay_calculation."
25             THE COURT:  Okay.  I can get it.
```

1          **MS. SCHWARTZ:**  It tells roughly what that will cause

2    the command to do.  It will display the actual calculation of a

3    cell or net timing arc delay value.

4          But you can't just type in this name of the command and

5    have it work.  The program needs more information to know what

6    it wants to do with this particular command.

7          And so that's where the syntax comes in.  And so syntax is

8    a well-understood term in computer science, and it's roughly

9    analogous to the English concept of syntax where you have to

10   have a particular arrangement in order for it be correct.  And

11   so it says here, it describes what the data type is that the

12   command will return.

13         So in this case it will return an "int," which is an

14   integer.  So it will return a numerical number so that the user

15   can use that to go ahead and use in later parts of the program.

16   Then it's got the name of the command.  And then it has a bunch

17   of different options and arguments that the user can provide.

18         And the user doesn't type all of this.  So, for example,

19   the little square brackets and the vertical lines, at the

20   beginning of the manual there is a description that this is

21   basically the language we're using to describe the syntax to

22   you.

23         So the user would just type "report_delay_calculation."

24   Then depending what they wanted to do, they can type "-min" or

25   they can type "-max."  They can type "-from_rise_transition."

1   But if they do that, because it's in italics here (indicating),

2   they have to provide an argument to that option.  So all --

3           **THE COURT:**  By "argument" you mean?

4           **MS. SCHWARTZ:**  Data.  So you would have to -- we can

5   see here its value and it describes -- it would have to be

6   "data of type float."  So you would you have to provide a

7   floating point integer value.  So the user would type

8   "-from_rise_transition."  Then they would have to have a long

9   floating point number, a "0.003 e to the -2," something like

10  that.

11          Same thing if they do the "-from_fall_transition" option.

12  If they use that, they are required to provide a data -- piece

13  of data or an argument after the option.

14          Same thing with the "-from."  You'll see the "-from" is

15  not in the little square brackets, so that's saying you have to

16  tell me.  You have to provide this option.  You have to use the

17  "-from" and you have to tell me what pin.  And we can see

18  that's going to be a string.  So that's going to be a name, a

19  character string with the name of the pin.  And you're going to

20  have to type "-2" and then you're going to have to provide

21  another name of a pin, or you can tell me what objects you want

22  me to report.

23          So it describes to the user all the different combinations

24  of elements that they have to type together with the

25  "report_delay_calculation" to make the program do the

1   "report_delay_calculation" process inside of the timing.

2           **THE COURT:**  Now, what's creative about that?

3           **MS. SCHWARTZ:**  There's a great deal that's creative.

4   There's -- if we bring up the exhibit, I think it's AS-4, which

5   is Exhibit 4 to the declaration of Dr. Storer.

6       (Document displayed.)

7           **MS. SCHWARTZ:**  Dr. Storer in his report -- and this

8   is an exhibit to his report -- went through and for each and

9   every single command, option, parameter, object and attribute

10  that's in PrimeTime that's at issue --

11          **THE COURT:**  All right.

12          **MS. SCHWARTZ:**  -- he said:  Okay, if we go back in

13  time to the time that these were added into PrimeTime, what are

14  some of the options or alternatives that Synopsys could have

15  chosen?

16      And his report describes -- and he described this at his

17  deposition as well -- that he has this dot, dot, dot

18  (indicating) because there is an endless number of names that

19  you could use.

20      For example -- and this one is for the "add collection."

21  He said you could just say "add."  You could say "row."  You

22  could say "add row," "insert row."  You see there is a variety

23  of different names.

24      Then he also goes on to describe that the syntax for that

25  particular command that's set forth in the manual is far from

1   the only syntax that Synopsys could have chosen; that there are

2   a bunch of different ways that you can pass the type of data or

3   provide the program with the type of data it needs to operate.

4       For example, instead of having the example we saw, the

5   "report_delay_calculation," with options, you might have just a

6   series of different commands.  Maybe you don't want the user to

7   have to look and sort through 15 different options.  It might

8   be easier to say:  Okay.  I'm instead going to turn this into

9   five different commands with fewer options, instead of one

10  larger command with more options.

11      And so those are some of the types of examples that he

12  provides for every single item in PrimeTime.

13      And *Oracle-Google* tells us that under Ninth Circuit law,

14  as well as some of the other Circuit's copyright law, that the

15  governing law for what determines whether it's a creative and

16  expressive item is really the existence of alternatives at the

17  time the item was created.

18      So at the time that Synopsys was adding these commands and

19  creating them, did it have alternatives?  Could it have used

20  different names?  Could it have used different syntaxes?  What

21  were other people using?  Were they using what Synopsys was

22  using?

23      And there is absolutely no evidence in the record that

24  Synopsys was not the company to create these input formats.  It

25  was the first one to come up with the combinations of the names

1  and syntax for everything at issue.

2        **THE COURT:**  When this timing analysis is done,

3  someone is using these terms to do this timing analysis, right?

4        **MS. SCHWARTZ:**  Uh-huh.

5        **THE COURT:**  And is it recreating the program then?

6  What's happening?  What are they doing to the design?

7        **MS. SCHWARTZ:**  So it depends.

8     If we can go back to Slide -- let's see.  I guess it was

9  40 --  40, if I'm reading the number.

10     (Document displayed.)

11        **MS. SCHWARTZ:**  So at each point in the flow it's

12  going to be doing something different.  The logic synthesis --

13  it's using timing commands to report on the timing that's going

14  on, but it may also be using them to figure out how -- what

15  logic gates should I turn the user's design into.  Because it

16  may be faster to do one combination of logic gates than

17  another.

18     And so it may use the timing to actually change how it

19  takes the design and turns it into the combination of

20  transistors.

21        **THE COURT:**  Well, it's starting with whatever the

22  design is in some fashion and then it's -- well, let me take

23  that back.

24     It knows what somebody wants in the form of a chip that

25  will do something.  Is it creating its own version and then

```
 1  checking that against what somebody else did in their program

 2  and saying:  Ours is better; yours is too slow?

 3          MS. SCHWARTZ:  No.

 4          THE COURT:  Okay.

 5          MS. SCHWARTZ:  At each step -- well, I may be -- the

 6  answer might be a little more complicated than my initial

 7  answer, but I'll try it.

 8      Like, at this point, the logic synthesis, the user at the

 9  top is going to be passing in --

10          THE COURT:  Yeah, I know what the user is doing.

11          MS. SCHWARTZ:  -- the design.

12          THE COURT:  What's your -- is your timing analysis

13  tool looking back at that stage?

14          MS. SCHWARTZ:  No.

15          THE COURT:  No.  When does it come in?

16          MS. SCHWARTZ:  The timing analysis tool is not

17  looking at it while it's processing.

18          THE COURT:  Exactly.

19          MS. SCHWARTZ:  But, but, people actually do use

20  PrimeTime to analyze this netlist.

21          THE COURT:  Yeah, okay.  But primarily --

22          MS. SCHWARTZ:  So the timing analysis tool -- you

23  could take this place and route step out of the middle of it --

24          THE COURT:  Well, let's not do it.  Let's not have

25  somebody doing some sort of half-done thing.  Somebody got to
```

1  place and route and that's when your tool comes into play,

2  right?  Usually.

3     **MS. SCHWARTZ:**  No.  Actually, usually the timing

4  analysis tool is at each and every level.

5     **THE COURT:**  Well, that's what I asked.  Okay.  So

6  it's doing something.  After the whole thing is done, it goes

7  back or is it doing it simultaneously?

8     **MS. SCHWARTZ:**  Well, it's up to the designer.  But in

9  a typical design flow, people are going to run the logic

10  synthesis tool and then they are going to run it against

11  PrimeTime.

12     **THE COURT:**  Okay.  They are going to actually stop

13  for a minute and say:  Okay, we're going to stop here.  Let's

14  run it and see how we're doing at this point.

15     **MS. SCHWARTZ:**  Right.

16     **THE COURT:**  Now, what is your -- and then they are

17  taking your program or your tool and they are feeding in

18  commands.

19     **MS. SCHWARTZ:**  Mm-hmm.

20     **THE COURT:**  And those commands are telling your tool

21  to do what?

22     **MS. SCHWARTZ:**  What they do is they tell the timing

23  analysis tool:  I want you to look at these specific points in

24  the design.  I want you to assume these values for your

25  calculations.  And this is the type of report that I want.  I

```
 1  want to -- because there's a bunch of different types of timing

 2  analysis you can do --

 3          THE COURT:  Okay.  It's asking -- it's saying:  You

 4  do what I did and see how it comes out?

 5          MS. SCHWARTZ:  Not quite.  I mean, there is a very

 6  simplified version of timing that happens here.  There is a

 7  little more sophisticated here, and this is a way more

 8  sophisticated.  And because this is so sophisticated, this can

 9  take days to run sometimes.

10          THE COURT:  But just doing it at a simple level,

11  you're actually -- your tool is kind of trying it out to see if

12  it works at those points.  It's doing it, in fact.

13          MS. SCHWARTZ:  Well, it takes the netlist and it runs

14  whatever timing the user wants to run.  And then the user looks

15  at the report that PrimeTime outputs and says:  All right.  So

16  I think I need to go back and tweak my design.

17          THE COURT:  That's not good enough.

18          MS. SCHWARTZ:  And the user tweaks what goes into the

19  top of this.  It tweaks their design.  The user go backs and --

20  goes back and changes the "and" gates --

21          THE COURT:  All right.  I'm just trying to find out

22  what your program is doing and what your user is doing because

23  they are entering these words, apparently, that's the subject

24  of this whole dispute.

25          So the user is putting in whatever words they've got for
```

1   their own program, and now they get this different program.

2   And they say:   Okay.   I want you to check out how we did.

3   Let's see.   Do you think we're doing as well as we thought we

4   were or not?   Because they are running their own thing at the

5   same time, okay, or have run it.   So, okay.   How did we do?   So

6   they put in these words, just to have the PrimeTime tell them

7   how they are doing.

8        You, apparently, don't think that the fact that they are

9   putting different words in at that stage is making it any more

10  difficult for PrimeTime to assess what happened.

11          **MS. SCHWARTZ:**   It does not make it any more difficult

12  for PrimeTime.   PrimeTime can -- doesn't care what commands you

13  fed up here, but it does make it more difficult for the user.

14       And that's why companies want to copy the commands, is

15  because if the user doesn't have to learn different sets of

16  commands to run each tool, it's --

17          **THE COURT:**   You mean, that's all that you're saying

18  they are saying, is that they had to learn a new language and

19  it's too hard to do it?

20          **MS. SCHWARTZ:**   Yes.   And they want to be able to take

21  our customers of IC compiler, who know our commands, and if

22  they don't have to learn a new language to run their tool, then

23  it makes it easier to switch customers.

24          **THE COURT:**   All right.   Maybe that's what's going on.

25  I don't know, okay, but that explains, at least, your version

```
 1   of what's going on.  And I think I understand that.  All right.

 2   Which is simply that everything will run, according to you,

 3   just fine.  It's just -- it's harder for the user to have to

 4   learn a whole new set the commands.

 5            MS. SCHWARTZ:  Yeah.  If you're used to --

 6            THE COURT:  That's the whole point.

 7            MS. SCHWARTZ:  That's the whole point.

 8            THE COURT:  Okay.  Well, that's a pretty simple

 9   point, if you're right.  I don't know if you're right.

10       Now, let's go back to the commands.  So these commands, as

11   you say, are --

12            MS. SCHWARTZ:  Can we look at Slide 9?

13       (Document displayed.)

14            THE COURT:  Okay.  I'm going to ask you a question,

15   okay?  And I'll use that same example that was used in the

16   motion.  Why is this different than control-alt-delete?

17            MS. SCHWARTZ:  Control-alt-delete are just three

18   separate little key names.

19            THE COURT:  Right.  That cause something to happen,

20   though.

21            MS. SCHWARTZ:  That's true.

22            THE COURT:  Okay.

23            MS. SCHWARTZ:  But *Oracle-Google* says the fact that

24   it causes something to happen does not mean that it's not

25   copyrightable.
```

```
 1          THE COURT:  Okay.  But you don't think
 2   control-alt-delete is copyrightable, do you?
 3          MS. SCHWARTZ:  I think control-alt-delete have been
 4   out there since the 60's, 70's and everybody was using them,
 5   so...
 6          THE COURT:  Okay.  But if it were new, if somebody
 7   said:  Hey, I want to get rid of this whole screen here and I
 8   can't get rid of it.  I'm going to try doing control-alt-delete
 9   and see what happens.  At that point you would have said:  Gee,
10   you could copyright that.
11          MS. SCHWARTZ:  If it's -- it depends.  I mean, there
12   is a -- there is, obviously, a level of analysis.  If it was
13   just control-alt-delete, you didn't have to provide it, all the
14   different options and parameters and data, and it was just
15   control-alt-delete, not part of a larger collection, probably
16   not.  Probably not copyrightable.
17          THE COURT:  Okay.
18          MS. SCHWARTZ:  But, you know, it depends on those
19   type of factual circumstances and that's not what we have here.
20          THE COURT:  Okay.  So then you are distinguishable
21   from control-alt-delete.  And we'll leave out that it's been
22   around, okay?  Because we'll say:  Okay.  Somebody didn't use
23   your words before you did.  All right?
24       But it isn't just words, according to you.  It's requiring
25   something more.
```

1        MS. SCHWARTZ:  Yeah.  It's -- well, first of all,

2    just the type of names that we have here, this is one that's --

3    I mean, some of the report commands are a little more simpler,

4    but if we get into some of the variables, some of these names

5    are 30 to 40 characters long, complicated with abbreviations in

6    the middle.  It's not even at that point just words.

7        THE COURT:  Okay.  But you didn't use that one.  You

8    used this one.

9        MS. SCHWARTZ:  Right.

10       But here (indicating), even just choosing these three

11   words and putting them together with underbars, even if we were

12   looking just at names, that's not the issue here.  There were a

13   whole bunch of different things you could have used that might

14   be copyrightable, but that's not the issue that's before us.

15       THE COURT:  Okay.

16       MS. SCHWARTZ:  What we have is this with, you have to

17   then follow the syntax that goes with the command name.  The

18   command name is part of it.  It's an easy way to identify it.

19   I mean, if you want to talk about a command, it's really hard

20   to say "report underscore" -- "it report underscore delay

21   underscore."  So --

22       THE COURT:  I'm going to use an example.  You tell me

23   if you think this could be analogous.

24       "Report Delay Calculation" is the title and the rest of

25   it's the story.

1          MS. SCHWARTZ:  Can you repeat that, your Honor?

2          THE COURT:  Okay.  "Report Delay Calculation" is the

3  title of the book and the next part is the story.  Not quite?

4          MS. SCHWARTZ:  I have to think about that a little

5  bit.  I'm not sure that -- I don't think that quite holds

6  together because you can separate the title from the rest of

7  the story, and you can't separate "report_delay_calculation"

8  from the syntax.

9      If you're going to use "report_delay_calculation" to talk

10 to the program, you have to use the syntax with it.  It's all

11 part of what the -- the format that the user has to follow.

12         THE COURT:  All right.  You are not claiming a

13 copyright in what I'll call the title.

14         MS. SCHWARTZ:  That's not what's at issue in this

15 case.

16         THE COURT:  Okay.

17         MS. SCHWARTZ:  We have never claimed just the names.

18         THE COURT:  You're only claiming it as it's part of

19 this whole story.

20         MS. SCHWARTZ:  Synopsys may have -- you know, they

21 may be copyrightable in the names, but that's not the issue

22 that we put in front of the Court and that's not --

23         THE COURT:  Okay.

24         MS. SCHWARTZ:  So I'm not going to take an opinion as

25 to whether that definitively is or is not copyrightable, but

1   it's not at issue here.

2           **THE COURT:**  Well, there are different formats that

3   could use "report_delay_calculation" or is there only one for

4   this?

5           **MS. SCHWARTZ:**  This is --

6           **THE COURT:**  With options, kind of.

7           **MS. SCHWARTZ:**  It depends.  PrimeTime is a program

8   that's evolving on a daily --

9           **THE COURT:**  Well, we'll just say at the moment.

10  Okay.  The options they are adding  --

11          **MS. SCHWARTZ:**  So they are adding and deleting

12  options all the time.  So what is the format in one version,

13  like 2016.12, may actually be slightly different in later

14  versions.

15          **THE COURT:**  Okay.  Well, to the extent that you

16  aren't claiming just what I'm calling the title.

17     Okay.  And when your expert did these alphabetically, all

18  right -- I've got to go back and look -- are they all with the

19  whole kind of syntax attached to them?

20          **MS. SCHWARTZ:**  The expert did not attach the manual

21  copies because his report would have been tens of thousands of

22  pages long.

23          **THE COURT:**  All right.  So why did he create the

24  alphabetical list then?  What was the purpose of it?

25          **MS. SCHWARTZ:**  Well, these are listed in the manuals,

```
 1  either alphabetically or alphabetically by group.  We weren't
 2  entitled to the source code.  We were not provided the source
 3  code in discovery.
 4          THE COURT:  We're talking about your product, not
 5  theirs.
 6          MS. SCHWARTZ:  Well, but the point of listing these
 7  was to be able to compare our product to theirs.
 8          THE COURT:  Oh, okay.  But he wasn't trying to
 9  describe --
10          MS. SCHWARTZ:  No.
11          THE COURT:  -- the -- at that point the actual
12  copyrightably claimed -- the claim for -- the claim material.
13          MS. SCHWARTZ:  He's -- to do the abstraction
14  filtration comparison test, he had to be able to compare our
15  product with theirs.
16          THE COURT:  Yeah, but why did he create the list he
17  did?  You're saying all he did was look for words.  Then you --
18          MS. SCHWARTZ:  No.
19          THE COURT:  -- didn't know if they were using all the
20  rest of this stuff in there, from what you're telling me.
21          MS. SCHWARTZ:  No.  If you read the body of the
22  report -- so the exhibits are a summary of the analysis and the
23  opinions he went through.  It's nothing more than a summary.
24      And if you read the body of the report, he describes the
25  abstraction, filtration, comparison steps he went through and
```

1  he explicitly says that he compared the syntax, as well as the

2  names.

3           THE COURT:  Yeah.  And he got that without source

4  code.

5           MS. SCHWARTZ:  He got that in a couple ways.  One, he

6  looked at the manuals that they provided in discovery.

7           THE COURT:  That's where it is.

8           MS. SCHWARTZ:  And, two, he had to run the executable

9  for their program and run a bunch of commands that would kind

10 of dump out some of the input formats that they would -- first,

11 they would dump out the list of all the commands alphabetically

12 from their program.  Then you had to run a second help command

13 to then take a look at what the syntax was.

14     And so he took the list that their program provided of

15 here are all the commands that are available and it -- he then

16 said:  Okay.  Here is a list of the ones in PrimeTime I'm

17 comparing.  And in my summary of what I did, here is what --

18 how they match up.

19           THE COURT:  Okay.  But did he look at whether or not

20 then -- let's just use this example.  Is this one you're saying

21 they are using?

22           MS. SCHWARTZ:  Yes.

23           THE COURT:  And he found that in their manual?

24           MS. SCHWARTZ:  Yes, he did.

25     And if we look at Slide 10 we have here, for example.

1          (Document displayed.)

2              **THE COURT:**  Or at least what he thinks is the same?

3              **MS. SCHWARTZ:**  Right.  Here is their manual section

4     where it's the "report_delay_calculation," and they list the

5     syntax.  And so --

6              **THE COURT:**  Okay.  This is in his report.

7              **MS. SCHWARTZ:**  These two particular excerpts are in

8     the expert report.

9         And then he describes generally that this is -- this is

10    the comparison I went through.  He doesn't list every single

11    command explicitly in the body of the report because it would

12    be 100,000 pages.

13             **THE COURT:**  Okay.  But he says whatever ones are on

14    his alphabetized list, he did the same kind of work and came up

15    with the same kind of comparison, but he has shown some

16    exemplars.

17             **MS. SCHWARTZ:**  Right.  He has shown some exemplars.

18    These particular exemplars come directly from his report.

19             **THE COURT:**  Okay.  So, let's say that that's the

20    purpose of why he gave an alphabetized list instead of doing

21    all this work for every single one, so that he could identify

22    which ones he thought were equivalent.  All right.  And he

23    doesn't have to look at source code.  He looks at a book.  He

24    looks at a manual.

25             **MS. SCHWARTZ:**  And not all of them were in the

```
 1  manual, so he also had to look at their executables.
 2          THE COURT:  By "executables" you mean?
 3          MS. SCHWARTZ:  The actual program.  The disk you put
 4  into the computer and then it runs.  That's the executable.
 5          THE COURT:  All right.  But in any event, he
 6  determined it's coming out the same way.  Okay.  Now --
 7          MS. SCHWARTZ:  He says that they are either identical
 8  or substantially similar.
 9          THE COURT:  All right.  Well, it's more than a couple
10  of words, I will certainly say that.  And there is at least,
11  from what I understand from what you've said, an acknowledgment
12  that just -- by the way, is "report" supposed to be in this
13  instance a verb or a noun?
14          MS. SCHWARTZ:  I think it's supposed to be a verb,
15  but I'm not sure, your Honor.  I would have to ask the folks at
16  Synopsys that came up with it.
17          THE COURT:  Okay.  But in any event, let's just say
18  it goes, you know, verb noun noun or something.  And you're not
19  trying to copyright that.
20          MS. SCHWARTZ:  No.  We're not claiming the copyright
21  in the general rules --
22          THE COURT:  Okay.
23          MS. SCHWARTZ:  -- that Synopsys chose to follow.
24  They could have chosen noun verb.  They choose that as a
25  guideline essentially.
```

```
 1          THE COURT:  All right.  Okay.  Mr. Alexander, you had

 2   said that you weren't clear as to what they were claiming here,

 3   all right?  They are claiming these things.  Not

 4   "report_delay_calculation" or, you know, some other term like

 5   that.  Just free floating.  They are claiming it as part of

 6   this whole set of commands.  Okay.

 7          MR. ALEXANDER:  Okay.  Several responses.

 8          THE COURT:  Okay.

 9          MR. ALEXANDER:  First, if you look at Dr. Storer's

10   report, he does claim "report_delay_calculation" itself.

11          THE COURT:  Yeah, but they are not.  So forget him.

12   He's not -- he is not the one who is going to make the

13   decision.  He's not Synopsys.  He's somebody they hired.

14      Okay.  So what he claims, we're not going to worry about.

15   That may have confused everybody, but they are not claiming it.

16   They are claiming the words not in the abstract, but as part of

17   a whole thing.

18      So if you said, "Once upon a time," and all somebody

19   wanted to copyright was "Once upon a time," you aren't going to

20   be able to.  But if it said, "Once upon a time there was a frog

21   prince," and then you'll go on, and then you'll see, and there

22   you go.  Okay.  And then you've got something that could be

23   copyrighted.

24          MR. ALEXANDER:  Except that, your Honor, we really

25   ask:  What is it that you claim is the copyright?  They said:
```

```
 1  It will be in our expert report.  That is Dr. Storer and what
 2  he said was just the lists.
 3          THE COURT:  I'm going to stop you.  That's
 4  historical.  Now we're in the present.  Okay?
 5       As long as they aren't claiming it, and they can't claim
 6  it if they are saying they are not, and if you -- I'll just
 7  say:  Does anybody object to my granting summary judgment on
 8  just the labels like "report_delay_calculation"?  Let's find
 9  out.
10          MR. ALEXANDER:  I'm not going to object.
11          MR. MICHAEL:  Your Honor, yeah, we actually would.
12  Not because we're claiming that it's copyrightable, but it's
13  not at issue in the case.
14          THE COURT:  Okay.  All I can say is that if they are
15  not claiming it, so I may not be able to do anything but give
16  an advisory opinion.  If you were claiming it, it wouldn't be
17  copyrightable.  Okay.  And I don't know what they are trying to
18  preserve for another case in another day.
19       But I will say this:  They are stuck with that
20  representation, as far as I'm concerned.  They are not going to
21  come back at trial and then try to claim that the
22  "report_delay_calculation," if you just used that all by
23  itself, is an infringement of their copyright.
24          MR. MICHAEL:  That's perfectly acceptable to
25  Synopsys, your Honor.
```

```
 1          THE COURT:  There you go.  All right.  You have one
 2   thing nailed down.  Now --
 3          MR. ALEXANDER:  Because -- and that would require,
 4   your Honor, some change in the expert report, because that's
 5   not what he says.  But we've got one thing nailed down.
 6          THE COURT:  All right.  Well, then you can confront
 7   him with that, if it goes to trial, and say:  Hey, look.  You
 8   say this -- remember how you said everything in the world is
 9   copyrightable.  Mister -- whatever his name is.  Dr. Storer,
10   whatever, you know, didn't you say the alphabet was -- whatever
11   you want to say to him.  Make him look bad at that point, but
12   that's a different question.
13          MR. ALEXANDER:  Okay.
14          THE COURT:  Now, we made progress.  Okay.
15      Now, go sit down.
16          MR. ALEXANDER:  May I go -- I need to get a little
17   closer to this to point out the next issue.
18          THE COURT:  What is it?
19          MR. ALEXANDER:  So you look at -- this is supposed to
20   be the syntax.
21          THE COURT:  The whole thing.
22          MR. ALEXANDER:  Right.
23          THE COURT:  Okay.
24          MR. ALEXANDER:  So look at this, your Honor.  From
25   the start timing part.  Where do you see
```

```
 1   "from start_timing_arc" over here?  You don't.

 2           THE COURT:  Okay.  That's the infringement part,

 3   okay?  And we've got a dispute as to whether or not there is

 4   enough that's the same to be the same or whether -- in other

 5   words, it doesn't have to be every word exact, but if the

 6   majority of it is.

 7      Now, I'm not -- frankly, I'm having a little trouble

 8   reading it and so I can't tell if he's got other stuff there.

 9   And this is one exemplar.  It's not all of them.

10      So I see threshold at a different point -- well, no.  It's

11   no split followed by threshold, that's part of that.  And then

12   there's a couple of minimum/maximum things that are in theirs

13   that aren't in yours -- oh, no.  They are up at the top.

14           MR. ALEXANDER:  They are expressed differently, your

15   Honor.

16           THE COURT:  Well, they are.  Okay.  Just a minute.

17           MS. SCHWARTZ:  I want to point out, your Honor, that

18   the coloring in the black boxes at the bottom, I added that to

19   what's in Dr. Storer's report.  So the -- I'm sorry.

20           THE COURT:  Okay.  The --

21           MS. SCHWARTZ:  The side-by-side is in his report, but

22   without the highlighting.  So I just wanted to make that clear.

23           THE COURT:  Let me ask you a question about that,

24   Ms. Schwartz.  If you look at these two, they are not

25   tracking --
```

1              **MS. SCHWARTZ:**  They are.

2              **MR. ALEXANDER:**  They are not.

3              **THE COURT:**  Excuse me.  If you just look at them,

4    they are not tracking.  If you can show how they are

5    independent of that, go ahead.

6              **MS. SCHWARTZ:**  I can.

7              **THE COURT:**  So that will answer -- just one minute,

8    Mr. Alexander.  Let's see if she can show why you're wrong.

9              **MS. SCHWARTZ:**  The min and max -- so I described how

10   at the beginning of the manual, in the PrimeTime manual, there

11   is a discussion about what the different symbols mean and that

12   you don't actually type these square brackets.  It means that

13   that's something that's optional.

14        And so the -- here (indicating), they chose to list min

15   and max separately.

16        Here (indicating), in PrimeTime they said, well, they are

17   kind of related, so we put them side-by-side.  But you can type

18   either min or max.

19        This backslash (indicating), the user doesn't have to

20   type.  That's a way in the Tcl language of saying:  Okay, go to

21   the next line.  It's still part of the same command.

22             **THE COURT:**  All right.  Let's say that some of these

23   punctuation marks are not necessary.

24             **MS. SCHWARTZ:**  Right.

25             **THE COURT:**  Okay.  But --

1          MS. SCHWARTZ:  And then the names, but if we look at

2   the -- like, we have minus --

3          THE COURT:  See -- hold on a minute.  But then

4   they've -- you've -- they've got --no, you've got

5   "from rise_transition value."  Two of those.  And they don't

6   have it.

7          MS. SCHWARTZ:  Well, they do.

8          THE COURT:  But not where you have it.  Does that

9   matter?

10         MS. SCHWARTZ:  No.  Because the user can type these

11  in any order that they want.  So the syntax matches.

12     So the -- the manuals describe that you don't have to put

13  these options in this particular value.  This is just the way

14  that the companies chose to list the options in the manuals.

15     The user, though, is able to type "min" then "max," or the

16  user could type "max" then "min," or the user could just type

17  "crosstalk" and then "min."  That is permitted in the syntax.

18  And that's what each of these little symbols are describing to

19  the user.

20         THE COURT:  All right.  So it's not, "Once upon a

21  time there was a frog prince."  You've got, "Once upon a time

22  there was a frog prince," and then you've got frog wants prince

23  upon whatever, and then saying they are the same.

24     Okay.  So tell me why they are.

25         MS. SCHWARTZ:  Well, it's taking a sentence and

 1  saying, well, you can -- you can take any of the pieces -- you

 2  can reorder them if you want, but this is what's required.

 3      And this is very -- this is typical in computer science.

 4  This is just the way computer languages work.

 5          **THE COURT:**  Okay.  So maybe it isn't like English, is

 6  what you're saying.

 7          **MS. SCHWARTZ:**  I think that the copyright analogy

 8  holds with English for a little while and then at some point

 9  the software starts to diverge.

10          **THE COURT:**  Okay.  Well, maybe.  Okay.  So -- all

11  right.

12      So that's their response to your observation, Mr.

13  Alexander, that they don't and the same, which they don't.

14  Okay.

15          **MR. ALEXANDER:**  Depends on what they are trying to

16  say.

17      First, if we're talking about the way that the syntax

18  reads -- and now we're talking about syntax.  It's labeled that

19  way.  Let's just take a look at it because this is not what the

20  analysis that Dr. Storer did.

21      But, look.  From pin to pin, and then there is something

22  called object to object.  You don't find that here.  The reason

23  that they highlight it is because "from  rise_transition fall."

24  They say:  Well -- well, that must be the same thing.  Maybe

25  that's -- you could just type it in a little differently and

1  that would be okay.

2        And then it's the same with all of these, several of these

3  others.

4              MS. SCHWARTZ:  I can correct that, too.

5              MR. ALEXANDER:  This one, your Honor --

6              THE COURT:  Okay.  I can't -- I'll just tell you,

7  I've got to go back and look at whether any of this is in any

8  reports, okay, or whether the Court is left to see what you

9  said and whether what you said is good enough that they don't

10 need this in their report, but -- and I'm willing to do that.

11       But let's take a -- even if you did just a traditional

12 type of regular copyrighted -- it could be a novel.  It could

13 be anything and somebody changed the punctuation, but all the

14 words were the same, that would be copyrightable.

15       Now, if somebody -- they put in a semicolon instead of a

16 comma, they put in a period instead of something else --

17             MS. SCHWARTZ:  And I think we've left the realm of

18 copyrightability.  We're now in the realm of infringement.

19       Mr. Alexander is trying to compare it and at that point we

20 have huge factual issues of what is substantially similar or

21 not and we have our experts who say they are.

22             THE COURT:  Yeah, okay.  So let's do this, all right?

23 I'm not going to say this minute that it's not good enough to

24 be infringement.  I'm going back to double check.  But I -- my

25 recollection is you've got dueling experts --

```
 1              MS. SCHWARTZ:  Dueling experts.

 2              THE COURT:  -- on the point.

 3       Yes, you could say even with dueling experts, one is just

 4  so beyond the pale that it just doesn't seem reasonable at all,

 5  but not necessarily here.  And I certainly would look at that.

 6       This is what I think we've done thus far on this.  We've

 7  got to decide if we're going to do anything more, given that

 8  you've got all these -- you know, your index of affirmative

 9  defenses.

10       So, just to go back for a second.  You can make one more

11  point, but after that I'm going to rely on your papers.  Okay?

12  So what's your last really great point?

13              MR. ALEXANDER:  Your Honor, the last great point that

14  I will make is that the way that they have expressed it now,

15  different from what's said before, now becomes a process.  They

16  are saying it doesn't matter whether you say "start_timing_arc"

17  or "start_timing_pitch" because it's the same process.  You

18  cannot copyright a process.

19       So what they've done is backed themselves into saying it's

20  a process and that cannot be copyrighted.

21              THE COURT:  I'm not so sure about that.  But what

22  they are saying is this is a modular story.  And I don't know

23  if modular story works and I'll have to look.

24              MR. ALEXANDER:  Okay.  And that is -- that is a

25  threshold point in our motion, is that they say that now, but
```

1    that's not what they said in their expert report.  And they

2    should -- they should be held to that because that's what they

3    said their claim would be.

4          **THE COURT:**  No.  I'm not going to bind them to the

5    expert report.  Okay?  I'm going to bind them to whatever

6    position they are taking in connection with their legal

7    arguments as to what their case is.  And then we're going to

8    see if they have put in sufficient evidence -- well, first,

9    we're going to see if you put in enough to kill off their case

10   if they hadn't said anything and then we're going to look to

11   see what they said.

12         **MS. SCHWARTZ:**  I would direct your Honor in

13   particular to, I think it's Pages 90 -- I know 93 of the Storer

14   opening report.  He explicitly addresses syntax and describes

15   what it is and describes his comparison.  So it is, in fact, in

16   his report.

17         **THE COURT:**  That's fine.

18      Okay.  Now, you've got output reports, okay, and there is

19   a fight over whether or not these are blank forms.

20         **MR. ALEXANDER:**  Right.

21         **THE COURT:**  Okay.  My initial reaction to this, I'll

22   just tell you, is it's not the same as a blank form, but it's,

23   rather, a way of describing a result.

24      In other words, it's written out and then it's divided up.

25   Whether these dividers are -- whether this kind of a format of

 1  how the result prints out with asterisks and column and dashes

 2  and all, whether that sufficiently, I guess, is creative and

 3  whatever else it has to be to be copyrightable you could argue

 4  about, but I don't want -- it's very unlikely I'm going to find

 5  this as a blank form.  Because it isn't asking someone, really,

 6  to fill in a form.  It says:  You tell us what you want to know

 7  and we'll tell you what we want to know in the form that we

 8  give to you.

 9          **MR. ALEXANDER:**  I'm not sure I understand that, your

10  Honor.

11          **THE COURT:**  In other words, they say this is what we

12  want to know.  We want it to do this, that and the other.  We

13  want to get a result from you.

14      And then at that point they create the result in the form

15  that they want it created.  All right?  But it isn't -- it

16  isn't like you are handing somebody a blank form.  You can say

17  the computer is filling out a blank form, but I don't think

18  that's quite the same.  And, again, we're in this weird field

19  of computer programs.

20      But I will look at that again.  I just don't want to hear

21  a lot about it because I read all about it already.

22      And then as far as whether it says -- you know,

23  sufficiently different and it's not like everybody has done

24  this this way, put little stars or whatever, I'll consider

25  that.

 1           **MR. ALEXANDER:**  Let me just -- in that connection,

 2   let me just... I think it's No. 3.

 3       (Document displayed)

 4           **MR. ALEXANDER:**  What I understand them to be

 5   claiming, if I guessed right on the exhibit.

 6           **THE COURT:**  It's very late.

 7           **MR. ALEXANDER:**  We should finish, okay.

 8           **THE COURT:**  Well, at least this part.

 9           **MR. ALEXANDER:**  What I understand them to be claiming

10   is that those dashes and, like, report, that's the blank form.

11   That's what it looks like.

12       What the user puts in it would come out in columns,

13   like -- like path and increment.  That's the form before the

14   user puts any information into it.

15           **THE COURT:**  Well, let me ask them a question.

16           **MR. ALEXANDER:**  And our position is that's not

17   copyrightable.  That's just --

18           **THE COURT:**  Okay.  But let me then -- this is

19   analogous to the concern you had before about what they are

20   claiming.  I want to find something out here.  Okay.

21       Now, Ms. Schwartz, apparently, point person on this one.

22   Okay.  Are you claiming the form in the form that's up there or

23   are you claiming it once its filled in?

24           **MS. SCHWARTZ:**  No.  The user never fills -- I don't

25   know what this is.  This is not in the record, what Mr.

1    Alexander has up.

2              **THE COURT:**  All right.

3              **MS. SCHWARTZ:**  I can show you one that is in the

4    record as what is generated and that's on Slide 14.

5         And this comes from the exhibit of -- this comes from

6    Dr. Storer's opening report at Page 48.

7         (Document displayed)

8              **MS. SCHWARTZ:**  So here is --

9              **THE COURT:**  That's filled in.

10             **MS. SCHWARTZ:**  That's filled in.  And that is -- this

11   is what's generated by the programs and this is what we are

12   claiming copyright in, the particular layouts.  The fact that

13   you have the stars.  The fact that you chose to put even a

14   little header describing the report.  The design.  The fact

15   that you list flags.  The order that you list each of those

16   columns.  You could rearrange the columns.  The names of the

17   particular labels for the columns.  Even the choice of the

18   flags, little "c" for "case-analysis."  That's what our output

19   format copyright is.

20             **THE COURT:**  Let me ask you a question.  Of course,

21   they are not going to have the exact -- I mean, every one of

22   these is going to be different, you know?  In other words --

23             **MS. SCHWARTZ:**  Their reports are strikingly similar,

24   your Honor.

25             **THE COURT:**  Really?

1          **MS. SCHWARTZ:**  Yes.  Their reports have the same 40

2     stars in a row.  They didn't even choose to do 39 --

3          **THE COURT:**  I'm talking about the content.

4          **MR. ALEXANDER:**  Well, the --

5          **MS. SCHWARTZ:**  Oh, the content.  Yes.  The numbers --

6     so, yes and no.  Some of it will be different.  Some of the

7     particular numbers or the particular names that the user input,

8     because the user might provide a different design name for each

9     one.  But the little c's and the capital C's that are generated

10    by the report and by the program and listed in flags, those

11    will be the same.

12        So there are some of the output that will be the same and

13    some will be slightly different, but the formatting will be --

14    whoops, I'm sorry -- identical.

15         **THE COURT:**  Okay.  Well, I will think about the

16    defendant's argument in connection with it.  Because unlike

17    your other -- the input formats, you're arguing that there is a

18    similarity in how they look as input.  And here there is going

19    to be a difference in how each of them looks as an output, but

20    the way in which it's arranged will be the same or arguably the

21    same.

22         **MS. SCHWARTZ:**  The labeling, the format.  And I point

23    out, your Honor, that their motion, they only moved under the

24    blank forms doctrine.

25         **THE COURT:**  I'm not so sure it's a blank form.

 1   That's the concern I have.

 2          **MR. ALEXANDER:**  But, your Honor, if you look at the

 3   Ninth Circuit opinion in *Bibbero*, you see that the fact that

 4   this information is there, that doesn't -- and it conveys that

 5   information, that absolutely does not turn it into a

 6   copyrightable form.

 7          **THE COURT:**  That's why I'm going to look at it, to

 8   see that this process, if you want to put it that way, is the

 9   same process or could be considered the same as a blank form.

10   That's all I'm going to say.

11          I'm not going to take any more argument on it because

12   you're going back to your brief anyway and I'm going to go and

13   look at it.

14          If I find it's not a blank form, in all likelihood I'm

15   going to find at this stage it's copyrightable.  There is a

16   good chance I'm going to find what's copyrightable is what was

17   shown as this, quote/unquote, syntax.

18          But then we still have the question of what was given up.

19   And I think I'm just going to have to go back and look again at

20   the case law on whether or not saying:  Hey, look at everything

21   else we've done in the past and, you know, we want to sort of

22   bring that in to our current registration, I'm not sure that

23   that works.  I have to look at it and see.

24          **MR. ALEXANDER:**  Right, your Honor.  And then you

25   would also have to look at Exhibit 5 to Dr. Storer's report

1   because that's what he claims, and that will mean --

2           **THE COURT:**  Just get off his report already, okay?

3   This isn't the end.  Dr. Storer is a piece of all this.  He's

4   not -- he's not running the show, you know?  He's more than a

5   bit player.  He's not running the show here.

6        Okay.  Now, what I want to say on all that is that -- and

7   I want to ask Mr. Michael:  Why did they make it so mushy?

8           **MR. MICHAEL:**  Why did they make what so mushy, your

9   Honor?

10          **THE COURT:**  The part that they disclaimed.

11          **MR. MICHAEL:**  All right.  Well, they didn't disclaim

12  anything, your Honor.

13          **THE COURT:**  All right.  Excluded.  The part they

14  excluded, why did they make it so mushy?

15          **MR. MICHAEL:**  Because it's exactly what the Copyright

16  Office told Synopsys to do.

17          **THE COURT:**  Is that in the record?

18          **MR. MICHAEL:**  It absolutely is in the record, your

19  Honor.

20          **THE COURT:**  Point it out.  Somebody will write it

21  down.

22          **MR. MICHAEL:**  If we could take a look, pull up AO-2,

23  please?

24       (Document displayed)

25          **MR. MICHAEL:**  This is Circular 61 from the Copyright

1   Office.  It's attached as Exhibit 2 to the declaration of Ralph

2   Oman, one of the former copyright registrars.

3           THE COURT:  Okay.  Well, that's where he explains

4   what they think everything means.

5           MR. MICHAEL:  He explains -- what's important, your

6   Honor, also, is --

7           THE COURT:  Where does he say it's okay to use mushy

8   descriptions?

9           MR. MICHAEL:  If we blow up the limitation of the

10  Claim section there at the very bottom, what the Copyright

11  Office -- and this is for computer programs.  What the

12  Copyright Office advises, when you fill in the Material

13  Excluded field, you may state, for example, "previous version."

14          THE COURT:  Are they thinking, when they wrote this

15  directive, that this was a previously registered version?

16          MR. MICHAEL:  No.  Absolutely not, your Honor,

17  because this is, in fact, the material -- it's the pre-existing

18  material that's incorporated into the current version.  If you

19  have previous registered versions, you have to identify those

20  as well.

21          THE COURT:  Separately.

22          MR. MICHAEL:  Separately.

23          THE COURT:  Okay.

24          MR. MICHAEL:  There's a place for identifying them.

25          THE COURT:  All right.

1          **MR. MICHAEL:**  Now, I also want to refer the Court to

2     the *Alaska Stock* decision.

3          **THE COURT:**  No, no, no.  I got that one already.

4     Okay.

5          **MR. MICHAEL:**  That's where the Ninth Circuit says

6     that the Ninth Circuit follows the advice given by the

7     Copyright Office with respect to circulars and guidance.

8          **THE COURT:**  Okay.  Very good.

9          Now, I will -- as I say, I've got -- you know, some of

10    these I've seen and some of the things I haven't focused on at

11    particular points, partly because I haven't had enough time to

12    just comb through every one of these pieces of evidence that

13    you've given me.  And that's why I do want to go back and why I

14    wanted you in here, to tell me what you thought was

15    particularly pointed toward as something I would see as an

16    issue.

17         So that's helpful, because, yes, I looked at it.  But have

18    I looked at it with kind of laser intensity at any particular

19    point?  No.

20         **MR. MICHAEL:**  Your Honor, I'd like to make two more

21    points on this particular point.

22         One is, the registration is not limited to the

23    certificate.  The registration also includes the deposit

24    materials.

25         **THE COURT:**  Okay.

1          MR. MICHAEL:  And the deposit materials also identify

2     pre-existing materials.  And that, too, is set forth in the

3     declaration of Mr. Oman throughout.

4          THE COURT:  Okay.

5          MR. MICHAEL:  And the final point is, the decision in

6     *Oracle v Google*.

7          THE COURT:  The decision what?

8          MR. MICHAEL:  The *Oracle v Google* decision.  Not the

9     one that went up to the Federal Circuit.  There is an earlier

10    decision, which we cite at Page 12 of our opposition, where

11    Judge Alsup overruled challenges to registration of previous

12    versions of Java based on the language that said, "prior works

13    by claimant and licensing components."  Precisely the exact

14    same language that's in Synopsys' registration certificate.

15         THE COURT:  And then --

16         MR. MICHAEL:  And the reason why is because everybody

17    follows Circular 61 and thousands of companies rely on this.

18         THE COURT:  Okay.  All right.  Now --

19         MR. ALEXANDER:  Your Honor, we dispute that.  And

20    we've cited to you cases, which you can also read, which are

21    the exactly opposite conclusion, correct on this very issue.

22         And in this case what's happening is we're being not only

23    mushy about what the copyright is, but now mushy even on what's

24    registered.

25         And so the evidence here is that you go all the way back

1   PrimeTime version after PrimeTime.  They don't even want to

2   limit to it PrimeTime.  They want everything that they did in

3   the past.  And that's exactly what this limitation says you

4   cannot do.

5           **THE COURT:**  All right.  So I'll go back and look at

6   that, too.

7       But I'm just giving you an idea, because I do not think

8   that we have time before the trial for me to give you a long

9   order on every one of these points.  All right?  So I want you

10  to understand that if I rule one way or the other, that's why

11  I'm ruling that way and I would probably say for the reasons I

12  expressed on the record and anything else that I can put in so

13  that you understand that I didn't just flip a coin on this.

14      But I want -- I'm not going to be calling it a treatise.

15  If I could have ruled from the bench today, I would have so

16  that you would have that ruling.  You would know where you

17  stand and then go out -- if the case is going to be tried,

18  you'll know what the parameters of the trial are and you can

19  get going on it without this cloud hanging over your head.

20      But I can't do it because I really do need to go back and

21  look at some of the evidence and, also, just reread, once I

22  have that squared away, some of the prime authority that you

23  have both cited.  So, that's fine.  But that's only on the

24  plaintiff's case.

25      If you are unsuccessful in fatally wounding the

1  plaintiff's case, then I've got all of these affirmative

2  defenses.

3      Now, we could come back in the afternoon, if you want to

4  do that, or we can find another day to have you come back.  And

5  I am open to either suggestion.  I wouldn't mind coming back in

6  the afternoon, but I'm not going to launch into it this second.

7          **MR. MICHAEL:**  We're prepared to come back this

8  afternoon, your Honor.

9      I'm just going to make one more reminder with respect to

10 the objection that we have to Mr. Alexander's declaration that

11 I would like to address with the Court, if appropriate, at some

12 point.

13         **THE COURT:**  As to what we've just been talking about?

14         **MR. MICHAEL:**  The declaration that Mr. Alexander has

15 which is in support of their summary judgment.

16         **THE COURT:**  No, no.  But that's what we have been

17 talking about.  He -- he doesn't express how he -- what his

18 methodology was and whether he's capable of doing it, other

19 than in general terms.

20         **MR. ALEXANDER:**  Look at it and I think it's clear,

21 but, of course, you're going to rule and we appreciate that.  I

22 know it's taking a lot of time, so I'm not --

23         **THE COURT:**  You know, even if I accept his

24 declaration as having, you know, found the stuff he found and

25 whatever, we still have all these other issues that we

1  discussed.  That's why I haven't really focused on that

2  totally.

3      If you want to make a couple points, and he wants to make

4  a couple of points when we come back.

5          **MR. ALEXANDER:**  I think the issue is, when should we

6  come back?  And that's, really, the defense's and Mr. Glick is

7  arguing those.

8          **THE COURT:**  Fine.

9          **MR. ALEXANDER:**  It may be good to know -- I don't

10  know -- I'll let Mr. Glick address that.

11          **THE COURT:**  So you've answered a fair number of

12  questions that I have.  It's now, whoa.  It's -- I've got 10 to

13  on my watch.  What does it look like on the clock?  At this

14  angle I can't tell.

15          **MS. SCHWARTZ:**  About seven til.

16          **THE COURT:**  Okay.  So why don't we say come back at

17  2:00?

18          **MR. MICHAEL:**  Okay.

19          **THE COURT:**  All right?  We're in recess til 2:00.

20  Everyone relax.  All right.  Thank you.

21      (Whereupon at 12:52 p.m. proceedings

22        were adjourned for noon recess.)

23

24

25

```
 1                    P R O C E E D I N G S
 2   DECEMBER 18, 2015                              2:07 P.M.
 3        (Proceedings resumed pursuant to noon recess.)
 4        THE COURT:  Was it Mr. Michael that wanted to have a
 5   couple of words on Mr. Alexander's declaration and attachments?
 6        MR. MICHAEL:  Your Honor, we discussed it over lunch.
 7   Our objections are stated in our opposition.
 8        THE COURT:  All right.
 9        MR. MICHAEL:  We'll rest on those and our objection
10   is noted.
11        THE COURT:  Okay.  So I need -- actually, I didn't
12   put anything away or move it back.  So let me do that.
13        (Brief pause.)
14        THE COURT:  I just want to get the correct filings
15   here.  Oh, just a minute.  I don't know what I did with the
16   motion and the other papers that go with it.  Let me make sure
17   I do have it out here.  Hmm...
18        Okay.  I wonder if I left those in chambers from earlier
19   this morning.  It's possible.  Ms. Lucero helped me bring
20   things out and I just want to see if I put something somewhere.
21   That's the earlier case.  Not yours.
22        Dr. Storer, ahh.  I think it got wrapped into the other
23   papers.
24        Okay.  So now I have everything.  All right.  So now we're
25   talking about the many affirmative defenses on fair use.  I
```

1    guess we would start with that.

2        I don't think there is any question that this is a

3    commercial use and to the extent that that has some

4    significance, we have that.  It's not the be-all and end-all.

5    But where is the transformation here?  Is there any -- I think

6    the defendants seem to be relying on that and I didn't see --

7    is somebody going to talk about fair use or are you worn out?

8        **MS. SCHWARTZ:**  I'm happy to take that on.  We don't

9    think there is any transformation, so...

10       **THE COURT:**  What I saw, at least could be argued to

11   not be transformation, but I -- I may want to get back to

12   Ms. Schwartz for one point on exactly what we saw in the

13   demonstrative that compared the Synopsys printouts, so to

14   speak.  It's not a printout and that's why I want to ask what

15   were we actually looking at.  What was that?  Was that out of a

16   user manual?  Was that --

17       **MS. SCHWARTZ:**  Those were out of user manuals.  But

18   there's a whole set, and it was from the user manual.  There's

19   one devoted to commands for each product.  So it was from those

20   particular manuals.

21       **THE COURT:**  All right.  And your understanding is

22   that both Aprisa -- Aprisa or Aprisa?

23       **MS. SCHWARTZ:**  I think it's Aprisa, but...

24       **MR. GLICK:**  It is, your Honor.

25       **THE COURT:**  Okay.  So, Aprisa.

1      Your understanding, Ms. Schwartz, is that Aprisa and

2  Synopsys, when these commands are used they -- they both --

3  both -- in both instances the user has the option of ordering

4  these various entries, so to speak, however they want?

5      **MS. SCHWARTZ:**  Yeah.  And I think the important point

6  for the lack of the transformative use is if you look up --

7  oops, I'm not very good at these.  I'm sorry.

8      (Document displayed.)

9      **MS. SCHWARTZ:**  If we look up at the description here

10  about the command, we can see exactly what these commands are

11  used for in each tool.

12      So the wording may be a little different in describing it,

13  but you can see that they do the same thing.  This displays the

14  calculation related to this timing arc delay value.

15      And here you get the results of the delay calculation for

16  a set of timing arcs.  They are doing the same thing.  They are

17  using the commands and the various input formats in these tools

18  for exactly the same purpose.

19      **THE COURT:**  Okay.  In the Aprisa instruction, they

20  tell the user that they have a lot of options.  There is

21  nothing over in the Synopsys PrimeTime instruction.

22      Are you saying the user understands that from somewhere

23  else in the manual?

24      **MS. SCHWARTZ:**  At the very beginning of the manual

25  there is a description of -- this is how we describe the

 1   syntax.  And so the user, looking at those, understands how to

 2   read this.

 3        Plus, this is -- the users of these tools are pretty

 4   familiar with computer science and this is actually a -- these

 5   are both mechanisms of describing syntax that are pretty well

 6   known in computer science classes.

 7        **THE COURT:**  Okay.  Now -- okay.  Now, let's see what

 8   Mr. Glick feels is the transformative nature of what ATopTech

 9   has done with their manual.

10        **MR. GLICK:**  Thank you, your Honor.

11        The transformative issue comes in under one of the four

12   factors, Factor No. 1, just so we're all in the same context.

13   And the -- that factor is a factor that -- and, of course, we

14   agree, as in almost all of the fair use cases that go both for

15   plaintiff and defendant, it's commercial.  Yes, there is a

16   commercial interest here.  No question.

17        It's not one of those non-profit educational purposes

18   exceptions that does exist, but applies rarely in any of these

19   fair use cases that either side has cited.  And so we know it's

20   not -- it's there, and it's true.  If it weren't, it would

21   matter.  But then the rest goes on.

22        **THE COURT:**  Right.

23        **MR. GLICK:**  The first factor relates to the purpose

24   and character of the use, including whether it's commercial.

25        When the Courts then look at whether something is

1   transformative after they have decided it's commercial, it's

2   not like the T-shirt trademark cases.  I know I got myself kind

3   of confused when I looked at that line of cases.

4        Here, what the Court is looking at, and if -- is the case

5   with the thumbnails.  The exact photograph was used by the

6   defendant, was found to be a fair use.  You can click on all 20

7   thumbnails, they came up.

8        So what the Court is looking at is what's the nature of

9   the use?  What's the purpose of the use?  And is that

10  transformative?  And within those cases it is here because,

11  first of all, the use in PrimeTime, the copyrighted work which

12  we're accused of infringing, is sign-off.

13            **THE COURT:**  Is what?

14           **MR. GLICK:**  Sign-off.  Verification.

15       The purpose of the use of the alleged copyrighted terms or

16  syntax that we heard from this morning, the purpose of the use

17  of that call it-- it's not a compilation you, but whatever it

18  is, it's a collection or syntax or some body of things, is to

19  enable the user, the software, to function to sign-off.

20       The purpose in the case of Aprisa is to -- and I think

21  it's interoperate.  They don't like "interoperate," but

22  coordinate, correlate, whatever the right verb might be.

23       PrimeTime is a place and route tool.  People buy -- I'm

24  sorry.  Aprisa is a place and route tool.  It's the heart and

25  soul.  It's the only reason it sells.  And it sells because

1    it's really effective and efficient in laying the chip.

2              THE COURT:  Good product.

3              MR. GLICK:  It has to correlate in the end.

4         The expert reports, if your Honor has had a chance to look

5    at them, are ships passing in the night.  There's complete

6    controversy between the experts as to exactly how these terms

7    are used and must be used for the PrimeTime tool to read it.

8    We had a dispute about it this morning.

9              THE COURT:  Don't drop your voice too much.  Maybe

10   bring the mic over a little bit.

11             MR. GLICK:  Yes, yes.

12             THE COURT:  Unlike Mr. Alexander, who is very

13   ebullient in his presentation, you're a little understated.

14   And I want to be sure, particularly after a long morning, that

15   I don't get lulled into just dozing off here.

16             MR. GLICK:  I do not want to --

17             THE COURT:  You don't have to be totally

18   entertaining, but just keep your voice up.

19             MR. GLICK:  I will.  I don't mean to lull.  And I'm

20   usually accused by court reporters of speaking too fast.

21             THE COURT:  No, no.  Don't speed up.  I'm not trying

22   to speed it up.  I just -- there is a very relaxed way you have

23   of presenting this.  I want to be sure I hear you and I just

24   want you to get the mic in front of you.

25             MR. GLICK:  Yes.

```
 1              THE COURT:  Go ahead.  I didn't mean to interrupt
 2    you.
 3              MR. GLICK:  So, again, transformative here is as to
 4    the purpose, as to the way it's used.  All of those go into
 5    these fair use cases, and we've cited them in our brief,
 6    particularly on this point, in determining what's
 7    transformative.  So here --
 8              THE COURT:  How are you using it differently, shall
 9    we say, than Synopsys?  Is it because at the time you're giving
10    the commands to your -- in Aprisa that you've -- you're using
11    them in order to create the chip as opposed to check the
12    timing, or what is it?
13              MR. GLICK:  We don't check timing.  That's the point.
14    We must --
15              THE COURT:  I thought you did --
16              MR. GLICK:  Well, of course -- we don't.  There is
17    timing constraints that go into the design of the chip.
18              THE COURT:  Right.  Now that's what the consumer
19    essentially says:  Hey, we need this to do this at this speed
20    and this time and whatever and get it done like that (snaps
21    fingers).
22              MR. GLICK:  Right.
23              THE COURT:  Then you find out how to wire the thing
24    up so it will do it.  And then -- along with the component
25    parts, the switches or whatever they are.
```

```
 1        And then -- but it sounded like everybody had conceded

 2   that along the way you're doing a cross-check in Aprisa so that

 3   you don't get to the very end after all that work just to find

 4   out that somewhere early on in the -- you know, the process

 5   something was already -- had gone awry.

 6             MR. GLICK:  You know, people have said all day

 7   almost, your Honor, when it gets to my client Aprisa, our

 8   client who is running Aprisa, the Aprisa software has

 9   everything built into it, including how to lay out, where the

10   wires should go and how to meet the specifications that --

11   let's say, in our example, because we said consumer Broadcom

12   has specified for us, and the commands and the words come down

13   from them.

14             THE COURT:  Okay.

15             MR. GLICK:  And we do the placing and routing, which

16   includes a component that meets the specification of speed and

17   then how we use the disputed terminology in this case.  You

18   know, we use it to pass the test.  It's like learning math in

19   the first instance versus passing the state-wide test that you

20   have to pass to move to the next grade or in our case to move

21   to the foundry.

22        And we believe that's the -- to the extent that there is a

23   transformative use here, the purpose in which we use it is to

24   sign-off.

25        If we never -- to put it another way.  If we weren't
```

1  required to sign off, none of that would be in the tool.  None

2  of this --

3       **THE COURT:**  Isn't that the purpose that they are

4  doing it?  I mean, they are -- they are signing off and you are

5  assuring that you can sign off by running your own sign-off

6  before they run their sign-off.  And --

7       **MR. GLICK:**  Again --

8       **THE COURT:**  Well, what about -- okay.  Keep going.

9  Keep going.

10       **MR. GLICK:**  It's the same as the thumbnails case,

11  right?  The purpose of the photographs in both cases is to

12  enjoy the heart of the photography, to see them and to enjoy

13  them.

14       So if that were the be-all and end-all of transformative,

15  it didn't go to the purpose of it, then -- then it would be

16  like the -- like trademark cases, if you will, your Honor.

17       **THE COURT:**  I understand it doesn't have to be a

18  parody or, you know, the T-shirt or what-have-you.  It's a

19  different -- or it's a broader concept than that.

20       **MR. GLICK:**  It is.

21       **THE COURT:**  I'm having a little trouble seeing the

22  transformation, I just want you to know.

23       Now, we also have the amount or the substantiality of the

24  portion in relation to the whole copyrighted work.  Now, the

25  whole copyrighted work is essentially this manual with all the

1   commands in it.  And they are saying you just took the whole

2   thing hook, line and sinker.  But then you have the question

3   about, you know, the ordering of the commands or whatever the

4   inputs.

5            **MR. GLICK:**  Your Honor, there are thousands of

6   commands in PrimeTime.  The whole -- and this is in Dr. Kahng's

7   report, and we cited it in our papers.  There are thousands of

8   commands.  That's the copyrighted work.

9            **THE COURT:**  All right.  You're in hundreds.

10           **MR. GLICK:**  Huh?

11           **THE COURT:**  You've got hundreds, right?

12           **MR. GLICK:**  Hundreds, but then after analytic

13  dissection, which I think we should talk about at some time

14  today, we believe we're down to about 55 or 58.

15       Perhaps with the syntax explanation it's a slightly higher

16  number, but it's in -- it's a significantly smaller number so

17  that -- the evidence that we have in the case is that the

18  amount taken is -- and this is part of that part of the test,

19  is just enough that's necessary for the correlation and a very

20  small fraction of the whole.

21           **THE COURT:**  All right.  What I would like to do, I

22  think, is have Ms. Schwartz come back up for a moment, if she's

23  going to be doing this, and ask her a couple questions.  And

24  then if you'll just kind of, you know, give her a little

25  breathing room here at the podium.

```
 1              MR. GLICK:  All right.  I'm going do go over --
 2              THE COURT:  You will go sit down again.  That's fine.
 3    Go sit down.
 4              MR. GLICK:  I just ask that at some point I can
 5    address both the gestalt of the test and the other factors of
 6    the test.
 7              THE COURT:  Which part?
 8              MR. GLICK:  The gestalt.  The way Courts have looked
 9    at fair use as a whole, because as the Courts advise, it's not
10    adding up one part of the test and another part.  It's the
11    entirety of the use.
12              THE COURT:  Right.  What did you say, gestalt?  Is
13    that what you said?
14              MR. GLICK:  That's what I said.
15              THE COURT:  Okay, fine.  I just didn't quite hear
16    that.  Go ahead and go sit down for a minute.
17              MR. GLICK:  Thanks.
18              THE COURT:  Okay.  Ms. Schwartz, when the defendant
19    was toting up a number of terms in PrimeTime, is he counting
20    them or is counsel counting them the way Synopsys does?
21              MS. SCHWARTZ:  Well, there is some of both.  Counsel
22    counts them up -- when he was talking about his analytical
23    dissection, the only discussion of analytical dissection is in
24    Exhibits 1 and 2, the Alexander declaration.  It's not in their
25    expert report.
```

 1      **THE COURT:**  Let's assume, just for argument sake, it

 2  came in.  It may well not, as you point out.  But if it did or

 3  at some point somebody counted it up, do you understand they

 4  are counting the way you would count?

 5      **MS. SCHWARTZ:**  No.

 6      **THE COURT:**  Okay.  You want to say why?

 7      **MS. SCHWARTZ:**  We don't think that they are counting

 8  the same way that we are.  They discount a number of things.

 9  They just decide, well, we don't think these are protectable,

10  so they take them out.

11      And the comparison is also off, because what -- what their

12  expert uses as the base of the comparison is how many of our

13  copied elements are there in comparison to the total number in

14  Aprisa.  And the law makes clear that in the fair use it's how

15  much of the copyrighted work did you take.  So the comparison

16  has to be the copied amount over the total amount from the --

17  the quantitative analysis.

18      And then we get to the qualitative.  In either one, if you

19  have either qualitative or quantitative significance, that's

20  enough to carry the weight on this factor in the fair use.  And

21  their briefing doesn't take on the quality of what they took

22  and nor does their expert.

23      And if we look at the transcript cites from their own

24  witnesses that we put into the record, it's clear that what

25  the -- the input formats that the defendants took are the heart

1    of PrimeTime.  They are the most important.

2        I can pull up, if we look at SM-12, which is the

3    transcript of Mr. Bai, who is one of their employees, Page 15

4    to 16.

5        (Document displayed)

6            MS. SCHWARTZ:  This is the type of testimony that we

7    got from their witness.  We only adopt some really, really

8    critical parameters.  The variable names from PrimeTime, they

9    use that.  They took the most important stuff.

10       If we go to SM-15, on Page 2, which is the transcript of

11   another one of their witnesses, Mr. Deng.

12       And if you can call this out?

13       (Document enlarged.)

14           MS. SCHWARTZ:  We asked -- I asked him, you know, you

15   had customers who had complained that some of Synopsys'

16   commands aren't in your tool and we would like them.

17       And I asked him:

18           "QUESTION:  Was your response to copy those?

19           "ANSWER:  Well, some of them are pretty important,

20       so we would add it."

21       What they added was the most important, most critical

22   input formats from PrimeTime.  And that's enough to carry this

23   factor.

24           THE COURT:  Okay.  Going back for a moment.  I

25   remembered I wanted to ask you something.

```
 1        When you had the demonstrative that was comparing the two
 2   syntaxes -- it will just take a second.  You probably don't
 3   even have to pull it up.  But if you do, I'll just ask:  Are
 4   these entries from the respective user manuals supposed to be
 5   an example for the user as to how they write what they want?
 6        MS. SCHWARTZ:  This is a -- these provide the user
 7   with enough information that the user knows how to type the
 8   input format into the -- an input format into the program that
 9   it will accept as valid, as input.
10        Then some of the manual entries continue, and these have
11   more text.  Sometimes they give examples.  Sometimes they will
12   have pictures describing some of the analysis.  So there will
13   be even more text describing how the command then goes on and
14   functions and what the user should provide.
15        THE COURT:  Is it an instruction?
16        MS. SCHWARTZ:  I don't think it's an instruction -- I
17   guess -- are you asking if the manual is an instruction or the
18   command?
19        THE COURT:  So can instructions be copyrighted?
20        MS. SCHWARTZ:  They can.  Because an instruction is a
21   line of source code and source code has been found to be
22   copyrightable by Courts consistently.
23        And the Copyright Office let's you register instructions
24   as part of source code as well.
25        THE COURT:  This is telling the user:  This is what
```

```
 1   you've got to do and these are the things you've got to say.
 2       You've said to me here in court that your understanding is
 3   they -- they don't have to put them in in the exact sequence
 4   that's shown in the two manuals because those sequences are
 5   different.
 6           MS. SCHWARTZ:  Correct.
 7           THE COURT:  And that was one of the things I had a
 8   question about that I wanted to go back and look at.
 9       But, okay.  To the extent that the -- that ATopTech is
10   arguing that there is thousands of terms or claimed
11   copyrightable material, do you understand that they have simply
12   taken some of the these "report_delay_calculation" type things
13   and counted each one of those of as a one?
14           MS. SCHWARTZ:  Well, they counted -- their expert
15   counts "report_delay_calculation" as one, and then he'll call
16   the "-min" as another one, because that's an -- so he breaks it
17   down into commands and options and variables and parameters.
18           THE COURT:  Okay.
19           MS. SCHWARTZ:  And our experts, when they did the
20   calculation, said:  Well, even if you count it that way, you
21   didn't count it properly.
22           THE COURT:  Okay.  "You" being Mr. Alexander, I
23   guess.
24           MR. GLICK:  No, it's not.  It's Dr. Kahng's report.
25           THE COURT:  Oh, that's in the report?
```

 1          **MS. SCHWARTZ:**  Oh, did I -- I didn't say it wasn't in

 2   the report.  I said that the way they count is --

 3          **THE COURT:**  I thought Mr. Alexander counted it up.

 4          **MS. SCHWARTZ:**  Mr. Alexander also counted it up, yes.

 5          **MR. ALEXANDER:**  I can tell you how I counted it up,

 6   but unless you want to know, then I won't interrupt the

 7   argument.

 8          **THE COURT:**  No.  It's either in your declaration or

 9   it isn't.  Okay.

10          **MR. ALEXANDER:**  Right, right.  And so --

11          **THE COURT:**  All right.  So then back to Mister -- I

12   guess I go back to Mr. Glick.

13      All right.  You have the argument here.  They actually

14   have the burden, so they probably should have the last comment

15   on this; but if you have something to say first, go ahead.

16          **MR. GLICK:**  Why don't you go back, if you don't mind?

17   Krista, if you don't mind, we'll switch.

18      The counting occurred at the time of the case of the

19   expert report, which I heard your Honor loud and clear this

20   morning, isn't the be-all and end-all, but that's where their

21   count came from --

22          **THE COURT:**  Wait a minute.  What did you just say?

23   What did you say I said?

24          **MR. GLICK:**  That whatever Mr. Storer said doesn't

25   define their claims.

1          THE COURT:  Yes, it doesn't define their claims.

2          MR. GLICK:  I got that.  I do understand that.  But

3    the counting came at a time when -- when -- before Synopsys had

4    said:  No, we don't count.  We don't claim individually each of

5    these individual words, but that's what -- first of all, the

6    testimony you've shown on the screen wasn't testimony focused

7    on examples of what they are now calling syntax.  It was the

8    much broader concept of the individual terms.

9          And so when the witness said:  Yeah, there were terms like

10   "report timing" and very common terms in the industry that were

11   important and that we used, well, of course, that's true and

12   that's what he said.

13         But that's a far cry from saying that what's in the case

14   here now, this -- these pieces of syntax, which we're going to

15   prove ultimately are completely functional and not protectable,

16   but we're not necessarily there today, that's, first of all,

17   what that testimony was about.

18         The count, the count that our expert made, Mr. Alexander

19   made it for his own purposes, too, was based on the total terms

20   both in PrimeTime, not just in -- not just in Aprisa --

21         THE COURT:  I understand that.

22         MR. GLICK:  -- and in PrimeTime.  And by doing that

23   analysis --

24         THE COURT:  You came up with your --

25         MR. GLICK:  -- the evidence is that it's a very small

1  portion, and we've put forth the proof that that's the case.

2  And maybe it will be disputed later on the evidence, but

3  that's --

4          **THE COURT:**  Yes.  I understood that your count was

5  higher than necessarily their claim.  I gave Ms. Schwartz an

6  opportunity to say that.  She didn't.  Okay?  But it seemed to

7  me you did.  And it seems to me that that is what was going on

8  because you have said, on behalf of ATopTech, that you

9  understood that Synopsys was claiming the words.  And even in

10  court today it was kind of hard to get them to say they

11  weren't.

12      And so I'm just -- you know, I see what you did, but as a

13  result, the count was -- well, I have to say it was inflated

14  because you counted up a bunch of stuff that they are not

15  relying on.  And so --

16          **MR. GLICK:**  And if we -- sorry.

17          **THE COURT:**  That's -- not that you -- you had no

18  reason to do it, but that's how it came out and now we're at

19  this juncture where their claim has been narrowed, at least as

20  you understood it to be.  They are saying it was always this

21  narrow, but I don't know.  Okay.

22          **MR. GLICK:**  I'm not sure you need to resolve that,

23  other than it's what's in the report.

24          **THE COURT:**  We resolved it.  We resolved it.

25          **MR. GLICK:**  It's resolved.  But if you made a new

```
 1  count based on the combination --
 2         THE COURT:  I know what you're talking about.
 3         MR. GLICK:  -- the portion is going to be very, very
 4  small.
 5     Because now, rather than having had an alphabetical list
 6  of terms, which one can match directly to terms in Aprisa and
 7  count them and say what's the percentage of that, the
 8  percentage of syntax that will be in common in the two programs
 9  is going to be very, very small.
10         THE COURT:  I don't know if I have that count,
11  though, in front of me.  And I don't know if it's something I
12  can do from what I have.
13         MR. GLICK:  But, again, I think if that's the
14  question at this juncture in the case, where you look at how
15  the expert did it, we're entitled to at least, to this point,
16  have relied upon that to make the necessary showing under the
17  fair use test, and we did.  So I don't think we can be
18  penalized.
19     I would represent to the Court, certainly, that if it's
20  matching the uses of the particular syntaxes, it's going to be
21  a far lower number.
22         THE COURT:  All right.  Well, I can't tell that.  If
23  you're saying if somebody did it, that would be less.  But at
24  the moment I don't think anyone has done it, nor do I -- I'd
25  have to look at it again, but I'm not -- I don't think I can do
```

1   it from what I do have.

2       Let me ask you something else here.   In the fair use

3   factor we've got this issue about the value of the copyrighted

4   work.   And the plaintiff is saying that -- let's see.   I see --

5   well, let me put it this way.

6       I understand, at least, that the U.S. Supreme Court has

7   said this a -- really, the most important factor.   Do you

8   understand that as well be the case?

9       I don't know that I would have thought that, but they do.

10  So --

11          **MR. GLICK:**   I do, your Honor.

12          **THE COURT:**   Okay.

13          **MR. GLICK:**   And having spent a lot of my life in fair

14  use, I will tell you that virtually -- not virtually.   Every

15  case repeats that as part of the analysis.   So, yes.

16          **THE COURT:**   Well, no.   You need it.   It's just --

17          **MR. GLICK:**   No.   As the most important.

18          **THE COURT:**   As the most important.   And so it is the

19  most important.   I mean, I accept that.

20      And from -- well, what you're saying is they are not

21  making any -- they are not losing any money because, if

22  anything, they are making money.

23          **MR. GLICK:**   Yes.   Let me -- if I will, I didn't quite

24  know you were going to turn to this.

25          **THE COURT:**   Well, I don't know.   I thought we kind of

 1  zipped through the other factors.  I'm trying to accelerate

 2  here.

 3          **MR. GLICK:**  No.  It's good.

 4          **THE COURT:**  I mean, I'm just happy if after having

 5  this hearing, I actually understand who is using what where,

 6  you know.  So...

 7      All right.  Now, Mr. Alexander is asking Joseph Logan, who

 8  is, again, the --

 9          **MR. GLICK:**  The witness put up on this topic.

10          **THE COURT:**  Right.  So he's the 36(b) on this, right?

11  Okay.

12          **"QUESTION:**  Have you lost any sales of PrimeTime

13      to ATopTech?

14          **"ANSWER:**  Have we lost the PrimeTime sales?  No."

15      Okay.  Now, is -- do you have to lose money in order

16  for -- to have -- I guess, to show that there is value.

17          **MR. GLICK:**  You don't.  It's -- it's the first and

18  most obvious place one goes in these case, to make an

19  evaluation.

20      But if we -- as is again in our expert testimony, and I

21  think is a matter of logic, if the place and route program is

22  made to particularly interoperate with PrimeTime versus

23  Cadence, or back in the day when Extreme DA was in the market,

24  that tool, whichever one it's going to correlate with is going

25  to enhance the sale of the use of that sign-off tool.

1        If, instead, the place and route tool works with the

2   customer like Broadcom or Samsung or any of the other customers

3   of ATopTech to use a different tool, then, of course, that is a

4   result in which PrimeTime was not enhanced.

5        **THE COURT:**  Okay.  Now, we know that as far as

6   PrimeTime is concerned, there doesn't seem to be any kind of

7   financial loss.

8        What Synopsys appears to be arguing is that they also can

9   show, to meet this factor, harm to a derivative work and then

10  they are arguing that the IC Compiler is derivative.  That's

11  their competing place and route software.

12       **MR. GLICK:**  Yes, yes.  And as we've pointed out in

13  the papers, it's not a derivative work of PrimeTime.  And they

14  have never claimed that it did.  An examination of their

15  papers, we think, shows that.

16       So if we put Exhibit 4 and turn to the section -- the next

17  page, and the one after that.

18       (Document displayed)

19       **MR. GLICK:**  What Mr. Napier says is that:

20       "IC Compiler's predecessor is Physical Compiler.

21       IC Compiler II is the derivative work of IC

22       Compiler."

23       **THE COURT:**  What's Physical Compiler?

24       **MR. GLICK:**  Physical Compiler is an earlier version

25  of a place and route tool.  So the genealogy -- and, your

 1    Honor, I can put these up, but they are in the record.

 2         If you look at the copyright registrations for PrimeTime,

 3    they show the PrimeTime family of works.  They don't cross

 4    reference IC Compiler.

 5              **THE COURT:**  Okay.

 6              **MR. GLICK:**  The IC Compiler genealogy, which is

 7    Exhibit 5, which was produced in this case -- I don't know if

 8    you can see it there, but it cites a different genealogy that

 9    doesn't include PrimeTime.

10         It's the genealogy -- and not a claim that it's a

11    derivative work which you -- as we've seen from the earlier

12    conversation this morning and the declaration of the Copyright

13    Office expert, he says what you do in your registrations in the

14    appropriate blank -- and he actually showed us how that was

15    done with PrimeTime -- is you list the derivative works of the

16    work.

17         What he didn't give us -- and I submit, certainly, this is

18    their burden to show -- is anything from the Copyright Office

19    that would have ever indicated that IC Compiler was a

20    derivative work.

21         And then if we just think about it --

22              **THE COURT:**  Okay.  Well, I am.  And you can argue

23    they are run up in parallel here.  They are not really one

24    after the other.

25         And I think that from I can see, that you've at least

 1   raised a factual question as to whether or not you've got a

 2   derivative work.

 3       Now, what I would like to know from Synopsys then -- since

 4   this is considered a very important factor.  It's not just kind

 5   of one that's sitting there that you get to at the very end --

 6   if there is any other type of harm that they envision from this

 7   use other than just losing money.  Okay.

 8           **MR. GLICK:**  Thank you, your Honor.

 9           **THE COURT:**  All right.

10           **MS. SCHWARTZ:**  I think that our briefing makes clear

11   that there are several other harms that come to PrimeTime.

12       The first is that we've lost control of the input and

13   output formats.  It's a competitive edge to the company to able

14   to have a consistent set that -- for its products suite.  And

15   the case law says that if there is evidence that widespread use

16   by others is going to harm the company --

17       (Court reporter interruption.)

18           **MS. SCHWARTZ:**  ...widespread use by other companies

19   or -- of the time of copying that the defendant is doing would

20   harm the company, then that's a harm.  And that's exactly

21   what's happening here.

22       If we have every competitor in the EDA space able to use

23   the same input formats, one of the sales edges that we have for

24   IC Compiler product and our Physical Compiler product are gone.

25       Now, we can have other competitors that will use the same

 1   tools and make it easier for customers to use the language, and

 2   that's -- that's a competitive edge that's taken away.

 3       We're also deprived of our right to get licensing revenue.

 4   These are copyrighted input formats.  We are entitled to

 5   license them and to get a customary license fee back.  We have

 6   been deprived of that revenue as well.

 7       And I think that -- I don't think that the defendants have

 8   raised a factual question about whether IC Compiler is a

 9   derivative work.  The statute says very clearly that a

10   derivative work is something that's based upon another work.

11   And the evidence in the record shows that IC Compiler not only

12   includes some of the same input formats as PrimeTime, they

13   share source code and they also share information bases.

14       And the defendant doesn't try to take on two of those

15   three sources that they overlap on.  They just say -- they

16   take on one -- they admit one of the three and they drop the

17   other two.

18           **THE COURT:**  Okay.

19           **MS. SCHWARTZ:**  So given the statutory definition,

20   it's clear that it's a derivative work.

21           **THE COURT:**  Well, you know, what appears to be

22   happening is in both programs.  In other words, for the place

23   and route programs that both Aprisa and IC Compiler -- wait a

24   minute.  Let me make sure...

25       Yeah, IC Compiler.  Both Aprisa and IC Compiler actually

125

1   do some timing analysis.  And, apparently, the defendant wants

2   to do what you're doing, which is feed in the same language, if

3   you will, at the time by the user to run those, for lack of a

4   better word, preliminary timing analyses.  And if that's

5   considered derivative, you know, if that is, then you've raised

6   that point, but -- but I have some question about that.

7        In the same -- and I'm not so sure about losing royalties

8   because it's true of every copyrighted situation, you're always

9   going to have lost royalties if you don't get them.  And so

10  that would be true always, but --

11            MR. MICHAEL:  On that point, your Honor, if we could

12  put up Slide 32?  I think --

13            THE COURT:  Which point?  The royalties?

14            MS. SCHWARTZ:  On the royalties point.  Because if we

15  look at the case that I have on Slide 32, the case law says --

16  and this is the *A&M Records* case out of the Ninth Circuit; that

17  where you had a commercial -- the intended use is for

18  commercial gain, then you presume that you have a likelihood of

19  market harm.

20       And that's precisely because if it's a commercial

21  endeavor, you're going to be depriving us of the right to get

22  licensing royalties.

23       And it's admitted, their use is commercial.  And so we

24  have a presumption of market harm.  ATopTech bears the burden

25  of proof, and they have not rebutted that given the evidence

126

1    that we've put forth and the lack of evidence that they have.

2            THE COURT:  Well, they have put in some admissions,

3    so to speak.  But, you know, we'll take another look, I will,

4    of *A&M Records v Napster*.

5        Just to get back for a second, this idea of losing this

6    competitive edge.  Okay.  One might think that you could sell

7    more PrimeTime to people who are familiar with how to use

8    PrimeTime in the first instance, PrimeTime commands and syntax.

9        But your fear is that if they are using it in a different

10   product, that -- are you worried at all that it may --it may

11   not work as well in the other product and diminish the

12   reputation and confidence in PrimeTime?

13           MS. SCHWARTZ:  That's entirely possible, but if

14   Aprisa is allowed to use those formats.

15           THE COURT:  Yes.  That's what I'm saying.

16           MS. SCHWARTZ:  Then corresponding other timing

17   analysis tools could -- might be able to copy them from Aprisa

18   and all of a sudden we're facing competition across the board.

19           THE COURT:  Oh, you're concerned if it gets out

20   there, as used by Aprisa and they give it to someone else, who,

21   clearly, would be competing with you, that that domino effect

22   would leave you exposed to unfair competition.  Of course,

23   those people would be more likely to not be using it as a fair

24   use.

25           MS. SCHWARTZ:  That's one angle.

1          Then the second angle is it's a unique marketing advantage

2     for Synopsys to sell its tool suite and be able to say:  Look,

3     we can sell you Physical Compiler.  We can sell you

4     IC Compiler.  We can sell you PrimeTime.  They all speak the

5     same language.  You don't need to learn a new language.

6               **THE COURT:**  Right.  It sounds good, except that your

7     36(b) witness didn't see it that way at the time.

8               **MS. SCHWARTZ:**  Well, but that was only on PrimeTime

9     sales.  It said it would cause you to lose sales of PrimeTime.

10    It would cause us to lose sales of our other products --

11              **THE COURT:**  Which may not count, but PrimeTime, as

12    part of that sweep, might well count.  So that you say:  Look,

13    we're selling this thing as a package, and PrimeTime is in

14    there, and under the circumstances if we don't have this unique

15    position, then you may not buy PrimeTime.  I'm not sure.

16         I'm just saying there may be here a triable issue.  In

17    other words, you're coming in, much as they did on trying to

18    eviscerate your -- you know, your claim.  You're coming in and

19    saying you have nothing to say about this.  This is a dead

20    event.  And I'm not totally sure that that's the case.

21         So I'm just saying, if I don't -- if I don't adjudicate it

22    summarily, it doesn't mean that you have -- that you have no

23    evidence or even that you don't have a very good position on

24    it.

25         But, again, if -- you know, if they have got enough to

1    just raise the issue -- and that's what's a concern and that's

2    why I'm going through all this, just I want to make sure that

3    I'm clear as to what your best points are, I guess.

4        **MS. SCHWARTZ:**  And I think given that we have a

5    presumption of market harm here, and this is their burden of

6    proof, and they haven't done anything to overcome that

7    presumption.

8        **THE COURT:**  Well, they tried.  They talked to your

9    people and your people said there wasn't any sales harm.

10       **MS. SCHWARTZ:**  Well, that -- to PrimeTime, but that

11   doesn't mean that there isn't sales harm to all of our other

12   tools that we now aren't able to sell as well because other

13   people can copy this.

14       **THE COURT:**  Yeah.  And I don't know if that counts.

15   Okay?  That's all I'm saying.

16       I'll give Mr. Glick one final word on it and then I want

17   to move to the statute of limitations.

18       **MS. SCHWARTZ:**  If I could make one point on the

19   30(b)6 testimony that they raised?

20       **THE COURT:**  Oh, yes.

21       **MS. SCHWARTZ:**  There is also -- if we continue on --

22   and this is in our motion itself on Page 25.

23       We point out the 30(b)6 testimony that they raised about

24   Mr. Logan, and we also point out that they cut off where he

25   keeps going on.  And he says:

129

 1          "The harm is certainly summarized in terms of

 2      lost sales and opportunities, which is in Exhibit 3.

 3      The other harm would be there is another tool on the

 4      market that was copied and that has a negative effect

 5      on us."

 6      Then he went and talked about the reputation.

 7          And so there is evidence of harm to Synopsys in the record

 8  and that has not been overcome with the evidence that the

 9  defendants have put forth.

10          **THE COURT:**  Okay.  So you may have a good point on...

11      All right.  Okay.  Mr. Glick, this is your last shot --

12          **MR. GLICK:**  Yes, following your Honor's instruction

13  in that regard.

14      First of all, there has never been in a fair use case a

15  presumption of harm on the analysis of the factor of the effect

16  on the market.  So we dispute that.

17      In the *Galoob* case, Nintendo made the same claims as we

18  made here.  This Game Jenie, this attachment device, is going

19  to ruin the game for Nintendo players.  Maybe they won't buy

20  some other Nintendo games.  And the Court, nevertheless, found

21  it to be a fair use.

22      Because, as your Honor said, if -- if you said and

23  Ninetndo tried to say, even though we didn't like it, maybe we

24  were harmed because we didn't license it.

25      And your Honor's point is exactly correct.  If you have

1  could make that statement, then every case the copyright

2  defendant would be able to show harm.

3       In the *Green Day* case, that both sides have cited, where

4  the icon was used wholly in the backdrop of the Green Day

5  concerts, the Court found even though that was used and there

6  was some effort to try and say that would have an adverse

7  effect on the market of the icon, the proof was that it didn't.

8       And that's what we're going to prove here is, as I think

9  we have already shown, that in terms of the -- of PrimeTime, it

10  enhances the sales and -- and that -- and when we get to this

11  point -- I think we'll get to it in a motion in limine

12  regarding the appropriate role or non-role of ICC in this case,

13  your Honor will have an opportunity to adjudicate that very

14  issue.

15          **THE COURT:**  Okay.  The other point I just want to

16  make is I don't understand this to be an all-or-nothing

17  situation.  In other words, you can look, I believe, at the

18  extent of the harm, not just whether there is some.

19          **MR. GLICK:**  That's correct.

20          **THE COURT:**  Okay.  So, thank you.

21       Now we're going to the question of the statute of

22  limitations.  And just a quick question upfront on this is, if

23  ATopTech were barred, as Synopsys argues, would there be a

24  starting point nonetheless from which they could -- I'm sorry.

25  If -- I'm sorry.

1      If ATopTech were correct that Synopsys is barred, could

2  Synopsys still go forward from a certain point, just not as far

3  as back in time?

4          **MR. MICHAEL:**  The answer to that, your Honor, is yes.

5          **THE COURT:**  Okay.

6          **MR. MICHAEL:**  It's kind of a continuing tort theory

7  essentially.

8          **THE COURT:**  Right.  And, you know, there is this

9  question about a conference and Synopsys was at it and the

10  correlation, quote/unquote, was supposed to be discussed.

11     And then Synopsys is saying:  Well, correlation isn't what

12  we're talking about anyway.  And, furthermore, our people -- he

13  didn't say our people were even in the room.

14     I don't know.  It sounds to me like you're going to have a

15  factual dispute on this one.  I have to tell you.  So, you

16  know, I don't know.

17     Let's go to this merger concept.

18          **MR. MICHAEL:**  Your Honor, can I make one brief point

19  on statute of limitations?

20          **THE COURT:**  You may.  Yes, you may.  It's your

21  motion.

22          **MR. MICHAEL:**  I do encourage you and urge you to look

23  at the record for what they say their citations to evidence

24  say, because they simply don't say what they claim.

25     There are no public statements from ATopTech at

1   conferences that they are talking about.  Each of the exhibits

2   they refer to are ATopTech confidential documents.  They were

3   produced in this case as Highly Confidential Attorneys' Eyes

4   Only.  And they have no declaration from anybody in this case

5   that those presentations were made publicly.

6            THE COURT:  Okay.  Is your argument that they have

7   not -- that they have laid no foundation for the public -- for

8   a statement that it's public or that there is no showing even

9   that it was public?

10       In other words, they could have put in some evidence that

11  there was a public statement, but that that evidence is -- it's

12  hearsay or, you know, there is no real declaration that works

13  to put it in, or you could have no showing at all that it was

14  public.

15           MR. MICHAEL:  There is no showing at all.  It's just

16  pure attorney argument, is what you have.  You have a brief

17  that argues it was public, but there is no evidence to say so.

18           THE COURT:  All right.  You're saying no person other

19  than a lawyer in a brief has said that it was public.

20           MR. MICHAEL:  That is correct, your Honor.

21           THE COURT:  Well, I will just ask briefly about that.

22           MR. GLICK:  Your Honor, I don't believe -- as I

23  recall, Mr. Wang's declaration talks directly about the

24  conference -- in terms of the conferences; that he went to the

25  conferences and other ATopTech engineers went to the

1  conferences.  And the comments that are recited in connection

2  with this defense were made at that conference.

3      The materials that collaborate that, that were produced,

4  were marked, as most everything was marked in this case,

5  "Attorneys' Eyes Only," but that wasn't mean that they weren't

6  made.

7          THE COURT:  I'm trying to just look at it right

8  now --

9          MR. GLICK:  Yes.

10          THE COURT:  -- to see, but I -- I'm not sure where

11  to -- in this stack that I can get to it.

12          MR. MICHAEL:  Sure, your Honor.  I will let you know

13  that I actually, at 6:00 o'clock this morning, read the Wang

14  declaration specifically for this purpose.

15          THE COURT:  Good.  Where is it?

16          MR. MICHAEL:  It's ECF 445.

17          THE COURT:  Yeah.  Unfortunately --

18          MR. MICHAEL:  There is nowhere in his declaration --

19          THE COURT:  Before you say ECF 445, it's got to be

20  attached to something somewhere.  And most of the time the ECF

21  numbers on these documents have been obliterated by hole

22  punching.

23          MR. MICHAEL:  Sure.  It is a stand-alone declaration

24  in support of ATopTech's opposition to Synopsys' motion.

25          THE COURT:  I may not have it out here, in which

1    case -- but I will go over it.  Okay.  I thought I had

2    everything, all the declarations, but these two stacks are --

3    let me just see here.  It's not in this one.

4         (Document displayed)

5              MR. MICHAEL:  Oh, looks like we have it up on the

6    screen, your Honor.

7              THE COURT:  I don't see it right there in this --

8              MR. MICHAEL:  And I welcome ATopTech's counsel to

9    show us where in Mr. Wang's declaration it says that these

10   statements were made publicly at the conference.

11             THE COURT:  You want to do that?

12             MR. GLICK:  I want to get a hard copy.

13             THE COURT:  How about if we -- can we flip through it

14   up there?

15        (Document displayed.)

16             THE COURT:  Anyway, even if it said

17   "interoperability," I don't know if that would be the answer.

18             MR. MICHAEL:  It wouldn't, your Honor.  And I also

19   think they have a very wrong standard in their position.  They

20   say the standard is whether Synopsys -- this infers that

21   Synopsys knew or should have known facts.  That's not the

22   standard.

23        The standard is whether Synopsys knew or should have known

24   facts that actually gave rise to a cause of action for

25   copyright infringement.

1          **THE COURT:**  Well, you know, if you're alerted that

2    somebody is doing something with your stuff, you might have an

3    obligation to look into what they are doing and figure it out.

4        I'm just trying to see whether the alert is included in

5    the declaration.

6          **MR. GLICK:**  We could page down, but my recollection

7    is that the declaration goes through the various trade shows

8    that ATopTech went to and talked about Aprisa, had a station

9    with Aprisa, advertised what Aprisa does.

10          **THE COURT:**  Yes.  That's your recollection. It,

11   apparently, differs from Mr. Michael's.  I don't know which

12   view is right.  I can't find it at the moment.

13       So what I would do under those circumstances is just look

14   at it afterwards and not keep you here for that purpose.

15       Okay.  All right.  So that then we were getting here to

16   this concept about Tcl.  For the reporter, that's spelled

17   T-C-L.  It's an acronym.  Okay.

18       Under the law if there is a limited number of ways you can

19   express an idea, the idea is said to merge with its expression

20   and what options the copyright holder had at the time.

21       If I'm going to harken back to Ms. Schwartz's earlier

22   presentation, she's going to say they had a lot of options and

23   could have done things a lot of different ways.

24          **MS. SCHWARTZ:**  That's precisely the exhibit we pulled

25   up before, of Dr. Storer --

 1        THE COURT:  I saw that.

 2        MS. SCHWARTZ:  The chart with just thousands of

 3   different alternatives listed for each and every item.

 4        And there's just no evidence in the record that Synopsys

 5   was forced to choose the particular name and syntax combination

 6   or had only one or two options to choose from.

 7        There is a lot of discussion in ATopTech's briefing about

 8   that once Synopsys made the choice to use Tcl -- which was a

 9   choice in and of itself.  It shows that there were

10   alternatives.  They could have used other languages -- that it

11   limited their choices.

12        But there is no evidence that says that it required them

13   to choose the particular command names with the particular

14   options.  There is no evidence of that in the record.

15        It's a lot of discussion about, well, if you have a

16   syntax, it's good to be consistent with it, but that doesn't

17   mean that I was forced to choose the exact same commands and

18   the exact same options, the exact same variables.

19        And nowhere in the briefing does ATopTech take on even a

20   single command or variable and say that Tcl or some other

21   factor forced Synopsys to use this name and this set of options

22   and this syntax because -- instead, it's just these vague

23   generalizations that, well, Tcl constrains your choices.

24        And even if we look at the evidence in the record

25   submitted by their expert, if we look at SM-25, which is

1   Dr. Kahng's rebuttal report on Page 19, he makes -- if we could

2   zoom in on Lines 5 to 8.

3        (Document displayed.)

4        **MS. SCHWARTZ:**  He makes a couple statements about

5   that -- well, once you -- first of all, he's talking about

6   choices.  Once you start making some choices, which shows that

7   you have alternatives, it reduces the size of the space for

8   command names, options, et cetera.

9        So once again, he's focusing on names.  And even then,

10  he's only saying he reduces the number once you've made

11  choices.  That doesn't mean that you are limited in the

12  particular options.

13       **THE COURT:**  Now, we know in *Oracle* they were talking

14  about Java.

15       **MS. SCHWARTZ:**  Uh-huh.

16       **THE COURT:**  Is there any comparison you can make

17  between Tcl and Java?

18       **MS. SCHWARTZ:**  They are very different -- they are

19  both programming languages, but they are very different.  Tcl

20  is what they call a scripting language and Java is a -- well,

21  it's also an interpreted language, but it's more robust.

22       Tcl only says that the --it sets up a framework for people

23  to create their own commands and add to the Tcl so they can

24  customize it to use in different contexts.

25       So because you set up a framework for people to come up

1   with their own commands and the options and variables that are

2   required for that command, doesn't mean that it requires you to

3   add specific commands and specific syntax.

4           **THE COURT:**  So your position is you can use Tcl and

5   put a lot of different kinds of -- a lot of different syntax,

6   and then your client did.

7           **MS. SCHWARTZ:**  There, I think you have a perfect

8   analogy to English.  Once I choose English, are my choices for

9   valid sentences constrained?  Yes.  But that doesn't mean I

10  still don't have a huge number of different options that will

11  be valid syntax within that language that are my own creation.

12          **THE COURT:**  Okay.  All right.  I don't know.  Do you

13  want to say something about this, Mr. Glick?

14          **MR. GLICK:**  Your Honor, the main thing I want to say

15  about it is to make sure we all understand the role of merger

16  and scènes à faire in abstraction, filtration and comparison.

17          **THE COURT:**  Why don't you do that?  Scènes à faire is

18  the next idea.

19          **MR. GLICK:**  It's the same.  It's similar.

20      And what happens and what -- and at some point in this

21  case -- I know, in *Oracle versus Google* Judge Alsup did it

22  after all the evidence was in.  I think at some point we should

23  talk about, perhaps, a way of doing it sooner than that.

24      But in any event, when that happens, when that is

25  performed, merger and scènes à faire are a crucial part of that

```
1   process.  Whether they in the end entirely eliminate them, it's
2   still -- it's still a critical part of this case.
3       Some commentators say mergers and scènes à faires are
4   really part of the main case and not even defenses, but to be
5   safe, practitioners always allege it as a defense.  But it
6   can't be wiped out of the case because as we get into
7   comparison and abstraction, there will be Tcl commands.  And
8   we're going to say to you as a matter of merger, those need to
9   be filled --
10       (Interruption in the proceedings.)
11           THE COURT:  It wasn't you.
12           MR. GLICK:  Good.
13           THE COURT:  All right.  Go ahead.
14           MR. GLICK:  Those need to be filtered out.
15       I don't know that the mic is working now.  Is it?
16           THE COURT:  Tap it.
17       (Loud noise.)
18           THE COURT:  Well, maybe it is you.  All I know is
19   this loud, strange audio distortion and -- okay.  Don't tap it
20   again.
21           MR. GLICK:  I won't.
22           THE COURT:  Just keep going.
23           MR. GLICK:  So as we're doing analytic dissection,
24   we'll look at what part is in common with Tcl.  We'll look at
25   what part is in common with SDC.
```

1      SDC is a body of -- I think your Honor is aware --

2  commands that are licensed and that may be used and it contains

3  within it, within it certain formats that it compels that any

4  user who is going to make actual use of SDC will need to employ

5  or the entire opportunity to use SDC is lost.

6      But the point on merger and scènes à faire is it's an

7  integral part of the analysis.  Some things we -- we're

8  absolutely confident will be filtered out and then we'll get

9  down to the protected expression, if there is any, which gets

10 compared.

11     So as I say, it's -- maybe it does need to be an

12 affirmative defense.  Maybe it doesn't.  But in any event, it's

13 certainly part of the case.

14         **THE COURT:**  It seems like whatever the Court's ruling

15 is on merger, it would likely be the same on scènes à faire;

16 that the two would probably go pretty much hand-in-hand.

17         **MR. GLICK:**  Yes.  And, again, *Oracle versus Google*

18 involved the entire APIs, which this case doesn't.

19     And I meant to mention, your Honor, of course, in *Oracle*

20 *versus Google* with an absolutely complete record on all of the

21 issues, including the stipulated taking of all of the APIs, the

22 Court nevertheless remanded for a fair use analysis despite

23 that.  We think it's much stronger in this case, anyway.

24     Thank you.

25         **THE COURT:**  Thank you.  All right.

1           **MS. SCHWARTZ:**  If I could make two quick points?

2       Mr. Glick did not raised any evidence at all that

3   Synopsys' choices were limited by Tcl.  Instead he says:  Well,

4   we need to have mergers so we can do filtration.  There are

5   other reasons that you can filter out items.

6       For example, if there was a command that was in Tcl that

7   Synopsys didn't create, you filter it out because it's not

8   Synopsys' creative copyrighted material.  You don't need merger

9   or scènes à faire for that.

10      SDC can't come into play because merger and scènes à faire

11  require the -- them to have limited Synopsys' choices and

12  Synopsys created SDC.  So, obviously, it didn't constrain

13  Synopsys' choice because it was its own creative process.

14      So neither of those are reasons to not remove the merger

15  and scènes à faires defenses in this case.

16          **THE COURT:**  All right.

17          **MR. GLICK:**  Can I indulge you for one last point?

18          **THE COURT:**  Only one.  Not too long.

19          **MR. GLICK:**  She said if there's a command.  That

20  harkens back to what we eliminated this morning.

21      If there is a command is the way counsel have been

22  litigating this case, but now it's about this combination and

23  the scènes à faire and merger doctrine are going to apply very

24  directly to that.

25          **THE COURT:**  Well, to the words.  Okay?  But not

```
 1  necessarily to what they are apparently arguing, but don't know
 2  what to call it.  You spent --
 3          MS. SCHWARTZ:  If I can --
 4          THE COURT:  Excuse me.
 5      You spent some time, Mr. Glick, trying to come up with a
 6  word to describe it other than syntax and, really, didn't come
 7  up with one either.  And they may have fallen back on command.
 8      That's why I said originally, I want to make sure that we
 9  just don't have a semantical dispute here where people think
10  they are disagreeing and they really aren't.
11      So if, Ms. Schwartz, you're using "command" to really
12  cover the whole thing you displayed up here earlier, we will
13  just pass by --
14          MS. SCHWARTZ:  But that's exactly how we're using it.
15  Command is the name and the syntax.  And that's how Dr. Storer
16  describes it and that's how the manuals describe it.
17          THE COURT:  All right.
18          MS. SCHWARTZ:  Just to be clear.
19          THE COURT:  Now, there is a concept of diminimus.
20  And whether this copying was so meager and fragmentary that
21  nobody would really even notice it was happening.
22      And I think we have a dispute, although I'm beginning to
23  wonder because we've got the whole question about how it's
24  raised.  If it's raised by Mr. Alexander and then whether or
25  not that particular -- sorry.  This seemed to get very loud
```

 1    here and lost your mic down there.

 2        Anyway, if -- if that doesn't come in, whether they have

 3    raised the amount of copying.  They say it's elsewhere in the

 4    record, not just to Mr. Alexander's declaration.

 5        I'll ask them about that once more and then we may move

 6    off of the diminimus.

 7            **MR. MICHAEL:**  Your Honor, I just would have one point

 8    on the diminimus, and that's in ATopTech's opposition at

 9    Page 21, Lines 4 to 8.  They cite one thing in support -- in

10    support of their diminimus defense.  They cite to -- I know,

11    it's an ECF number, but they refer to another -- their motion

12    for summary judgment, which ultimately referred back to the

13    Alexander declaration and Exhibits 1 and 2.

14        So if that exhibit is out, if that declaration is out,

15    which it should be, they have no evidence to support their

16    diminimus defense and summary adjudication on that defense

17    should be granted.

18            **THE COURT:**  Okay.  Let's go to Mr. Glick.

19        You had -- either you or Mr. Alexander had mentioned

20    earlier that there was something beyond Mr. Alexander's

21    declaration that would touch upon a number of the things that

22    he touched upon.  Do you want to say what that is?

23            **MR. GLICK:**  It's Dr. Kahng's expert report.

24            **THE COURT:**  We're back to that.  Sorry.

25            **MR. GLICK:**  Which Mr. Alexander's declaration

144

```
 1  authenticates.
 2              THE COURT:  Right, okay.
 3              MR. GLICK:  So that's --
 4              THE COURT:  So that was the one where you were kind
 5  of searching through their copy that was up there as a
 6  demonstrative, but you weren't able to find your hard copy, and
 7  I guess you still haven't found it?
 8              MR. GLICK:  That was Yucheng Wang's declaration.
 9              THE COURT:  Oh, that's Wang.  Oh, yes.  That's right.
10  Sorry.  Now we've got Kahng.  I think I have that somewhere,
11  but...
12              MR. GLICK:  You do have it.
13      But on the diminimus point, what I would say, your Honor,
14  is that we have put in evidence on that, but ultimately the
15  realtime to make that test is after abstraction and filtration
16  and it may be at that point that what's left is diminimus.  We
17  believe it will be.  They believe it won't be.
18      If once, your Honor -- if we've reached that point and
19  there is a lot, we're going to abandon this defense.
20              THE COURT:  Okay.  Let me ask you just collectively
21  here, as soon as they get through conferring -- which is fine,
22  if you want to --
23              MR. MICHAEL:  I'm sorry.
24              THE COURT:  Oh, okay.  The question in ruling on
25  these motions, okay, and dealing with the, quote/unquote,
```

```
 1  abstraction, filtration, et cetera, do you envision that the
 2  Court will actually try to do this?  Because I'm not sure that
 3  I'm in a position to do it at this stage given what the
 4  defendant is calling a moving target and the plaintiff says has
 5  been there all along, but I don't think I have it in front of
 6  me laid out in a way that I can make that determination.
 7          MR. MICHAEL:  Your Honor, the AFC test is only for
 8  purposes of infringement.  So it's not something that you need
 9  to deal with once -- you know, if their motion for
10  non-infringement is denied, it just doesn't need to be
11  addressed.
12          THE COURT:  And, Mr. Alexander, you disagree with
13  that?  Or do you want Mr. Glick to address it?
14          MR. ALEXANDER:  I think Mr. Glick can handle it.
15          THE COURT:  Because you jumped up.
16          MR. ALEXANDER:  Protectable is something the Court
17  has to determine.  It's not -- you just don't do this in the
18  abstract.
19          MR. GLICK:  It bears on their motion insofar as they
20  attempted to eliminate scènes à faire or merger or other
21  quasi-defenses or parts of the case that will be done in
22  abstraction and filtration.
23      We haven't had a chance to meet-and-confer on this, but
24  one thought that we have had is because you can't do it now --
25  and I don't think you can --
```

1            THE COURT:  I don't think I can.  That's why I'm

2    asking.

3            MR. GLICK:  I don't think you will be able to until

4    the evidence has been put on before the parties have rested

5    before jury instruction.  And it's at that point, I think in

6    many cases, that judges do it.  Or my experience and my

7    understanding and what was -- again, what happened, what Judge

8    Alsup did, for better or worse, in *Google versus Oracle* is put

9    the case to the jury and perform it after that.

10           But at some point -- and we should meet-and-confer and

11   make a suggestion to yourself, that that is something that will

12   need to take place.

13           THE COURT:  Okay.  I just want to make sure that for

14   whatever rulings I make on this motion, that you're not

15   expecting me to figure out all of the details of what's going

16   on here because I don't think it's in front of me.

17           MR. GLICK:  It's not.

18           THE COURT:  Okay.

19           MR. GLICK:  We agree.

20           THE COURT:  The other thing, just -- while I was

21   thinking about it -- oh, well.  I guess it doesn't matter.

22           I want to go to excuse of performance that goes to the

23   breach of the contract claim.  In other words, to get off for a

24   moment the infringement claim and go to breach of contract.

25           You've got a licensing agreement here and between Extreme

 1  DA and ATopTech.  And let me just get that in front me for a

 2  moment so if I want to look at it, I can.

 3      And you're arguing over what the parties meant by certain

 4  terms.  Although the name -- I'm assuming that this is an

 5  individual agreement and isn't a stock -- stock licensing

 6  agreement that Extreme DA used, but do we know one way or the

 7  other?

 8          **MR. ALEXANDER:**  We know that this was an agreement

 9  between Extreme DA and ATopTech.

10          **THE COURT:**  Right.  Was it tailored?

11          **MR. ALEXANDER:**  We know ATopTech steps into the shoes

12  of --

13          **THE COURT:**  No, no.  That isn't the question.

14      The question is:  Is this pretty much just a boiler

15  licensing agreement or is it tailored to the particular parties

16  that were involved in the agreement?

17      It looked like it was tailored, at least in part, because

18  it starts out with a blank for the date, but then actually

19  doesn't have a blank.  It has the name for the parties.  But I

20  wasn't sure and, of course, it does talk about this

21  interoperability idea.

22          **MR. ALEXANDER:**  The best I can tell you on that, your

23  Honor, is that I don't think Extreme DA had any other such

24  agreements.  I'm absolutely certain that ATopTech did not,

25  Extreme.  So this was not like, okay, we're going to do this a

148

1    million times.

2            **THE COURT:**   Okay.   All right.   Just checking because

3    depending on how this particular agreement may have been used,

4    it may have language that might have a different understanding

5    to people, depending on who is getting the license.   So I just

6    wanted to clarify that.

7        Okay.   So there is a provision that says you're not

8    supposed to make copies.   Okay.   And then there is Synopsys'

9    argument that -- I'm sorry.   There is a provision -- I'm sorry.

10       There's Synopsys' argument that there is a provision that

11   says you're not supposed to make copies.   And ATopTech is

12   arguing that the only way that they could actually engage in

13   the kind of behavior that was anticipated in the purpose of the

14   licensing agreement was to make these copies.

15           **MR. ALEXANDER:**   And -- and we provided evidence of

16   actual statements by parties in implementing the agreement;

17   that they were cooperating with one another to do that very

18   thing because the whole point of it was to make Extreme DA

19   GoldTime the STA program interoperable with Aprisa.   And the

20   way you make interoperable, as we've discussed a great deal

21   here today, among other things, but one way to make them

22   interoperable is to have them recognize the same command terms.

23       So that is exactly what they were agreeing to do and did

24   under the agreement and, therefore, you can't say that that's

25   wrongful.

```
 1            THE COURT:  Well, we're only talking about whether
 2   your excuse of performance is a dead duck here or whether they
 3   have got -- in other words, you're not -- you don't have a
 4   cross motion on it, so let's just see what Mr. Michael wants to
 5   say.
 6            MR. MICHAEL:  Yes.  Sure, your Honor.
 7        So, first, they really make two arguments in support to
 8   justify maintaining their excuse of performance.
 9        Their first is this Synopsys refused to support
10   interoperability, and that is at their opposition at Page 22,
11   Lines 15 to 20.
12            THE COURT:  Well --
13            MR. MICHAEL:  And what their evidence there is is
14   they are citing to antitrust laws.  So they have no evidence
15   for that theory whatsoever.
16            THE COURT:  I'm sorry.  You mean, they -- but it--
17   it's clear that Synopsys doesn't want them to use these terms.
18            MR. ALEXANDER:  Correct.
19            THE COURT:  I don't think that's really a disputed
20   fact.  That's the whole basis of the claim here, stop using
21   them.  So that's not really -- to me, that's not so much the
22   issue.
23        I don't think that --
24            MR. MICHAEL:  I want to make sure we're talking about
25   the same argument here, your Honor.
```

1           **THE COURT:**  Okay.  Go ahead.

2           **MR. MICHAEL:**  Their excuse for non-performance

3  argument.

4      Their excuse for non-performance is that Synopsys somehow

5  breached the agreement first.

6           **THE COURT:**  I think it's one -- one excuse.

7           **MR. MICHAEL:**  So Synopsys' position with respect to

8  what ATopTech can or cannot do under the contract after the

9  contract is terminated can't be a breach and somehow give rise

10  to some excuse for non-performance.

11      The reality is it is a license for use, not a license to

12  copy.  There is a big difference between the two of them and

13  that's why the contract has in the restrictions a provision

14  that says:

15           "You shall not copy in whole or in part the

16           licensed software or any material without prior

17           written consent."

18           **MR. ALEXANDER:**  For the purpose of  --

19           **THE COURT:**  Excuse me.  Excuse me.

20      It's one of the reasons I was asking how this license came

21  to be.  Because, for example, if a bunch of end users got it,

22  sure, they are not supposed to be making copies.  And that

23  might be that stock language was in there.

24      Since it is most likely a unique license, or pretty close

25  to it, and not kind of a standard license that goes out to

1   any -- you know, any group who might get their hands on,

2   legitimately in the first instance, the manual, I think that

3   helps your argument, but I don't know that it's the end of the

4   discussion.

5       I just want to get one thing clear.  I thought there were

6   two prongs here.  One of them, we're excused because Extreme DA

7   led us do this.  And, two, that somehow when you came into the

8   picture, you -- you breached the license, so then we can just

9   keep doing this.  That didn't seem to really work though.  So I

10  missed that point.

11          **MR. ALEXANDER:**  So we have an agreement with Extreme

12  DA that -- that allows us and encourages us and tells us to use

13  these terms.

14          **THE COURT:**  Right.  Yeah.  I got that.

15          **MR. ALEXANDER:**  Synopsys steps into the shoes.  Then

16  what Synopsys does is terminates, breaches that agreement.

17  Doesn't cooperate and takes the opposite position and tries to

18  put us out of business.

19      So if you have agreed with someone to facilitate

20  interoperability and then you begin to take steps, aggressive

21  steps to stop them from even having the terms, then it seems to

22  me you have breached your agreement and that's a part of what

23  we're talking about here.

24          **THE COURT:**  That's the part I don't quite get.  Okay.

25  Because if you have had a right to do it during the time of the

1   license, you know, while the license existed, if you -- you're

2   arguing that the whole intent of the people who were

3   participants in this license was that your client could do what

4   they're doing.  Okay?  And that's based on the purpose and the

5   reason that they were engaged in this and, apparently, their

6   understanding, unlike mine at the beginning of this hearing,

7   that you wanted to use -- the user to be able to use one

8   language and not have to use two.

9        Okay.  In any event, that may be or may not be.  At some

10  point I will need to construe this license.  Because as a

11  matter of law, it's the Court's obligation to construe a

12  contract.

13       At this point if there are facts in dispute as to what the

14  license means -- in other words, if you've got behind the

15  scenes commentary about who said what to whom before it was

16  entered into, how it was used as a practice, whatever, but then

17  there are disputes in some way or another as to those facts,

18  then those facts might have to be resolved.

19       If there really isn't any dispute as to the facts and just

20  what the language means without any other relevant facts

21  bearing on how one interprets it being in dispute, then I would

22  have to decide it now.

23       So I do want to clarify what the state of the record is in

24  that regard.

25       In other words, you could have, for example, an ambiguous

1   agreement.  A party could come in and say:  Yeah, it's

2   ambiguous to you, but if you were knowledgeable in the field

3   that we're dealing in, everybody knows what in that this means

4   X,Y and Z, even though in just everyday street talk it doesn't

5   mean that; or you could have a number of other reasons for

6   saying what somebody intended and -- okay.

7        Now, the point here is, let's say, you're operating under

8   this license, your client is.  They think they have a right to

9   do it and let's say someone says they do.  Then it is ended by

10  Synopsys and your client keeps on engaging in the same

11  behavior.

12       Is that the --

13            **MR. ALEXANDER:**  Your Honor --

14            **THE COURT:**  Just a minute.

15            **MR. ALEXANDER:**  I'm sorry.

16            **THE COURT:**  Is that the allegation here or does it

17  end with the license?

18            **MR. MICHAEL:**  It ends with the -- once the license is

19  terminated --

20            **THE COURT:**  No, no, no, no.  You missed my point.

21       Does your claim, I'm sorry, keep going beyond the end of

22  the license?

23            **MR. MICHAEL:**  Oh, absolutely, your Honor.

24            **THE COURT:**  Yes.  All right.  So now you're saying --

25  I'm assuming there is an argument here that even if you had a

1   license to do whatever you did with Extreme DA, at the time

2   that Synopsys came in, they -- now, if you want to say they

3   terminated, then the question is whether they had a right to

4   terminate or not under whatever this license is, because if --

5   if Extreme DA could not have done so, then you can't launder

6   this in some way by selling it to someone else.

7        So for purposes of Synopsys' position here -- or maybe I

8   should ask you, Mr. Alexander.

9        Is there something in this agreement, in the first

10  instance, that would preclude Synopsys -- well, let's just say,

11  if Synopsys hadn't bought Extreme DA, okay, would there have

12  been anything to preclude Extreme DA from terminating the

13  license at the time they did as set forth in the licensing

14  agreement itself?  That's question number one.

15            **MR. ALEXANDER:**  If the conditions for termination

16  existed, perhaps they could have.  I have not looked at that

17  precisely.

18       What I can tell you is Extreme DA did not want to

19  terminate the license.  They wanted to continue it and there

20  was no reason to believe that it would be terminated --

21            **THE COURT:**  Well, but their views become irrelevant

22  once they're out of the picture and then you're just dealing

23  with somebody's rights.  In fact, their views probably weren't

24  relevant at the beginning either, because it's whatever your

25  agreement is.

```
 1              MR. ALEXANDER:  But --

 2              MR. MICHAEL:  I'm not quite sure how Mr. Alexander --

 3              THE COURT:  Just a moment.  Just step over to the

 4    side there.  We can't keep going back and forth all day.

 5        Okay.

 6              MR. ALEXANDER:  The point is that Synopsys -- you

 7    said that -- you know, I'm going to say this briefly.  Synopsys

 8    does take the position of Extreme DA.

 9              THE COURT:  Right.  So just call it extreme DA for

10    this purpose.

11              MR. ALEXANDER:  So you cannot agree with a company

12    like ATopTech for two years to put these terms in and to use

13    them interchangeably and have them all put in your software so

14    that you can be inoperable and now all of a sudden say:  Oh,

15    I'm going to walk off and I'm going to terminate and now you

16    have to take them all out.  That's the point.

17        Once these terms are there and they're -- everybody's in

18    agreement, then you are -- you have facilitated that to happen

19    by agreement.

20              THE COURT:  Okay.

21              MR. ALEXANDER:  You may not be able to put any new

22    ones in --

23              THE COURT:  Okay.  Okay.  I got the idea.

24        Their position is Extreme DA, and we'll just -- we're just

25    going to use Extreme DA and say that's the same as Synopsys for
```

1    this purpose, okay?

2        Extreme DA, if they hadn't been bought up -- in any event,

3    Extreme DA said you could put them in and there is nothing in

4    there that says once they are in, you have to take them out

5    when they tell you to.

6            MR. ALEXANDER:  You agree with someone to put them in

7    and --

8            THE COURT:  No.  Well, I got it.

9            MR. ALEXANDER:  -- and then they rely upon that

10   agreement --

11           THE COURT:  No, no.  You've got two different points.

12       I mean, one is that we've got a contract interpretation.

13   Then you've overlaid some equitable concept, whatever you want

14   to label that equitable concept, that it's not fair, or if you

15   want to say that it's breaching the covenant of good faith and

16   fair dealing, that it wasn't spelled out as a direct term in

17   the agreement, but that it would be implied, but once you put

18   them in and spent the money to create this, if there was money

19   spent -- I don't know how much this cost -- and how hard it

20   would be to take it out.  But if the understanding would that

21   be that once it's in it's in and then if they decide to

22   terminate the agreement, you can't keep adding to it and

23   eventually you'll have an out-of-date, you know, manual.  But,

24   okay.

25       Now, just looking briefly.  I'm just looking at the

 1   Paragraph 7.  It says:

 2           "The initial term of this agreement begins on the

 3       effective date noted above and automatically

 4       terminates 12 months from such date, unless earlier

 5       terminated in accordance with this agreement.  Then

 6       subject to participants' payment of Extreme DA's then

 7       applicable support fees and all other terms and

 8       conditions for participation set forth in this

 9       agreement, this agreement may be renewed for

10       additional terms upon mutual written agreement of

11       Extreme DA and participant" -- that's ATopTech --

12       "prior to the applicable expiration date."

13       Now, the initial term is 12 months.  Is there anything

14   about re-upping for further terms?

15           MR. ALEXANDER:  There were some re-uppings, your

16   Honor.  I don't have them in front of me, but it was in effect

17   in 2012, when -- which is two years later, when Synopsys

18   acquired Extreme DA.

19           THE COURT:  Okay.  Well, the real question, I think,

20   here is whether there was an understanding, because we have the

21   following language in 7.3:

22           "Upon the termination of this agreement,

23       participant shall immediately cease all use of the

24       licensed software and shall either return or destroy

25       the licensed software and all Extreme DA confidential

 1          information the participant may have in its

 2          possession or control and shall furnish Extreme DA

 3          with a certificate signed by an executive or

 4          participant verifying the same has been done."

 5          It does say:

 6              **"Neither party will be liable to the other party

 7          for damages of any sort solely as a result of

 8          terminating this agreement in accordance with its

 9          terms."

10          I'm not sure that anybody actually relied on any of this

11   part, but in reading it it seems to me that they did

12   contemplate termination, irrespective of what somebody may have

13   invested, but it didn't necessarily say that you had to remove

14   the terms.  It just says:  Give us back all our stuff, which

15   you've already used and gotten whatever you wanted out of

16   anyway.

17              **MR. ALEXANDER:**  Well, not on -- everybody is talking

18   today about how everything is evolving continually, so on and

19   so forth.

20              **THE COURT:**  Right.  And that's why I say if you

21   continue to use the evolution of this manual, then there could

22   be a problem.  To the extent that you're only using what you

23   were originally given the authority to, then that might be

24   different.

25          There is nothing that says that anyone here is totally out

1  of line for terminating, and it would be hard to come up with

2  evidence in light of that very strong language in the agreement

3  that would be to the contrary.

4      But I understand your position and without, you know,

5  getting into this idea that Synopsys is just the equivalent of

6  a really bad person.

7      And let me turn to Mr. Michael and see --

8          **MR. ALEXANDER:**  One point I would add to that.

9          **THE COURT:**  Because they are trying to end your claim

10  here of, you know, excuse.

11          **MR. ALEXANDER:**  What Synopsys did, of course, in

12  addition to this termination, was not -- was not only that.

13  They removed the GoldTime from the market completely.

14      So they have taken active steps to make what we did in

15  using GoldTime less valuable or of no value.  But during the

16  time we had this right, we had the right to use these terms.

17  That was -- and that was incorporated into the software.  And

18  so those terms, we can use.  We can't use the new ones if the

19  agreement is terminated, but we can use those terms.

20          **THE COURT:**  Now, GoldTime was using the terms that

21  are in PrimeTime?

22          **MR. ALEXANDER:**  That's what they claim.  In fact, I'm

23  glad you said that.

24      GoldTime called these very terms --

25          **THE COURT:**  Pardon me?

1          **MR. ALEXANDER:**  GoldTime, Extreme DA, called these

2    very terms standard industry terms.  And it turns out now, they

3    claim, that many of these claims, many of these terms were the

4    same as the ones in PrimeTime.

5          So -- so we were -- we had GoldTime authorizing us to use

6    these terms.  Maybe of them laid out there are the same that

7    was in PrimeTime.  So I don't know how they justify now saying

8    we can't use these terms because we had a contractual right to

9    use these terms.

10         **THE COURT:**  Okay.  Well, they are trying to say that

11   Extreme DA was infringing also.  I don't know where that quite

12   comes into play.  Okay?  It may be that they haven't lost their

13   right just because a third party came in to the picture and did

14   what it did and then you're sued as against Extreme DA for

15   putting you in this difficult position, or what-have-you.

16         **MR. ALEXANDER:**  But there you get the problem that

17   Synopsys acquired Extreme DA and became Extreme DA.

18         **THE COURT:**  Right.  So then their suit is against

19   them.

20         **MR. ALEXANDER:**  Themselves.

21         **THE COURT:**  All right.  But it doesn't,

22   interestingly, necessarily mean they couldn't terminate the

23   agreement.

24         **MR. ALEXANDER:**  But that's not the entire issue --

25         **THE COURT:**  No, I understand.

1          **MR. ALEXANDER:**  -- because we had already

2   incorporated these terms.

3          **THE COURT:**  Yes.  So if they are, themselves, the

4   infringer of themselves -- but they weren't -- they weren't at

5   the time, so I'm not sure how that works out.

6          In other words, if they -- they weren't Extreme DA when

7   Extreme DA was arguably infringing, and now they are Extreme

8   DA.  I'm just saying that I don't know if they lose their right

9   or not.

10          I don't know that this has been fully briefed, to be

11   honest, that -- this quirky aspect.

12          If you didn't have them buying Extreme DA up and they came

13   into court and they said:  Okay.  You are infringing our

14   copyright.  You are using these terms.  You say:  Hey, we got

15   them from Extreme DA.  You know, that's like, you know, I

16   bought it-- I bought the stolen property from a fence.  It

17   doesn't really --

18          **MR. ALEXANDER:**  It's your problem.  That's right.

19          **THE COURT:**  So it still is their property.

20          **MR. ALEXANDER:**  But that isn't what happened.

21          **THE COURT:**  Well --

22          **MR. ALEXANDER:**  They did acquire Extreme DA.

23          **THE COURT:**  They did acquire them and I don't think

24   anybody has briefed what happens when that occurs.

25          **MR. ALEXANDER:**  You step into the obligations and

 1  liabilities of the company you acquire.  You step into their

 2  shoes.

 3          **THE COURT:**  Yes.  Okay.  But I'm not sure where that

 4  all pans out.

 5      All I'm saying is you may well have a triable issue here.

 6  I think the question is whether they have knocked it out.

 7      And I ought to hear from Mr. Michael briefly on that, and

 8  then that may be our last one, or close to it.

 9          **MR. MICHAEL:**  Good afternoon, your Honor.  Are you

10  ready for me?  I'll try to make this brief --

11          **THE COURT:**  Oh, no.  This isn't our last one.  This

12  is really just too much defenses.

13      Okay.  Go ahead.

14          **MR. MICHAEL:**  It is.

15      So, a number of points.  First of all, there is nothing in

16  the CPLA that gives ATopTech the right to copy.  The reason the

17  restrictions say that you cannot copy is because you don't need

18  to copy for the purposes of achieving interoperability.

19          **THE COURT:**  That's back to Ms. Schwartz's

20  demonstration.

21      But did they need to have Extreme DA to do

22  interoperability because your -- your position, as I understood

23  it, is, everybody is interoperating anyway.  There is no big

24  deal.  Everybody can read everybody's language at that earlier

25  point.

 1          **MR. MICHAEL:**  I don't know if they needed to have

 2     Extreme DA GoldTime for the purposes, but think certainly had a

 3     license to GoldTime.  But that doesn't mean they had a right to

 4     copy, which is why the restrictions expressly say:  You don't

 5     have a right to copy.

 6          And to make that point, your Honor, I think your point on

 7     the termination provision is really good.

 8          So we're clear.  Synopsys didn't terminate this agreement.

 9     It expired.  It has a 12-month provisions in it.  It was signed

10     in 2010.

11          If ATopTech had the right to copy, nobody would agree to a

12     12-month term to a license that gave somebody the right to copy

13     proprietary information into another product because you would

14     never be able to remove it.  It doesn't make sense.

15          So on the point of contract interpretation, I encourage

16     you to look through the contract and there is no place in the

17     contract that remotely suggests that ATopTech had a right to

18     copy.

19          **THE COURT:**  Maybe they are just talking about getting

20     the source code.  You know.  In other words, they are getting

21     GoldTime.  They are not getting just a bunch of the manual

22     terms that somebody is going to put in.

23          And it does say, you know, you can't try and reverse

24     engineer.  You can't take it apart and try and figure out

25     everything we're doing.  So it's possible that they aren't

 1  talking about this particular aspect, but something else.

 2      All I'm saying is that they may well have a triable issue,

 3  and then I would encourage you to just kind of look at the law

 4  at -- when -- when somebody who is arguing that somebody else

 5  is a thief becomes the thief.  Okay?  And where that -- that

 6  ends up, because I'm not sure where it does, but I'm going on.

 7  I really -- I'm moving on.  Enough about this.  We have two

 8  more.

 9      And this is really crazy because we have been doing this

10  all day.

11          **MR. MICHAEL:**  We have, your Honor.

12          **THE COURT:**  All right.  And I think much of what the

13  reason is that we're going through all this now is because I

14  really didn't understand, as I pointed out earlier, until the

15  first part of our hearing what was going on here.  And much

16  better idea now.

17      All right.  But let's do estoppel.  Okay?  Now, I think

18  this is going to depend on the evidence that you cited

19  respectively on the matter because whether -- you've got

20  detrimental reliance, what was known here to Synopsys at the

21  time that ATopTech committed resources in time to using all

22  this, if they did.  Synopsys says you didn't know about the

23  infringing conduct.

24      Are we back now to the -- this conference and who made

25  what presentation?

 1            **MR. ALEXANDER:**  Your Honor, I can shorten this by

 2  doing this.

 3            **THE COURT:**  Okay.

 4            **MR. ALEXANDER:**  That estoppel defense, as you may

 5  recall from our prior hearing --

 6            **THE COURT:**  Oh, wait a minute.  You got to amend.

 7            **MR. ALEXANDER:**  We got to amend.

 8            **THE COURT:**  That's gone.

 9            **MR. ALEXANDER:**  Okay.

10            **THE COURT:**  Okay.  Laches, I think -- is laches in or

11  out on that same --

12            **MR. MICHAEL:**  Your Honor --

13            **MR. ALEXANDER:**  We stated that and so you should

14  look, at least, at what we have said there.

15            **THE COURT:**  On laches.  But forget estoppel.

16            **MR. MICHAEL:**  No, no.  Estoppel is still at issue

17  here, your Honor.

18            **THE COURT:**  Why?

19            **MR. MICHAEL:**  The only thing they added to their

20  affirmative defense is that they claim estoppel based on the

21  CPLA in 2010.

22            **THE COURT:**  No.  Wait, wait.  I just want to -- I

23  granted summary judgment on certain defenses earlier and gave

24  the -- not summary judgment.  I granted the --

25            **MR. ALEXANDER:**  Dismissed.

1    **THE COURT:**  I dismissed, and then I said that you

2    could amend if you wanted.

3    **MR. ALEXANDER:**  And we did amend and so what we have

4    now stated are additional facts in our new estoppel defense

5    that has been repleaded.  It is before --

6    **THE COURT:**  So why am I -- that's what I thought.

7    But then I thought you said we don't have to do it.

8    **MR. ALEXANDER:**  We don't because we don't -- we don't

9    -- well, what I'm asking you to do is to take into account when

10   you decide this --

11   **THE COURT:**  Oh, oh.  You mean, their motion is going

12   to your old pleading?

13   **MR. ALEXANDER:**  Yes.  And now you need to consider

14   our new pleading.

15   **THE COURT:**  Oh.  Oh, no.  Okay.

16   **MR. MICHAEL:**  So, your Honor -- on timing, actually

17   what happened, your Honor, is you'll recall they had an

18   estoppel theory that was based on what I think you called

19   "I want to play with your toy, too" and you dismissed that.

20   And you suggested to ATopTech that they might want to add to

21   their estoppel defense this contract with Extreme DA.

22   That afternoon ATopTech filed their opposition to the

23   motion for summary judgment in which they added that very

24   theory into their opposition so it is right for this Court to

25   adjudicate.

```
 1          THE COURT:  All right.  Is it going to depend on any
 2    showing other than what we have been talking about with this
 3    excuse defense that was raised in connection with the breach of
 4    contract?
 5          MR. MICHAEL:  Yes, it does.  And the reason is is
 6    because estoppel requires reliance.
 7          THE COURT:  Yes.  Well, I mentioned that upfront, but
 8    haven't they -- oh, you're going to say they didn't rely
 9    because they knew upfront you could cancel out the contract
10    after a year?
11          MR. MICHAEL:  No.  Absent -- absent science fiction,
12    they couldn't rely in 2007, when they were copying, on a 2010
13    contract.
14          As a matter of law and a matter of physics, it's
15    impossible for them to have relied on a contract that was three
16    years in the future.
17          MR. ALEXANDER:  But we are being sued on terms that
18    were added after that, and they include those in their claims.
19          So there are -- there's time progression, but we are being
20    sued on more than that and we are entitled to that estoppel
21    defense, and we have raised it minimum an issue of fact on
22    this, your Honor, and so we should be allowed to proceed with
23    this.
24          THE COURT:  All right.  I'm going to go past that and
25    go up to laches.
```

```
 1        Thank you for reminding me, though, about the change in
 2   the pleading, except that the issue has been addressed in the
 3   context of the -- I think what's been added to the pleading.
 4        Well, we're back on this whole reliance idea again.  And
 5   you really would need an extraordinary circumstance to get past
 6   the current case law on this.
 7             MR. ALEXANDER:  I think, your Honor --
 8             THE COURT:  Do you have any evidence of what could be
 9   considered extraordinary under Petrella?
10             MR. ALEXANDER:  Your Honor, in addition to the
11   amendments that we made, we also amended the laches defense.  I
12   think we narrowed it, rather than broadened it.
13        The evidence, I think if we can agree on one thing, you
14   have heard every possible factual argument we could make.  And
15   so --
16             THE COURT:  Okay.  That's fine.
17             MR. ALEXANDER:  So we don't need to repeat ourselves.
18             THE COURT:  Okay.  Now, what are we going to do?  All
19   right.  Those were all the issues.  Those were all the
20   defenses.  That's the, you know, discussion of the plaintiff's
21   claim in this matter.
22        To the extent that we've discussed how any particular
23   exhibit might bear on any of the issues here, I do want to go
24   back and look at them and a couple of cases in light of that,
25   after I've narrowed down my review of the evidence.
```

1    I have to tell you that in the majority, if not all of

2    these instances, from both of your standpoints, I mean, it

3    seems like there are some triable issues with one side or the

4    other having a better position, but not necessarily the other

5    side having none.  But I don't want to be too simplistic about

6    that, and if the case can be narrowed in any way, well, great.

7    If it's -- somebody doesn't have to spend a lot of time on

8    an affirmative defense that really didn't going anywhere, fine.

9    If somebody doesn't have to address some portion of the claim

10   that's being raised here, that's fine, too.

11   We have narrowed, at least upfront -- although Mr.

12   Alexander is still skeptical of it -- the material upon which

13   the plaintiff is relying for the breach of copyright claim.

14   And I think you're just going to have to be satisfied with

15   whatever the record is on that at this point.

16   I'm trying to remember at one time -- this is the only

17   thing I can't remember, going back to this morning, whether we

18   went into it.  At one point I was concerned that in connection

19   with whether there was some material that was -- well, whether

20   the earlier material that is claimed to have been brought up

21   into the registration, okay, the earlier versions, whether if I

22   found in favor of the defendant -- without saying I'm going to

23   do that.  I'm not at all convinced I am at the moment.

24   But if I were to find that there was a failure, for

25   example, to adequately describe that earlier material, what is

1  it?  Where is it?  Do I need to have it or know about it in

2  order to exclude it or can one simply say whatever is out there

3  that was there before is gone and everybody would know what I

4  meant.

5      Because it's not identified in the record, to my

6  knowledge, as distinct from whatever the new stuff is.

7          **MR. ALEXANDER:**  We've tried to do that and we will --

8  if your Honor rules, we will -- we will either reach an

9  agreement on what it is or bring that issue for you to decide.

10          **THE COURT:**  Okay.  Now, I'm not --

11          **MR. ALEXANDER:**  But it does -- sorry.

12          **THE COURT:**  I was just going to say, I'm not

13  convinced that I do need it at the moment or even that I'm

14  going to make such a finding.

15      Let's see.  The language that was used in the registration

16  here is prior works.  That's a little different than Judge

17  Alsup's prior versions --

18          **MR. MICHAEL:**  Oh, no.  Judge Alsup's was prior works.

19  It's identical.

20          **THE COURT:**  Oh, it was prior works?  Oh, I thought

21  you said it was prior versions.  Prior works?

22          **MR. MICHAEL:**  Yes, it's prior works.  Exactly the

23  same.

24          **THE COURT:**  Okay.  Well, he certainly is a colleague

25  I respect.  And even perhaps more to the point, you say that

1   you have an exhibit that addresses this matter from the

2   standpoint of the -- you know, the regulation or the

3   instructions that go along with it.

4        I hadn't quite picked up on that when I looked at it

5   before, and so I want to look at that.

6            MR. ALEXANDER:  But, your Honor, the case before

7   Judge Alsup was very different.

8            THE COURT:  Yes.  That's why I'm going to look at

9   that.

10           MR. ALEXANDER:  We're talking about hundreds of

11  whatever it is that don't -- you know, this is a very different

12  case.

13           THE COURT:  Well, it may be a different case, but I

14  don't know that the issue is different --

15           MR. ALEXANDER:  It is different in the way that the

16  judge would see it, because if we're talking just about this

17  code --

18           THE COURT:  Well, he said it would take up too much

19  time to put all those things into a little form.  I don't know

20  if that can be actually the dividing line here between that

21  case and this case.

22       I mean, if it's good enough for a lot of stuff, you can

23  argue it, certainly, is good enough for a little.  It's a lot

24  less to go try and find.

25       So I've just -- you know, let's let that alone, as long as

1  I don't have to make any specific finding, if I found in your

2  favor, which I'm not saying I'm going to do at the moment.

3       Now --

4            **MR. ALEXANDER:**  I have one issue --

5            **THE COURT:**  You may and you may not because we have

6  come to almost now 4:00 o'clock.  Keep in mind we started the

7  hearing a little after 10:00, and we did have a break for

8  lunch, and there was that, oh, maybe half hour in there where I

9  was tied up with the case management conference and a recess

10  afterwards.  But this is pretty much the last thing I want to

11  hear at this point, so it's got to be good.

12           **MR. ALEXANDER:**  I don't know if it's good or not, but

13  it's a personal matter that my spouse has reminded me of.

14      We have had a five-day trial scheduled for over a year --

15  that's not a problem -- starting on February 22.  I am reminded

16  that I have on March 4th a family trip that we have paid for,

17  and so I wanted to make the Court aware of that.

18           **THE COURT:**  Let's look at that right now.  The trial

19  is scheduled to start February 22 for 5 days.  There is nobody

20  near your case that's, you know, coming down the road to push

21  you off of the February 22.

22      I have to say that at this point we are not in a position

23  to go back earlier in time to your earlier date.  But true to

24  form, the criminal case didn't settle, as I said it wouldn't.

25  They ran into a problem because of the Super Bowl and all of

```
 1   their witnesses needing to be -- after Paris, all their
 2   witnesses have to be on high security alert doing all kinds of
 3   things in connection with protecting people for the Super Bowl.
 4   They can't be here to testify in some drug case.
 5       So they came in and about a week or so ago and told me.  I
 6   said:  You know, I put a whole case over because of you.  But,
 7   you know, that -- as I say, I did not expect them to settle and
 8   they didn't.
 9           MR. ALEXANDER:  But all I wanted to do is make your
10   Honor aware of my issues --
11           THE COURT:  Hold on.  Yeah.  Okay.
12       This case is supposed to take five days.  So if you count
13   it up, assuming that you were going to start on time,
14   February 22, and you are leaving -- you are running into a
15   problem.  I just want to tell you that.  And I don't intend to
16   break up your happy home life.
17       So you have had a trip planned and it's supposed -- you're
18   supposed to leave when?
19           MR. ALEXANDER:  March 4.  We should be fine with a
20   five-day trial.
21           THE COURT:  All right.  March 4 is a Wednesday --
22           MR. ALEXANDER:  I'm sorry --
23           THE COURT:  No wrong day.  I'm sorry.  No, I'm in the
24   wrong year.  It's a Friday.  So let's go back.
25       February 22.  One, two, three...  As I told you before, a
```

1    five-day trial is not necessarily going to be five days in one

2    week because we are doing things like this.  Hopefully, not

3    every Friday, by the way.

4        So one, two, three, four, and the fifth day would be the

5    29th.  If you're only five days and if nothing else -- now how

6    long is your trip for, by the way?

7            **MR. ALEXANDER:**  One week.

8            **THE COURT:**  All right.  I think all we could do is

9    hope we will be through by March 4th, which we should be, if

10   you keep to a schedule, if I give you time limits, and all.  So

11   you can be thinking about time limits.

12       This is assuming -- you know, you're trying to end the

13   trial here.  Okay?  Assuming we have one and that we do go

14   forward in some fashion on these claims, the -- I'm just

15   thinking, there are a couple of things here to speed up the

16   process of your trial.

17       One, it's important that you and plaintiff's counsel try

18   to agree on what's a reasonable time limit for each side in

19   terms of hours, figuring that your trial day is going to be

20   about -- it's going to be somewhere between four and five

21   hours.  In other words, probably five hours, because I would

22   plan to go 9:00 to 12:00 and 1:00 to 4:00.  Okay, so you're

23   starting with six hours.  Take out a couple 15-minute breaks,

24   you're down to five and a half.  Then start adding where

25   something comes up that's going to be discussed that isn't on

1   the clock.  You may get down to five.  So just -- you know, so

2   that you know.  And any number of other things.

3        But, let's say, you're going to get five hours out of the

4   day.  So you can figure out how that works in terms of time.

5        When you do it, consider the following:  Put in your

6   opening statements, your direct and any cross of your -- of the

7   other side's witnesses.  Probably don't build in closing

8   argument, but be thinking about what kind of separate limit you

9   would put on that.

10       The reason I say it is because you can tell what you're

11  going to do for opening, but after the case is in, you may not

12  have as good an idea until you've heard the case how much time

13  you might think you need for closing.  So if you want to wrap

14  closing into it, you can, but you can also break it off.  Just

15  remember when you want to get through with all this.

16       Okay.  The other thing is I'll probably start with counsel

17  at 8:30 and the jury at 9:00.  Because we have a lot of, at the

18  moment, affirmative defenses, which could extend the -- let's

19  see.  Some of them were equitable.  And we go to the Court and

20  could be, I guess, decided at any point, having the evidence

21  come in at the time of the jury trial.  But I don't think they

22  are all equitable.  And I didn't count up how many might not

23  be.

24       Excuse would not be, would it?

25            MR. MICHAEL:  Excuse would not be.

1          **MR. ALEXANDER:**  Excuse and estoppel are not.

2          **THE COURT:**  No.  Estoppel could be.

3          **MR. ALEXANDER:**  I think it's --

4          **THE COURT:**  You think that's legal.

5          **MR. ALEXANDER:**  It's equitable.

6          **THE COURT:**  All right.  Well, look up -- you know,

7   take a look at how many of these things could be going to the

8   jury.

9          Keep in mind when you're talking about instructions, how

10  the Court is going as to instruct on some of these affirmative

11  defenses, as well as the claims, so that we don't have too

12  prolonged an instruction conference, which, likewise, could add

13  time to your trial.  Okay.

14         I think we'll be okay.  The worst thing that would, I

15  guess, happen -- because I'm going to tell you that I'm not

16  trying to stop your trip -- would be whether we could then

17  break to let you go and if -- what we would do at that point.

18         **MR. ALEXANDER:**  Your Honor, I've missed trips before.

19  I understand what happens.

20         **THE COURT:**  I don't want you to miss it --

21         **MR. ALEXANDER:**  This is the job I signed up for.  So,

22  I just wanted to let the Court know of this --

23         **THE COURT:**  Okay.

24         **MR. ALEXANDER:**  -- rather than wait.  You know, this

25  is something we, hopefully, will work out.  Five days, we

1 should do it, fine.  I just didn't want to stand here and not

2 mention that this was an issue.

3     **THE COURT:**  All right.  Well, tell your wife that you

4 brought it up; that the Court is aware is aware that it's

5 really important that we get through the trial on time; that

6 she has assured you that, at least as we sit here right now --

7 and there is only a little time left between now and your

8 trial -- that there are no cases that would impinge upon your

9 case starting on time and finishing on time.  All right?  And

10 anything else that you can glean from this hearing to show that

11 you really care about her and going on the trip.  Okay?

12     **MR. ALEXANDER:**  This will contribute greatly to

13 matrimonial harmony, your Honor.

14     **THE COURT:**  So that's the easy part.  The hard part

15 is what I'm going to do on deciding all these matters, which I

16 will do.  And I have, you know, a much better idea of the case

17 after this.  I mean, not all of it was helpful, but a good deal

18 of it was.  So I appreciate that.

19     I'm going to take the motion from both sides under

20 submission.

21     I do have to tell you that there is going to be some

22 slow-down during the next couple of weeks.  I had plans to be

23 in various places other than here and, I don't know about you

24 folks, but may take a little longer.  You should plan -- as

25 you're preparing for the trial, plan on things going forward.

```
 1  Okay?  And that's the likelihood of what's going to happened,

 2  just so that you know.?

 3            MR. ALEXANDER:  Understood.

 4            THE COURT:  Okay.  Okay.  Now, anything else before

 5  we call it a day?

 6            MR. MICHAEL:  I don't think so, your Honor.

 7      We're working through meet-and-confer efforts on pretrial

 8  exchanges and trying to line our ducks up, and I think we will

 9  keep working towards that and be ready on the 22nd.

10            THE COURT:  Okay.

11            MR. ALEXANDER:  Nothing from me, your Honor.

12            THE COURT:  By the way, is there any, any possibility

13  of resolving the case without the trial?

14            MR. MICHAEL:  We had a mediation with Judge Cahill.

15  We were unable to resolve the matter.  We remain in

16  communication with him.  But at this point we expect that we'll

17  be going to trial on February 22.

18            THE COURT:  He is an excellent neutral.  You don't

19  want to buy them, do you?  Buy.  Buy.  Buy.  Buying up all the

20  over the place.  You sure you don't want to buy them?

21      Well, just think about it.  Okay?

22            MR. ALEXANDER:  Thank you, your Honor.

23            THE COURT:  All right.  Anything else?  No?  Okay.

24  Thank you very much.  Have a nice weekend, nice holiday.

25            MR. MICHAEL:  Happy holiday, your Honor.  We are in
```

1   recess.

2            **MR. ALEXANDER:**  Thank you, your Honor.

3            **MR. MICHAEL:**  Thank you for your time today.

4        (Proceedings adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, December 19, 2015